# IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
# STATE OF MISSOURI

| | |
|---|---|
| DARREN JOHNSON, on behalf of himself and all others similarly situated, | File No. |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| GILEAD SCIENCES, INC., a foreign corporation, | |
| <u>Registered Agent</u>: CT Corporation System 120 South Central Avenue Clayton, Missouri 63105 | |
| Defendant. | |

## CLASS ACTION PETITION

Plaintiff Darren Johnson ("Plaintiff" or "Johnson"), on behalf of himself and all others similarly situated, by and through his undersigned attorneys, alleges the following against Defendant Gilead Sciences, Inc. ("Gilead"), based on information and belief.

## NATURE OF THE ACTION

1. This case arises out of Defendant Gilead's unlawful and unjust conduct in connection with the sale and marketing of prescription drugs containing tenofovir disoproxil fumarate ("TDF") for the treatment of HIV. Gilead's actions caused Plaintiff and others to purchase TDF in Missouri at artificially high prices, and Gilead was unjustly enriched at the expense of Missouri patients. In this action, Plaintiff seek to hold Gilead responsible and to recover on behalf of himself and all others similarly situated.

## PARTIES

2. Plaintiff Darren Johnson is a natural person who resides in the City of St. Louis, Missouri, and has resided in the City of St. Louis, Missouri, at all times relevant here.

3. Defendant Gilead Sciences, Inc. is, on information and belief, a foreign corporation with its principal place of business in Foster City, California. It describes itself as a biopharmaceutical company.

## JURISDICTION AND VENUE

4. Jurisdiction is proper in this Court pursuant to R.S.Mo. 506.500 because Gilead transacts business—including, specifically, the promotion and sale of TDF in Missouri, and Plaintiff purchased the TDF that caused his injuries in Missouri.

5. Venue is proper in this Court pursuant to R.S.Mo. 407.025 because Plaintiff purchased the TDF that caused his injury in the City of St. Louis, Missouri. Venue is also proper in this Court pursuant to R.S.Mo. 508.010 because Gilead is a nonresident of Missouri, and Plaintiff purchased TDF and was first injured by Gilead's actions in the City of St. Louis, Missouri.

## FACTUAL BACKGROUND

*Scientists Discovery Tenofovir*

6. In the 1980s, scientists in Czechoslovakia first synthesized and developed tenofovir, and learned that it could be an effective treatment against the human immunodeficiency virus ("HIV"), the virus that causes acquired immunodeficiency syndrome ("AIDS").

7. While studies showed that tenofovir was effective when taken intravenously, it had low "bioavailability" when taken orally; meaning that, when taken by mouth, a very low proportion of the drug actually reaches the circulatory system, inhibiting its efficacy in arresting the replication of HIV in patients.

8. But intravenous drugs do not sell as well as oral medications do, so Defendant Gilead set out to develop an oral tenofovir "prodrug."

9. A "prodrug" is a compound that, when metabolized in the body, is converted into the active version of the drug. Gilead developed two tenofovir prodrugs relevant here that could be taken orally: (1) tenofovir disoproxil fumarate ("TDF"); and (2) tenofovir alafenamide ("TAF").

***Gilead Develops Both TDF and TAF in the 1990s***

10. Gilead developed both TDF and TAF in the late 1990s. Gilead patented TDF in the 1990s and filed for patent protection for TAF no later than July 2000.

11. The next year, in 2001, Gilead filed a New Drug Application ("NDA") with the FDA to approve TDF for marketing under the brand name Viread. The FDA approved Viread [TDF] at a 300 mg dose for the treatment of HIV in adults.

***Gilead Discontinues TAF—An Objectively***
***Superior Product to TDF—Under False Pretenses***

12. Gilead did not file an NDA for TAF in 2001 even though Gilead knew that TAF (referred to as GS 7340 at the time) promised to be more effective and safer than TDF. As Gilead reported to its stockholders in its 10-K for the year ending December 31, 2001:

> Both GS 7340 [TAF] and Viread [TDF] are processed in the body to ***yield the same active chemical, tenofovir***, within cells. However, the chemical composition of GS 7340 may allow it to cross cell membranes more easily than Viread, so that with GS 7340, tenofovir may be present at much higher levels within cells. As a result, ***GS 7340 may have greater potency than Viread and may inhibit low-level HIV replication in cells that are otherwise difficult to reach with reverse transcriptase inhibitors.***

(emphasis added).

13. Gilead conducted several studies of TAF in the early 2000s, and frequently lauded TAF's promise and the results from those studies.

3

14. As late as January 29, 2004, Gilead was still reporting publicly that Gilead was "continuing the clinical development of GS 7340, a novel amidate prodrug of tenofovir, based on favorable Phase I/II results."

15. But later that year, Gilead applied for, and the FDA approved in August 2004, the marketing of TDF in a new form—a "fixed-dose combination" drug that combined both TDF and emtricitabine (another HIV antiviral drug) in a single pill, marketed as "Truvada."

16. Shortly thereafter, in an October 21, 2004 press release, Gilead announced that it was discontinuing the development of TAF. In explaining its rationale, Gilead represented that TAF was not sufficiently distinct from TDF in terms of "safety, tolerability, and efficacy":

> Based on the safety, tolerability and efficacy of Gilead's HIV products established in clinical studies and commercial use, Gilead does not believe that GS 7340 has a profile that differentiates it to an extent that supports its continued development.

17. While not known to individuals outside of Gilead at the time, this representation was false. As Gilead would later admit, the studies from the early 2000s indicated that TAF was a game changer. For example:

    a. In a November 14, 2011, press release, Gilead explained that "GS 7340, Gilead's investigational anti-HIV agent, is a novel prodrug of tenofovir, the active agent in the company's HIV drug Viread(R) (tenofovir disoproxil fumarate). Phase 2a dose-ranging studies have identified a dose that is ten times lower than Viread and provides greater antiviral efficacy"; and

    b. In a January 24, 2012, press release, Gilead called TAF "the next generation of best-in-class therapies for HIV," because in "previous studies" (those from the early 2000s) "[TAF] has demonstrated the ability to provide

Electronically Filed - City of St. Louis - August 27, 2020 - 07:52 PM

greater antiviral efficacy at a dose that is ten times lower than Viread [TDF]."

18. "Dosing" of course, was important. Gilead knew from its experience with similar drugs that if you can decrease the dose of the drug, you decrease the risk of serious side effects. For example, as Gilead reported in its 10-K for the year ending December 31, 1999:

> On November 1, 1999, an FDA Advisory Committee recommended against approval of our application to approve a 60 mg dose of adefovir dipivoxil to treat AIDS. Kidney toxicity associated with this 60 mg dose, as well as a desire for additional data, were the major concerns of this committee. Following this recommendation, we were informed by the FDA that they would not approve our application unless we obtained additional data that satisfied the concerns raised by this committee. Based on these discussions, we terminated our development of adefovir dipivoxil for the treatment of AIDS. We are using 10 and 30 milligram doses of adefovir dipivoxil in our Phase III clinical trials of adefovir dipivoxil for hepatitis B. *We believe that these lower doses will not result in the kidney toxicity experienced with 60 milligrams* and that adefovir dipivoxil can be effective in treating hepatitis B at this lower dose. We cannot be certain, however, that these lower doses will be both safe enough and have sufficient treatment benefits to receive FDA approval. *Tenofovir DF is in the same class of drugs as adefovir dipivoxil. And, while we have not yet experienced kidney toxicity in our clinical trials of tenofovir DF, the kidney toxicity in our clinical trials of adefovir dipivoxil for AIDS did not arise until the later stages of our clinical trials. We cannot be certain that similar toxicity issues will not arise later in our clinical trials of tenofovir DF. A number of companies in our industry have suffered similar setbacks in advanced clinical trials despite promising results in earlier trials.*

(emphasis added). Gilead reported similar information in its 10-K for the year ending December 31, 2000.

19. Thus Gilead knew no later than 2004 that TAF, which delivered the same active chemical—tenofovir—as TDF, would be objectively superior to TDF because it would be more effective ("greater potency than Viread," "greater antiviral efficacy") and safer ("a dose that is ten times lower than Viread").

5

20. But Gilead nevertheless discontinued TAF and misrepresented why it was doing so.

***Gilead's Pursuit of Profit at the Expense of
Patient Health Was Gilead's True Reason for
Discontinuing TAF***

21. In 2004, Gilead was in a more precarious financial situation than it is now: while Gilead had significant net income (approximately $449 million in 2004 versus approximately $18 billion in 2015), it was not well-diversified, and was therefore vulnerable.

22. Gilead knew, and warned its shareholders, that maintaining the sales of its TDF drugs was essential to its competitiveness and, ultimately, survival. As Gilead explained in its 10-K for the period ending December 31, 2004, three products constituted nearly all of its revenues, and growing revenues from HIV products was critical:

> ***We are currently dependent on sales of our HIV products, especially Viread***, and AmBisome, to support our existing operations. Although ***Viread comprised 86% of HIV product sales in 2004,*** it is important to consider Viread, Emtriva and Truvada collectively as future sales of these three products are intimately tied to one another. Together ***sales of HIV products and AmBisome accounted for approximately 90% of our total product revenues*** for the year ended December 31, 2004. ***If we are unable to continue growing our HIV product revenues or maintain AmBisome sales, our results of operations are likely to suffer and we may need to scale back our operations.***

(emphasis added). This included the need to convince doctors to switch their patients to Gilead's products:

> A large part of the market for our HIV products are patients who are already taking other HIV drugs. ***If we are not successful in encouraging physicians to change patients' prescriptions to our HIV products, the sales of our HIV products will be limited.***

(emphasis added). Gilead was also committed to stave off competition that could drive the price of drugs down, such as generics:

6

> *As generic HIV products are introduced into the major markets, our ability to maintain pricing may be affected.*

(emphasis added).

23. Accordingly, Gilead shelved TAF, which—as a safer and more effective version of tenofovir—would cannibalize the sales of Viread, Truvada, and other TDF-based drugs.

24. With TAF shelved, Gilead continued to release successive iterations of TDF-based drugs, including Atripla (received FDA approval in July 2006), Complera (received FDA approval in 2011), and Stribild (received FDA approval in 2012).

25. As Gilead's TDF-based products were disseminated in the market, Gilead's own predictions came true: there was an unreasonably high number of adverse events reported from use of the TDF-based drugs, including severe bone and kidney injuries.

26. Nevertheless, Gilead continued to withhold the safer TAF from the market so that it could continue to generate billions of dollars in profits from its TDF-based products. For example, in the year ended 2012, Gilead reported revenue of over $8 billion from the sale of TDF-based products in that year alone, which constituted approximately 85% of the company's total product sales that year. Gilead also reported that the margin on its products for the years 2010-2012 was relatively steady at 74-75%.

*Gilead Recommences Development of TAF to Launch a "New Generation" of Tenofovir Drugs as the TDF Patents Begin to Sunset*

27. The patent on Viread—the first of the TDF drugs Gilead launched—was set to expire in 2017. And, to maintain its profits, Gilead believed it had to convince doctors and patients to switch over to TAF-based products before TDF generics hit the market. As that date was approaching, Gilead picked back up the development of TAF, and launched a Phase 2 clinical trial in late 2012.

7

28. In a January 24, 2012, press release announcing plans to commence the clinical trial later that year, Gilead confirmed that "[i]n previous studies, GS-7340 [TAF] has demonstrated the ability to provide greater antiviral efficacy at a dose that is ten times lower than Viread."

29. The January 2012 press release explained that the TAF Phase 2 study will be "an important milestone in Gilead's efforts to develop the next generation of best-in-class therapies for HIV," and that "[b]ecause it can be used once-daily at one-tenth the dose of Viread, which is a much lower dose compared to other currently available anti-HIV compounds, GS-7340 [TAF] could enable the development of a new range of single-tablet regimens for HIV that optimize clinical efficacy, safety and tolerability for patients."

30. These characterizations, of course, were in stark contrast to what Gilead represented in 2004 (*see e.g. supra,* ¶ 16). Gilead identified nothing in the science that had changed in the intervening years that would cause such an about face; there was nothing: Gilead had shut down the development of TAF. What had changed was that Gilead had made a fortune on its TDF "franchise" in the intervening years, and was preparing to make billions more on a "new generation" of patent-protected drugs using TAF instead of TDF, as TDF's patents were sunsetting.

*The FDA Approves TAF, and Gilead Begins Marketing Them as Significant Improvements Over TDF*

31. Gilead received FDA approvals for the following TAF-approved drugs as follows.

   a. In November 2015, the FDA approved Genvoya, which is, essentially, a TAF-based analog to Stribild, only it contained 10 mg of TAF instead of 300 mg of TDF.

   b. In March 2016, the FDA approved Odefsey, the TAF-based analog to Complera; formulated with 25 mg of TAF instead of 300 mg of TDF.

  c. In April 2016, the FDA approved Descovy, the TAF-based analog to Truvada; formulated with 25 mg of TAF instead of 300 mg of TDF.

  d. And in November 2016, the FDA approved Vemlidy, the TAF-based analog to Viread; formulated with 25 mg of TAF instead of 300 mg of TDF.

32. The order in which Gilead worked with the FDA to obtain approval of these TAF-based formulations reflected, in inverse order, the relative sales strength of the TDF-based formulations. The following chart reflects the sales data Gilead reported for the TDF versions of these drugs in Gilead's 10-K for the period ending December 31, 2014:

| Product | 2014 | 2013 | 2012 |
|---|---|---|---|
| Atripla | $3.470 billion | $3.648 billion | $3.574 billion |
| Truvada | $3.340 billion | $3.136 billion | $3.181 billion |
| Complera | $1.228 billion | $810 million | $342 million |
| Stribild | $1.197 billion | $539 million | $58 million |
| Viread | $1.058 billion | $959 million | $849 million |

33. As noted above, Viread's only active ingredient is 300 mg of TDF, which is the base of the other formulations. Had Gilead sought approval of Vemlidy (the TAF-based analog of Viread) before the other TAF-based formulations, patients and doctors could have created their own TAF-based combination therapies without the need for Genvoya, Odefsey, and/or Descovy. To avoid that result, Gilead secured approval for Vemlidy last, and never sought to have it formally approved for the treatment of HIV (Vemlidy is FDA-approved for treatment of only hepatitis B).

34. Similarly, Gilead appears to have never sought approval for a TAF-based version of Atripla, which was the best-selling TDF-based medication according to the above charts.

35. Once the FDA approved the TAF-based regimens, Gilead marketed the products as significant improvements over TDF.

*The Sale of TAF-Based Drugs Causes the Sale of*
*TDF-Based Drugs to Decline Significantly*

36.  As Gilead began marketing the TAF-based drugs, sales of the TAF-based products began to eclipse the sale of their TDF-based analogs, and continued to build as patients learned of and switched over to the TAF-based drugs.

37.  Below are tables summarizing sales figures Gilead reported for its TDF- and TAF-based HIV drugs for the three year period from 2017-2019.

| TDF Products | 2019 | 2018 | 2017 |
|---|---|---|---|
| Atripla[1] | $600 million | $1.206 billion | $1.806 billion |
| Complera | $406 million | $653 million | $966 million |
| Stribild | $369 million | $644 million | $1.053 billion |
| Truvada | $2.813 billion | $2.997 billion | $3.134 billion |
| Viread | $243 million | $307 million | $1.046 billion |
| *Totals* | *$4.431 billion* | *$5.807 billion* | *$8.005 billion* |

| TAF Products | 2019 | 2018 | 2017 |
|---|---|---|---|
| Biktarvy[2] | $4.738 billion | $1.184 billion | -- |
| Odefsey | $1.655 billion | $1.598 billion | $1.106 billion |
| Genvoya | $3.931 billion | $4.624 billion | $3.674 billion |
| Descovy | $1.500 billion | $1.581 billion | $1.218 billion |
| Vemlidy[3] | $488 million | $321 million | $122 million |
| *Totals* | *$12.312 billion* | *$9.308 billion* | *$6.120 billion* |

---

[1] Atripla does not have a TAF-based analog.

[2] Biktarvy is a TAF-based drug Gilead released in 2018; it has no TDF-based analog.

[3] As noted above (¶ 33), while Vemlidy is a stand-alone TAF drug, and therefore analogous to Viread (a stand-alone TDF drug), Vemlidy has not been approved by the FDA to treat HIV.

10

38. The difference is most stark when comparing the directly analogous drugs:

| Product | 2019 | 2018 | 2017 |
|---|---|---|---|
| | | | |
| Stribild (TDF) | $369 million | $644 million | $1.053 billion |
| Genvoya (TAF) | $3.931 billion | $4.624 billion | $3.674 billion |
| | | | |
| Complera (TDF) | $406 million | $653 million | $966 million |
| Odefsey (TAF) | $1.655 billion | $1.598 billion | $1.106 billion |

39. Critically, as Gilead admitted in its 10-K for the period ending December 31, 2017, the decrease in sales of TDF-based products and the increase in sales for TAF-based products is because patients are shifting to TAF-based regimens *even when the generic version of TDF-based products are available:*

> The increases in 2017 compared to 2016 in all major markets were primarily driven by higher sales volume as patients shifted away from TDF-based regimens. In Europe, product *sales of our TAF-based regimens continue to grow despite the availability of generic Viread and Truvada in several countries.*

(emphasis added).

40. And while the sales of Truvada (TDF-based drug) are still higher than its TAF-based analog, Descovy, for the years 2017-2019, this was because the FDA did not approve Descovy for use as a pre-exposure prophylaxis ("PrEP")—a daily regimen taken to prevent HIV infection that is a large component of Truvada sales—until October 2019. Nevertheless, patients were quickly shifting to the TAF-based Descovy. As Gilead noted in its 10-K for the period ending December 31, 2019, by the end of 2019 (only two months after the FDA approval), "approximately 27% of individuals [in the United States] on PrEP were receiving Descovy."

Electronically Filed - City of St. Louis - August 27, 2020 - 07:52 PM

41. Gilead further admitted in its 10-K for the period ending December 31, 2019 that, now that the FDA has approved Descovy for PrEP, Descovy sales will continue to cannibalize Truvada sales:

> Truvada (FTC/TDF)-based product sales decreased in the United States and Europe in 2019 compared to 2018. ***The decrease in U.S. sales was primarily due to lower sales volume as a result of patients switching to newer regimens containing FTC/TAF***, partially offset by the increased usage of Truvada for PrEP. The decrease in Europe sales was primarily due to lower sales volumes of Truvada and Atripla as a result of the broader availability of generic versions and patients switching to newer regimens containing FTC/TAF. ***We expect a decline in our sales of Truvada in the United States as patients switch to Descovy for PrEP from Truvada for PrEP and the expected entry of generic versions in late 2020.***

(emphasis added).

## PLAINTIFF SPECIFIC ALLEGATIONS

42. Plaintiff began using Truvada in or around May 2012, using it continuously until he switched to Complera in or around May 2014.

43. He used Complera continuously until Gilead began selling the TAF analog to Complera, Odefsey.

44. In or around March 2016—immediately following Odefsey's release into the market, Plaintiff switched to Odefsey because of the decreased health risks of Odefsey (a TAF-based drug) as compared to Complera (Odefsey's TDF-based analog).

45. Plaintiff would not have taken Truvada or Complera at any point if Descovy and/or Odefsey was available and known to him.

46. Plaintiff would not have paid what he paid for Truvada and Complera had he known that they were less effective and more dangerous than they needed to be, had he known of Gilead's deceptive and misleading conduct, or had he known of any of the other facts discussed above.

12

47. Plaintiff believes it is unjust for Gilead to have reaped profits on the TDF-based drugs given Gilead's deceptive, unlawful, and unfair conduct described above.

## TOLLING OF STATUTE OF LIMITATIONS

48. Before switching to a TAF-based drug, neither Plaintiff nor any other class member was aware of TAF, that Gilead had discontinued the development of TAF under false pretenses, that Gilead had put patients' health at risk unnecessarily for purely profit-driven reasons, or that he or she had over-paid for the TDF-based drug; and Plaintiff nor any other class member was aware of any facts putting him or her on inquiry notice of any of these facts.

49. Every time that Plaintiff or a class member purchased a TDF-based drug, he or she was damaged, and the last item of damage did not occur until that person stopped purchasing the TDF-based drug.

## CLASS ACTION ALLEGATIONS

50. Plaintiff repeats and realleges each and every allegation set forth above as if they were set forth here.

51. Plaintiff brings this class action pursuant to R. S. Mo. 407.025 and Missouri Rule of Civil Procedure 52.08 on behalf of the following class:

> All "persons" (as defined by R.S.MO. 407.010.5) who purchased any TDF-based drug, including but not limited to Atripla, Complera, Stribild, Truvada, and/or Viread, in Missouri, primarily for personal, family or household purposes.

Excluded from the class are Gilead, its parents, subsidiaries, and affiliates, and their officers, directors, employees, and agents.

52. The proposed class meets all the requirements for class certification.

53. On information and belief, thousands of "persons" (as defined by R.S.MO. 407.010.5), have purchased TDF-based drugs in Missouri. Thus, the class is so numerous that joinder of all members is impracticable.

54. There are several substantial questions of law and fact common to all class members, including:

    a. Whether TAF is objectively superior to TDF because it is more effective and safer than TDF;

    b. Whether Gilead's discontinuing the development of TAF in 2004 was a method, act or practice declared unlawful by R.S.Mo. § 407.020;

    c. Whether Gilead misrepresenting the reason it was discontinuing TAF in 2004 was a method, act or practice declared unlawful by R.S.Mo. § 407.020;

    d. Whether Gilead's misrepresentations concerning TAF affected the market price of TDF-based drugs;

    e. Whether Missouri consumers paid too much for TDF-based drugs and were damaged by Gilead's unlawful conduct; and

    f. Whether Gilead was unjustly enriched by profiting from the sale of TDF-based drugs.

55. Plaintiff's claims are typical of the claims of the class members.

56. Plaintiff will adequately and fairly represent the class.

57. The prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to the individual class members which would establish incompatible standards of conduct for Gilead.

58. Gilead has acted and refused to act on grounds generally applicable to the class, thereby making appropriate injunctive and declaratory relief with respect to the class as a whole;

59. The questions of law and fact common to the members of the class predominate over any questions affecting only individual members.

60. A class action is superior to other available methods for the fair and efficient adjudication of the controversy for many reasons, not the least of which is the fact that many members of the class are unlikely to prosecute their claims for fear that their HIV status will become public.

61. Notice can be provided to the class members by using the same methods for providing notice to class members that were used in other class actions concerning prescription drugs.

## PUNITIVE DAMAGES

62. Plaintiff repeats and realleges each and every allegation set forth above as if they were set forth here.

63. Gilead's actions as described above were outrageous because of Gilead's evil motive and/or conscious disregard and/or reckless indifference to the rights and safety of Plaintiff and the class members.

64. As a result of Gilead's conduct, the jury should be permitted to award punitive damages.

## COUNT I
## MISSOURI MERCHANDISING PRACTICES ACT
R.S.Mo. § 407.010 *et seq.*
*By Plaintiff, on behalf of himself and all others similarly situated, against Gilead*

65. Plaintiff repeats and realleges each and every allegation set forth above as if they were set forth here.

66. Gilead's conduct described in this Class Action Petition constitutes methods, acts and practices declared unlawful by R.S.Mo. § 407.020, including but not limited to Gilead's suppression and concealment of TAF in 2004 under false pretenses, specifically to deprive Plaintiff and the class members from purchasing the TAF-based products so that Plaintiff and the class members would have to purchase the less effective and more dangerous TDF-based products.

67. Plaintiff and the class members purchased the TDF-based drugs primarily for personal, family or household purposes.

68. Plaintiff and the class members suffered an ascertainable loss of money as a result of Gilead's use or employment of the methods, acts, and practices declared unlawful by R.S.Mo. § 407.020.

    a. As a matter of fundamental economics, a consumer buys a product based on a set of expectations. When the product is different from what those expectations are, he did not receive what he bargained for. In this case, Plaintiff and the class purchased TDF-based drugs with the expectation that TDF-based drugs had a certain risk profile, and that they were the most effective and safest version of the therapy known to Gilead. But Gilead hid from Plaintiff and the class members the risk profile for the TDF-based drugs, and misrepresented, suppressed, and concealed the reasons why the development of the TAF-based drugs were abandoned in 2004.

    b. It is also a matter of fundamental economics that, when faced with a choice between products that perform the same function, the product that is more effective and safer is worth more than the other. This is particularly true in the case of prescription drugs such as this case. Nevertheless, on

      information and belief, Gilead prices the TDF-based drugs at approximately the same or a slightly higher price than their TAF-based analogs.

c. As noted above, once the TAF-based drugs were released into the market, sales of the TAF-based drugs far eclipsed the TDF-based analogs. As Gilead's own SEC filings show (*supra* ¶ 39), customers chose the TAF-based formulations even when patients have available to them generic TDF-based analogs. In other words, even when patients have available to them significantly less expensive TDF versions of the drug, they still chose the more expensive TAF-based analog.

d. These facts show that the prices Gilead commanded for TDF-based drugs prior to the release of the TAF-based analogs did not reflect the true value of those drugs, and Gilead was able to command such prices only because of their unlawful conduct and misrepresentations concerning TAF and TDF.

e. The amount of damages Plaintiff and the class members suffered is ascertainable through discovery of, among other things, historical sales of the TDF and TAF-based drugs, projections of future TDF and TAF-based drugs, Gilead's pricing strategies, and expert analysis.

## COUNT II
## UNJUST ENRICHMENT
*By Plaintiff, on behalf of himself and all other similarly situated, against Gilead*

69. Plaintiff repeats and realleges each and every allegation set forth above as if they were set forth here.

70. As described above, Plaintiff and the class members conferred a benefit upon Gilead in the form of money payments.

71. Gilead was enriched by the sale of TDF-based drugs.

72. That enrichment was at the expense of Plaintiff and the class members.

73. Gilead has provided no refund, repayment or other remuneration to Plaintiff or class members and has, thus, retained the aforesaid benefits conferred upon it.

74. It would be unjust to allow Gilead to retain the benefit.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays this Court to enter judgment for Plaintiff and the class and against Gilead and award the following relief:

    a. Certify this action as a class action;

    b. Appoint Brenes Law Group, P.C. and Calabro Law Office as class counsel;

    c. Declare Gilead's actions unlawful;

    d. Award damages to Plaintiff and the class in an amount to be determined at trial;

    e. Enter an ordering discouraging all profits Gilead recouped from the sale of TDF-based drugs to the class;

    f. Award punitive damages in an amount that is fair and reasonable, and will serve to deter Gilead and others from engaging in the same or similar conduct;

    g. Award pre-judgment and post-judgment interest;

    h. Award attorney's fees and costs;

    i. Grant any further relief that the Court may deem just and equitable.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

Respectfully submitted,

Dated: August 27, 2020

**CALABRO | LAW OFFICE**

By: _____*/s/ J. Toji Calabro*_____
J. Toji Calabro (MO Bar No. 66574)
Two Pershing Square
2300 Main Street, 9th Floor
Kansas City, Missouri 64108
Tel:  (555) 585-1247
tojicalabro@calabro-law.com

**BRENES LAW GROUP, P.C**.
Adam E. Evans (MO Bar No. 60895)
1200 Main Street, Suite 2120
Kansas City, MO 64105
(949) 397-9360 Telephone
(949) 607-4192 Facsimile

*Attorneys for Plaintiff*