**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| JONATHAN SEARCY, on behalf of himself and all others similarly situated and | ) ) ) ) | |
| ERVIN KIRK, on behalf of himself and all others similarly situated | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 4:20-cv-1523-MTS |
| GILEAD SCIENCES, INC. | ) ) | |
| Defendant. | ) | |

**DEFENDANT GILEAD SCIENCES, INC.'S OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

Page No.

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND .............................................................................. 2

      A.    Gilead Develops Groundbreaking TDF Medicines. ................................ 3

      B.    Gilead Develops a New Line of TAF Medicines and Makes Frequent
            Disclosures During the Class Period. ..................................................... 4

      C.    Generic TDF Enters at Discounted Prices, Consistent with the Expected
            Dynamics of Generic Competition. ........................................................ 6

      D.    Gilead's TDF Medicines Remain Safe, Effective, and Appropriate
            Treatment Options, as Demonstrated by Plaintiffs' Facts. ..................... 8

            1.    The Choice of Which Medicine to Take—and Its Cost to Putative
                  Class Members—Will Vary from Patient to Patient. ................... 9

III.  LEGAL STANDARDS ....................................................................................... 12

IV.   ARGUMENT ...................................................................................................... 13

      A.    Individualized Issues Predominate as to the MMPA Claims. ................ 14

            1.    Patient-Specific Prescribing Decisions Raise Individualized Issues
                  that Are Central to the Questions of Causation, Loss, and Standing. ....... 14

            2.    Whether Consumers Suffered Any Actual Loss of Money Cannot
                  be Determined on a Classwide Basis, and There Is No Feasible
                  Way to Exclude Those Without Standing. ................................... 18

            3.    Plaintiffs' Authority Is Legally and Factually Inapposite. ......... 21

      B.    Plaintiffs' Model for Calculating Classwide Loss Fails Under *Comcast*. ........... 23

            1.    Plaintiffs' "Retail Price" Metrics Do Not Appropriately Measure
                  Consumers' Loss of Money or the Nature of Their "Bargain." ............... 24

            2.    Generic TDF Pricing After the Class Period Is Not a Valid
                  Measure for the Actual Value or But-For Market Price of the
                  Brand Medicines. ....................................................................... 26

      C.    Individual Issues Predominate as to the Unjust Enrichment Claim. ..................... 28

      D.    The Class Also Fails for Lack of Typicality and Adequacy, and
            Superiority. ........................................................................................... 30

V.    CONCLUSION .................................................................................................. 30

# TABLE OF AUTHORITIES

<strong>Page(s)</strong>

**Cases**

*In re Actiq Sales & Mktg. Litig.*,
  307 F.R.D. 150 (E.D. Penn. 2015) ........................................................................19

*Anderson v. Bass Pro Outdoor World, LLC*,
  355 F. Supp. 3d 830 (W.D. Mo. 2018) ................................................................28

*In re Avandia Mktg. Sales Prac. & Prods. Liab. Litig. ("Avandia")*,
  100 F. Supp. 3d 441 (E.D. Pa. 2015), *aff'd* 639 F.App'x 866 (3d Cir. 2016) ...........16, 17, 22

*Avritt v. Reliastar Life Ins. Co.*,
  615 F.3d 1023 (8th Cir. 2010) ......................................................................13, 18

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*,
  2011 WL 6740338 (W.D. Mo. Dec. 22, 2011) ............................................ *passim*

*Calderon v. Sixt Rent a Car, LLC*,
  114 F.4th 1190 (11th Cir. 2024) ........................................................................20

*In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*,
  2014 WL 108197 (D. Mass. Jan. 10, 2014) ........................................................22

*Cheatem v. Landmark Realty of Missouri, LLC*,
  2022 WL 5144772 (W.D. Mo. July 1, 2022) ......................................................20

*State ex rel. Coca-Cola v. Nixon*,
  249 S.W.3d 855 (Mo. 2008) ..............................................................................28

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ........................................................................... *passim*

*Craft v. Philip Morris Co.*,
  2003 WL 23139381 (Mo. Cir. Ct. Dec. 31, 2003) ..........................................15, 25

*In re Emerson Elec. Co. Wet/Dry Vac Mktg. & Sales Litig.*,
  2021 WL 5003102 (E.D. Mo. Oct. 28, 2021), 2022 WL 670131 (E.D. Mo.
  Mar. 7, 2022) ..................................................................................24, 25, 26

*In re Express Scripts, Inc. Pharm. Benefit Mgmt. Litig.*,
  2006 WL 2632328 (E.D. Mo. Sept. 13, 2006) ....................................................18

*Heindel v. Pfizer Inc.*,
  381 F. Supp. 2d 364 (D.N.J. 2004) ....................................................................24

*Hennessey v. Gap, Inc.*,
    86 F.4th 823 (8th Cir. 2023) ................................................29

*In re HIV Antitrust Litig.*,
    2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) ................................21, 28

*In re HIV Antitrust Litigation*,
    2023 WL 3603732 (N.D. Cal. May 23, 2023) (Mem. 24) ....................21

*Hudock v. LG Elecs. U.S.A., Inc.*,
    12 F.4th 773 (8th Cir. 2021) ................................................12, 13

*Irvin E. Schermer Tr. by Kline v. Sun Equities Corp.*,
    116 F.R.D. 332 (D. Minn. 1987) ................................................30

*Judy v. Pfizer Inc.*,
    2010 WL 3001745 (Mo. Cir. Ct. July 27, 2010) ................................15, 17, 27

*Landers v. Monstanto Co.*,
    2017 WL 3531378 (E.D. Mo. Aug. 17, 2017) ................................29

*Lewis v. Lead Indus. Ass'n*,
    178 N.E.3d 1046 (Ill. 2020) ................................................20

*Marcormic v. Vi-Jon LLC*,
    2023 WL 1100378 (E.D. Mo. Jan. 30, 2023) ................................30

*Mikhlin v. Johnson & Johnson*,
    2014 WL 6084004 (E.D. Mo. Nov. 13, 2014) ................................16, 17

*In re Milk Prod. Antitrust Litig.*,
    195 F.3d 430 (8th Cir. 1999) ................................................30

*Owen v. Gen. Motors Corp.*,
    2007 WL 1655760 (W.D. Mo. June 5, 2007), *aff'd*, 533 F.3d 913 ....................15

*Owen v. Gen. Motors Corp.*,
    533 F.3d 913 (8th Cir. 2008) ................................................14

*Plubell v. Merck*,
    289 S.W.3d 707 (Mo. Ct. App. 2009) ................................21, 22

*In re Polaris Mktg., Sales Prac. & Prod. Liab. Litig.*,
    9 F.4th 793 (8th Cir. 2021) ................................................16

*Povich v. Combe Inc.*,
    2017 WL 1058850 (E.D. Mo. Mar. 21, 2017) ................................16, 22

*Prohias v. Pfizer, Inc.*,
    485 F. Supp. 2d 1329 (S.D. Fla. 2007) ..................................................................24

*Roberts v. BJC Health Sys.*,
    391 S.W.3d 433 (Mo. 2013) ........................................................................20, 21

*Saavedra v. Eli Lilly Co.*,
    2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ...........................................14, 22, 24

*In re St. Jude Med., Inc.*
    ٫ 522 F.3d 836 (8th Cir. 2008) ......................................................................15

*Tatum v. Van Liner Ins. Co. of Fenton*,
    104 F.3d 223 (8th Cir. 1997) .........................................................................21

*In re Teflon Prod. Liab. Litig.*,
    254 F.R.D. 354 (S.D. Iowa 2008) .................................................................30

*Thompson v. Allergan USA, Inc.*,
    993 F. Supp. 2d 1007 (E.D. Mo. 2014)..........................................................17

*In re Trasylol Prods. Liab. Litig.*,
    No. 08-MD-01928, 2010 WL 6098571 (S.D. Fla. Mar. 16, 2010).........................20

*Van v. LLR, Inc.*,
    61 F.4th 1053 (9th Cir. 2023) *on remand* 2023 WL 8434456 (D. Alaska Dec.
    5, 2023) .................................................................................................13, 19

*Vitello v. Natrol, LLC*,
    50 F.4th 689 (8th Cir. 2022) ..................................................................17, 28, 29

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................ *passim*

*White v. Just Born, Inc.*,
    2018 WL 3748405 (W.D. Mo. Aug. 7, 2018)............................................14, 28, 29

*Williamson v. Genentech, Inc.*,
    2020 WL 1281532 (N.D. Cal. Mar. 18, 2020).....................................................20

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
    644 F.3d 604 (8th Cir. 2011) ..........................................................................13

**Statutes**

Mo. Rev. Stat. § 407.025.1(1)................................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 23 .................................................................................................. *passim*

# I.  <u>INTRODUCTION</u>

Since 2001, Gilead Sciences, Inc. ("Gilead") has saved countless lives through its HIV therapies, including those containing tenofovir disoproxil fumarate ("TDF") and those containing tenofovir alafenamide ("TAF"). ███████████████████████████████ ███████████████████████ Nonetheless, they claim that they and the putative class "overpaid" because Gilead allegedly delayed seeking approval of TAF (an allegedly even safer compound) and concealed or misrepresented information about TDF and TAF. Mem. 1, 7, 20. Putting aside the merits of Plaintiffs' claims (which are baseless), their Rule 23 motion should be denied.

For both of Plaintiffs' claims, individual issues predominate as to whether putative class members suffered any loss and injury-in-fact for Article III standing. At the outset, Gilead made ongoing disclosures about TDF's risks and TAF's potential benefits during the class period. Putative class members who took the medicine that was as represented—and which treated their condition without causing any harm—have suffered no monetary loss, cannot claim unjust enrichment, and have no standing to sue. Plaintiffs' "overpayment" theory does not change the fact that individual issues predominate. Based on insurance and other programs, many putative class members paid nothing at all for prescriptions. Many others paid only a small, fixed co-pay that was unaffected by the challenged conduct and equal to or less than the price of generic TDF (Plaintiffs' benchmark for the drugs' "true" value). Because determining what each person paid (if anything) would require thousands of mini-trials, and because a class cannot be certified if it includes uninjured individuals, Rule 23 is not satisfied.

Plaintiffs' "benefit of the bargain" damages model cannot save their motion. Their model calculates the difference between (a) the so-called "retail" price of Gilead's brand TDF medicines during the class period, and (b) the declining price of *generic* TDF medicines from 2017-2023, years after the class period (after TDF went "off patent"). The model fails under *Comcast Corp. v.*

*Behrend*, 569 U.S. 27 (2013), and is not properly tied to Plaintiffs' liability theory or the facts.

Plaintiffs' price metrics—based largely on amounts paid by third-party payors—have no relation to putative class members' payments, "bargain," or alleged "loss." For example, ███████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████ Simply put, putative class members did not suffer "an ascertainable loss of money" of thousands of dollars per prescription for medicines that safely and effectively treated their conditions while costing them little-to-nothing.

Nor is *generic* TDF pricing a valid measure of the market price of Gilead's brand TDF medicines but-for the challenged conduct. Plaintiffs' expert conceded he is not opining that Gilead or any reasonable manufacturer would have sold brand TDF medicines at generic prices during the class period, even if TAF were available—a fatal admission under the case law. Moreover, generic drugs are typically priced at a discount, and with seventeen generic TDF sellers entering the market between 2017 and 2022, generic prices fell for reasons unrelated to the challenged conduct. Because Plaintiffs' model does not even attempt to isolate and measure damages *caused by* the alleged violations, the model fails under *Comcast* and cannot satisfy Rule 23.

For these and other reasons detailed below, Plaintiffs' Motion should be denied.

## II.  FACTUAL BACKGROUND

The sections below describe the TDF and TAF medicines' development, uses, and sale, as well as individualized facts relevant to Plaintiffs Searcy and Kirk, and the putative class.

### A. Gilead Develops Groundbreaking TDF Medicines.

Gilead began developing TDF to address the deadly HIV/AIDS epidemic.[1] In October 2001, FDA approved Viread® (TDF), which turned out to be significant advance over then-existing therapies in treating HIV because it was more effective, easier to administer, and far less toxic.[2]

Gilead built on TDF to develop "fixed dose combination" medicines—drugs with multiple active ingredients, allowing people to obtain a complete antiviral therapy regimen in fewer pills, which helps them adhere to their regimen and avoid viral resistance.[3] Those efforts led to FDA's approval of Truvada® (TDF and FTC) in 2004; Atripla® (TDF/FTC/efavirenz) in 2006; Complera® (TDF/FTC/rilpivirine) in 2011; and Stribild® (TDF/FTC/elvitegravir/cobicistat) in 2012.[4]

FDA called Atripla® a "watershed" because it was the first "single tablet regimen"—all three components of an antiviral regimen in one pill. DX 63, at 3. Reflecting its safety, Truvada® has been approved for pre-exposure prophylaxis ("PrEP")—prevention of HIV in healthy individuals.[5] Viread® has been approved for treatment of hepatitis B virus ("HBV"). DX 40.

All medicines have potential side effects, and TDF is associated with potential kidney and bone side effects, which are rare, particularly for people without certain preexisting conditions.[6] Over the years, Gilead provided FDA with all of the relevant safety data, the FDA-approved labels

---

[1] DX 4, at 350:4-351:20; Glick ¶¶ 11, 12, 17. "DX" refers to the exhibits in Gilead's Compendium of Exhibits, and the names refer to the Gilead's expert reports from infectious disease expert Dr. Nancy Glick ("Glick") (DX 1), regulatory expert Dr. Jonathan Jarow, and economist Prof. Laurence Baker, Ph.D. ("Baker") (DX 3). "PX" refers to Plaintiffs' Exhibits.

[2] Jarow ¶¶ 14-16, 31-32; Glick ¶¶ 18-20.

[3] *See* Glick ¶¶ 17-21; Jarow ¶¶ 111, 132-135. As the experts explain, an antiviral therapy regimen typically includes two nucleoside reverse transcriptase inhibitors ("NRTIs"), plus a third medicine from another class. TDF and TAF are in the NRTI class.

[4] *See* Glick ¶¶ 23-28; Baker ¶ 9. "FTC" refers to emtricitabine, another NRTI.

[5] DX 45; Jarow ¶¶ 108-112 (explaining that FDA would not have approved Truvada® for healthy individuals unless it had a strong safety profile such that the benefits outweighed the risks).

[6] Glick ¶¶ 35-36, 74; DX 13; DX 22, at 58:23-59:1, 64:6-10; DX 30, at 77:11-16; *see also* DX 14, at 62:14-64:4, 76:1-77:1, 126:3-12.

have *always* warned of TDF's kidney and bone risks, and those warnings have been updated as more data became available.[7] For example, while Plaintiffs' expert critiques certain labels, █████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

### B. Gilead Develops a New Line of TAF Medicines and Makes Frequent Disclosures During the Class Period.

**Investigation through 2004**. Several years into developing TDF, Gilead started looking at TAF (then called "GS-7340") as a backup.[10] The development team believed it was "critical that GS 7340 be more than a mere replacement for Viread but also provide significant benefits," which was defined—upfront as a "go/no go" decision point—as viral load reduction of at least "1 log" (a 10-fold decrease) in a "Phase I/II trial" Gilead was conducting. PX 8, at 6, 8.

That Phase I/II trial ("Study 1101"), which concluded in February 2003, involved 20 TAF subjects and 10 TDF subjects taking the medicines for 14 days; it found TAF and TDF to have "similar" safety profiles. DX 6, at 7-8, 10-11. TAF achieved higher intercellular concentrations of tenofovir, but "the pre set target for the internal go decision, one log difference in viral load between [TDF] and GS-7340, was not met." *Id.* at 10-11.[11]

---

[7] Glick ¶ 34; Jarow ¶¶ 46, 67, 72-81, 89, 93-95; DX 37-53.

[8] *See* DX 16, at 62:25-64:13, 167:8-168:6, 178:5-21; DX 13, at 118:25-119:4; DX 14, at 34:5-11, 41:6-15, 58:5-17; *cf.* Jarow ¶¶ 72-89 (responding to labeling allegations).

[9] DX 22, 56:13-19, 62:5-7, 63:8-64:2; DX 30, at 79:22-81:11, 151:18-152:3; DX 31, at 25:4-11, 147:2-9; *see also* Glick ¶¶ 55, 67, 99.

[10] DX 4, at 351:3-352:11; PX 4, 6.

[11] Plaintiffs wrongly assert Gilead "knew TAF was safer" at this time. Study 1101 was too small and limited to obtain FDA approval or show TAF's long-term safety and efficacy. Jarow ¶¶ 38-41, 124-130; DX 4, at 349:10-18, 351:12-353:3; *see also* DX 14, at 75:4-15; DX 17, at 159:1-15.

As Plaintiffs' own exhibits show, Gilead forecasted that, *if* TAF differentiated itself, developing TAF immediately could generate nearly *$1 billion* in additional revenue from 2008-2013. PX 9, at 11-12. But researchers felt "the emerging profile of GS-7340 … does not appear to be sufficiently differentiated from Viread," and its safety was unknown.[12] So, Gilead stopped TAF development in October 2004 and prioritized using TDF to develop new combination therapies.[13]

**Development of TAF (2010-2015)**. Given the success of the TDF medicines, people with HIV are living longer, and some have developed conditions associated with normal aging, like loss of kidney function and bone density. DX 4, at 386:9-388:21. In 2010, Gilead took another look at TAF, this time as a possible lower-dose alternative for this aging demographic—all the while recognizing a "Major Risk[]" that TAF's safety profile "may not be different from that of TDF."[14]

During the class period Gilead continually updated the public on events relating to TAF's development and data on its safety profile as compared to TDF. On November 15, 2011, Gilead announced development of a combination therapy using TAF (what became Genvoya®, the first TAF-based drug); that announcement reported that recent "dose-ranging studies" for TAF had "identified a dose that is ten times lower than Viread® and provides greater antiviral efficacy." DX 66. From 2012-2015, Gilead regularly reported on ongoing Phase 2 and Phase 3 clinical studies, with taglines that the TAF-based regimen had shown a "***Favorable Safety Profil***e" and "***Improved***

---

[12] DX 7, at 2; *see also* PX 9, at 1, 3 (nine-month toxicology study on dogs); *id.* at 3 (TAF studies showing unexpected tissue distribution). Plaintiffs also cite a 2003 memorandum discussing a hypothetical scenario for a later TAF launch, but that memorandum expressly assumed that TAF could *not* be significantly differentiated and would be "comparable to TDF's safety profile." PX 23, at 2-3; *see also* DX 8, at 149:17-155:20, 159:5-19 (explaining that 2003 memo assumed TAF's "safety was equal to Viread" and that financially it "wouldn't have made any sense to delay the development" of TAF if Gilead knew it was safer).

[13] *See* PX 9, at 10-13; PX 24; DX 4, at 366:7-367:19; DX 5, at 427:17-428:18; *see also* PX 7; PX 11; PX 18; PX 24; Glick ¶ 19; DX 64.

[14] *Id.* at 379:9-381:9; *see also* DX 9, at 241:6-243:2; PX 17, at 3; PX 26, at 12.

*Renal and Bone Safety*" compared to the TDF-based regimen. DX 67-74.

In 2013, Gilead asked FDA to expedite approving the new TAF regimen as a "Breakthrough Therapy," but FDA rejected the request because the data did not "demonstrate the drug will provide substantial improvement over existing therapies." Jarow ¶¶ 140-141. It was not until November 5, 2015—five years after Gilead began development—that FDA approved the first TAF medicine: Genvoya® (TAF/FTC/elvitegravir/cobicistat). *Id.* ¶¶ 20, 139-143. In 2016, FDA approved Descovy® (TAF/FTC) and Odefsey® (TAF/FTC/rilpivirine). Glick ¶ 28; DX 56-58.[15]

In 2018, Gilead launched Biktarvy® (TAF/emtricitabine/bictegravir), which featured a newly developed "second generation" integrase inhibitor, bictegravir (and thus has no TDF counterpart).[16] Bictegravir quickly became a recommended therapy and provided physicians a reason to prescribe Biktarvy® separate from any comparison between TDF and TAF.[17]

### C. Generic TDF Enters at Discounted Prices, Consistent with the Expected Dynamics of Generic Competition.

To obtain approval, new brand drugs must go through a time-intensive, risky, and costly development and regulatory approval process. Baker ¶ 39. Brand medicines are priced in light of these risks and costs to recoup the investment while the innovative product remains under patent protection (the exclusivity period). *Id.* ¶ 42. "Generic" manufacturers can obtain approval to sell bioequivalent versions of the brand drug once the exclusivity period ends, but without needing to undertake the same development costs or time-intensive regulatory approval process. *Id.* ¶ 39.

Thus, generic drugs are typically priced at a discount to their brand-name counterparts, including because generic drugs do not require the same development costs. *Id.* ¶¶ 41–43.[18] As

---

[15] Also in 2016, FDA approved Vemlidy® (TAF) for HBV (not HIV).

[16] Glick ¶¶ 28, 42; DX 59. Integrase inhibitors are in a different class than TDF and TAF.

[17] Glick ¶¶ 17, 42, 104; DX 22, at 79:7-14, 160:22-162:6; *see also* DX 11, at G-1.

[18] *See also* DX 17, at 254:10-14; DX 18, at 186:2-188:2; DX 20A; DX 20B, at 3-4, 11-13, 29-31.

more generic sellers enter, generic prices drop further—often approaching marginal costs—due to increased competition to sell the generic products to pharmacies and other purchasers. *Id.* ¶ 44.[19]

The first generic version of Viread® (TDF) entered in December 2017, with generic versions of Truvada® and Atripla® arriving in 2020.[20] At first entry, each generic drug was priced at only a modest discount to Gilead's brand version, but generic prices dropped over time as up to seventeen generic sellers entered the market.[21] Those price declines are consistent with what the economic literature would expect and with the price discounts seen with other generic HIV drugs:[22]



Interestingly, the literature shows that brand drug prices generally *do not fall*—and often rise—in response to generic entry.[23] That is what happened here. At all times, the prices of Gilead's branded TDF medicines have increased—even *after* the market received disclosures about TDF and TAF, *after* TAF's entry, and *after* entry of generic TDF products.[24]

---

[19] *See also* DX 18, at 186:2-188:2; DX 20A.

[20] *Id.* ¶ 7. Complera® and Stibild® do not currently have generic equivalents on the market.

[21] *See* Baker ¶ 131; Bradford ¶ 74 & tbl. 14; DX 19.

[22] See DX 20A (2019 FDA Report based on all drugs with generic entry from 2015-2017); Baker ¶¶ 130-132 & ex. 8 (citing literature, generic price declines seen with other HIV drugs, and comparing observed generic-to-brand price difference for TDF/Viread®).

[23] Baker ¶ 44; DX 20B, at 12, 29-31.

[24] *See* Baker ¶¶ 23, 125-127 & exs. 6-7; DX 19-19B, 76.

Plaintiffs misleadingly assert that "[v]irtually no consumers purchase branded TDF" anymore. Mem. 26. Plaintiffs fail to account for the fact that Missouri (like many states) allows "automatic generic substitution," so pharmacies will switch prescriptions written for a brand TDF medicine to a generic version unless the brand is explicitly requested. Baker ¶¶ 40, 104. Many consumers continued choosing TDF-based medicines, including brand TDF medicines, after TAF launched. *Id.* ¶¶ 20, 103-104. Meanwhile, the major driver of TAF medicine sales since 2018 is Biktarvy®, which contains the second-generation integrase inhibitor and has no TDF counterpart. *Id.* ¶ 110 & Ex. 4. As Gilead expert Baker explains, the aggregate sales data cited by Plaintiffs (so-called "revealed preference analysis") does not show actual switching behavior and cannot show, for example, whether prescriptions for generic TDF medicines were written for the brand medicine; whether prescriptions for Biktarvy® were based on a preference for bictegravir; or any other of the myriad individual factors affecting consumer's choices.[25]

### D. Gilead's TDF Medicines Remain Safe, Effective, and Appropriate Treatment Options, as Demonstrated by Plaintiffs' Facts.

Although Plaintiffs claim TAF is safer than TDF, their expert Dr. Harbour concedes the TDF medicines were "important option[s]" with life-saving benefits, and that TDF's risks are so low it remains widely and reasonably prescribed.[26] Plaintiffs do not claim that Gilead withheld information from FDA, that FDA should have withdrawn the TDF medicines, or that TAF is more effective at treating HIV.[27] As explained below, TDF medicines remain recommended options to

---

[25] *See id.* ¶¶ 19, 84-113 (explaining why Plaintiff's so-called "revealed preference analysis" was not performed in a proper, economically sound manner and not based on analysis of actual patient choices); DX 18, at 68:8-71:3, 107:1-7, 109:11-114:2 (Bradford admitting that his aggregate data does not show whether people are actually switching from TDF to TAF; and cannot distinguish generic substitution or reasons for choosing Biktarvy®).

[26] DX 13, at 109:11-110:9; DX 14, at 92:8-101:7, 106:8-13, 111:5-113:24, 123:19-124:24, 126:3-12, 264:8-22.

[27] DX 27 (RFA Resp. Nos. 1-75, 106-109).

consider based on patient-specific factors—it simply is not true that TAF is "safer" or "better" for everyone—and the amount (if any) that consumers paid for TDF medicines varied widely. Plaintiffs' individualized experiences confirm these points.

**1.    The Choice of Which Medicine to Take—and Its Cost to Putative Class Members—Will Vary from Patient to Patient.**

The Department of Health and Human Services ("DHHS") publishes the authoritative clinical guidelines for treating HIV, and it continues to include TDF among the recommended therapies for treating HIV. DX 11, at G-1-2. Those guidelines do not state that TAF is "superior" to TDF; rather, they identify patient-specific factors for deciding which to prescribe, including that "TAF has fewer bone and kidney toxicities than TDF, while TDF is associated with lower lipid levels." *Id.* at G-2. The clinical guidelines for PrEP (prevention of HIV) state that "[f]or most patients **there is no need to switch**" from a TDF medicine to a TAF medicine because "**no differences** in clinically meaningful adverse events have been seen." DX 12, at p. 37 (emphasis added); Glick ¶ 46. World Health Organization guidelines continue to recommend TDF as the front-line HBV therapy unless the person has a pre-existing condition. DX 75.

Thus, selecting a medicine requires an individual approach, based on a patient's condition, medical history, and contraindications.[28] Many still take TDF medicines and never switched to TAF.[29] Some people who were placed on a TAF-based medicine were switched back to TDF.[30]

Moreover, the TDF medicines' cost to putative class members will vary depending on factors such as insurance coverage, plan design, and participation in a financial assistance program—including those offered by Gilead. Baker ¶¶ 57-81. Although Gilead sets a list price for

---

[28] Glick ¶¶ 7, 30-31, 39-41; DX 15 ¶ 19; DX 14, at 88:8-20, 124:4-16.

[29] Glick ¶¶ 44, 47; DX 22, at 51:14-18; DX 31, at 27:13-20.

[30] DX 10, at 187:6-188:5 (testimony from third-party clinician and researcher Dr. Peter Ruane). Dr. Ruane is "a colleague" of Plaintiffs' expert Dr. Harbour. DX 13, at 301:19-302:25.

wholesale sales (Wholesale Acquisition Cost, or "WAC") (*id.* ¶¶ 47-49), that is not indicative of what *consumers* pay; nor do most consumers pay a pharmacy "retail" price. Instead, most putative class members have insurance (Medicaid, Medicare, or private), in which case the pharmacy breaks the transaction into two charges: the amount charged to the consumer; and the amount charged to the third-party payor. *See id.* ¶¶ 59-70. Those on Missouri Medicaid generally paid a copay ranging from $0.50 to $2 per prescription, regardless of which drug they were prescribed. *Id.* ¶ 70. Many others also paid only a fixed co-pay or paid *nothing* out-of-pocket due to insurance or other programs. *E.g., id.* ¶¶ 59, 66-67, 73-80. Indeed, data from one major pharmacy in Missouri show that over *50%* of purchases involved no charge to the consumer at the point of sale. *Id.* ¶ 164.



---

[32] *Id.* ¶¶ 96-97; DX 22, at 47:18-48:1, 51:17-18 (explaining that he chose Truvada® "[b]ecause of the side effect profile and tolerability and effectiveness").
[33] Glick ¶ 100; DX 21, at 144:7-11.
[34] DX 22, at 79:7-14, 160:22-162:6.

█████████████████████████████████████████████████████, "[t]he difference is **so small** that I've never seen the difference in my patient population."[35] When asked at deposition whether today he would prefer TAF to TDF, he said "that's a hypothetical that doesn't relate to what our practice does"; he prescribes "based on the integrase inhibitor."[36]

Kirk agreed Atripla® and Truvada® provided life-saving benefits and that he relied on doctor's recommendations.[37] He says he assumed Gilead's TDF medicines were the best and safest HIV medicines known to Gilead (PX 37 ¶ 5), but he admits no one at Gilead ever told him that.[38]



[35] DX 22, at 207:16-208:6 (emphasis added).

[36] *Id.* at 209:22-210:10; *see also id.* at 77:19-79:22, 207:16-207:22; *see also* Glick ¶ 104.

[37] DX 21, at 74:7-9, 97:7-10, 111:5-115:6, 315:20-316:2; DX 22, at 64:16-19, 167:7-11.

[38] █████████████████████████████████, DX 21, at 37:5-39:12, 246:25-248:19, 297:7-298:6, ████████████████, DX 22, at 174:24-175:2. ███████████████████████████████████████. DX 21, at 87:3-8, 352:2-353:4.

[39] Baker ¶ __; DX 21, at 131:19-133:18; DX 24-26.

[40] Glick ¶¶ 49-50, 54, 57; DX 30, at 128:23-129:6, 138:23-139:25, 153:25-154:6.

[41] Glick ¶¶ 59, 62; DX 30, at 149:16-19.

[42] Glick ¶¶ 55, 58, 67-69; DX 30 at 79:22-81:11, 151:6-24, 153:20-24, 178:14-180:6; DX 31, at 25:4-11, 74:9-18, 146:17-147:9.



## III.  **LEGAL STANDARDS**

"A party seeking class certification 'must affirmatively demonstrate his compliance' with

Rule 23." *Hudock v. LG Elecs. U.S.A., Inc.*, 12 F.4th 773, 775 (8th Cir. 2021) (quoting *Comcast*

---

[43] DX 30, at 157:12-158:10, 162:20-163:14; DX 32, at 00374, 384, 407, 480, 732. ████████ ██████████████████████████████████████████████. *Id.* at 236:11-238:13.

[44] DX 30, at 162:2-164:1.

[45] DX 29, at 236:11-237:25; DX 32, at 00480.

[46] DX 30, at 170:4-171:12.

[47] DX 29, at 38:9-39:18, 140:8-141:14.

[48] *Id.* at 89:24-92:3, 196:3-23; *see also id.* at 115:24-116:25, 229:8-18; DX 36, at 16-18.

[49] DX 29, at 156:7-157:12.

*Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Instead, it requires showing through "evidentiary proof" that the requirements of Rule 23 are met. *Comcast*, 569 U.S. at 33.

"What matters to class certification is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. To certify a damages class under Rule 23(b)(3), Plaintiffs must meet the more "demanding" requirement that "'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Comcast*, 569 U.S. at 33-34; *Hudock*, 12 F.4th at 776. A district court must conduct a "rigorous analysis" that includes resolving factual disputes that bear on the Rule 23 requirements, even if those disputes "overlap with the merits." *Comcast*, 569 U.S. at 33–34.

Further, Article III standing "requires a showing of injury in fact . . . that is fairly traceable to the challenged action of the defendant," and "a class cannot be certified if it contains members who lack standing." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010); *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011). If it is not feasible to exclude uninjured people from the class without individual inquiries, then individualized issues will predominate and class treatment is improper. *See Van v. LLR, Inc.*, 61 F.4th 1053, 1069 (9th Cir. 2023) (vacating certification to assess feasibility of excluding class members without standing), *on remand* 2023 WL 8434456 (D. Alaska Dec. 5, 2023) (denying class certification).

## IV.    ARGUMENT

Plaintiffs assert claims under the Missouri Merchandising Practices Act ("MMPA") and for unjust enrichment, alleging that putative class members (Missouri consumers) overpaid for their TDF medicine, purportedly because Gilead concealed information regarding TDF and TAF and delayed seeking approval of TAF. The class period spans over twelve years from July 2003

(when TAF allegedly could have been available) to November 2015 (when the first TAF medicine launched). The class excludes anyone who has filed personal injury claims related to their use of TDF—i.e. putative class members claim no physical harm, only purported economic loss.

Plaintiffs cannot meet their burden to satisfy Rule 23 because (A) individual issues predominate on their MMPA claim as to whether putative class members suffered actual injury and an ascertainable loss of money caused by the challenged conduct; (B) Plaintiffs' purported damages model fails under *Comcast* and thus cannot supply the common proof needed to satisfy Rule 23; (C) individual issues predominate on the unjust enrichment claim as well; and (D) Plaintiffs fail to satisfy typicality/adequacy and superiority.

### A. Individualized Issues Predominate as to the MMPA Claims.

The MMPA requires that claimants "suffer an ascertainable loss of money or property . . . as a result of" the violation, Mo. Rev. Stat. § 407.025.1(1), meaning that "the MMPA demands a causal connection between the ascertainable loss and the unfair or deceptive merchandising practice," *Owen v. Gen. Motors Corp.*, 533 F.3d 913, 922 (8th Cir. 2008). Individual issues predominate as to causation and loss as necessary under the MMPA and for Article III standing.

### 1. Patient-Specific Prescribing Decisions Raise Individualized Issues that Are Central to the Questions of Causation, Loss, and Standing.

Putative class members cannot claim injury from their TDF purchases if (1) they took a TDF medicine based on an accurate labeling and it performed as represented without causing them harm; or (2) they would have taken a TDF medicine regardless of the challenged conduct. Because there is no way to identify those class members and exclude them without individual inquiries, class certification should be denied, as it has been denied in similar cases. *See In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, 2011 WL 6740338, at *1–3, 5 (W.D. Mo. Dec. 22, 2011); *White v. Just Born, Inc.*, 2018 WL 3748405, at *4–5 (W.D. Mo. Aug. 7, 2018); *Saavedra*

*v. Eli Lilly Co.*, 2014 WL 7338930, at *7-8 (C.D. Cal. Dec. 18, 2014) (denying certification of MMPA claims for failure to fully disclose drug risks based on "[p]hysicians' roles in prescribing" the drug because the importance of undisclosed risks "may differ depending on" the patient's condition); *Judy v. Pfizer Inc.*, 2010 WL 3001745, at *4 (Mo. Cir. Ct. July 27, 2010) (denying certification of MMPA claims relating to marketing of drug, where intended uses varied, efficacy "varies from patient to patient," and class would include consumers who had no injury).[50]

*BPA* is instructive. The plaintiffs sought to certify a class of consumers who purchased a baby bottle or sippy cup containing BPA, alleging a failure to disclose alleged safety and health risks associated with the chemical. 2011 WL 6740338, at *1. As here, the plaintiffs claimed loss under the "benefit of the bargain rule," citing *Plubell v. Merck & Co., Inc.*, and *Craft v. Philip Morris Cos.* *See* BPA, 2011 WL 6740338, at *2. But the district court denied class certification.

The court first observed that "[i]ndividuals who knew about BPA's existence and the surrounding controversy before purchasing Defendants' products have no injury" and no standing. *BPA*, 2011 WL 6740338, at *1 (quoting *State ex rel. Coca-Cola v. Nixon*, 249 S.W.3d 855, 858 (Mo. 2008), for proposition that consumers "***suffered no injury***" if they would purchase product knowing the truth (emphasis in original)). The court then held that consumers who fully used the products without experiencing harm suffered no loss or injury-in-fact; and it rejected the notion that the benefit-of-the-bargain rule meant the purchase "*ipso facto* caused an economic loss." *Id.* at

---

[50] Even where a statute (like the pre-2020 MMPA) does not require reliance as an element of the claim, it is still probative whether plaintiffs would have made the purchase even if they were aware of the challenged conduct. *See In re St. Jude Med., Inc.*, 522 F.3d 836, 838-40 (8th Cir. 2008) (finding physicians' independent judgment "highly relevant and probative on the question whether there is a causal nexus between alleged misrepresentations and any injury"); *Owen v. Gen. Motors Corp.*, 2007 WL 1655760, at *5 (W.D. Mo. June 5, 2007) (MMPA claim rejected for failure to show plaintiffs would not have purchased product had they been aware of purportedly unlawful practice), *aff'd*, 533 F.3d 913.

*2–3; *see also id.* at *6 (explaining that benefit of the bargain rule is "not the sole measure of damages" and should not be used when "inappropriate"). Individual issues predominated for related reasons, and due to variation in knowledge over the class period. *Id.* at *5–6.

*BPA* is consistent with the other cases cited above denying certification of MMPA claims, and with federal decisions rejecting similar MMPA claims, including for lack of Article III standing.[51] As one court put it, "where a plaintiff has suffered no adverse effects from a product, and has used the product successfully, he has no quantifiable damage…. [T]hat the product may cause health problems for other users is not sufficient to create an injury in fact." *Povich v. Combe Inc.*, 2017 WL 1058850, at *2 (E.D. Mo. Mar. 21, 2017); *see also In re Polaris Mktg., Sales Prac. & Prod. Liab. Litig.*, 9 F.4th 793, 796 (8th Cir. 2021) (rejecting standing to sue on overpayment/ "benefit of the bargain" theory based on alleged undisclosed risk of defect that did not manifest).

The record confirms that Plaintiffs' claims raise a host of individual issues, starting with the varying information about TDF and TAF over the 12-year class period. TDF's kidney and bone risks were disclosed during the class period and the labeling was repeatedly updated; thus, what putative class members were told and understood would vary widely and be subject to individual proof. *Supra* at 3-4. And while Plaintiffs █████████████████████████████████████ ██████████████████████████████████████" Mem. 10, their assumption was not based on anything they saw or heard from Gilead. *Supra* at 11-12. Indeed, during the class period, ████████████ ███████████████████████████████████████████████████████████████. *Id.*

---

[51] *See In re Avandia Mktg. Sales Prac. & Prods. Liab. Litig. ("Avandia")*, 100 F. Supp. 3d 441, 446 (E.D. Pa. 2015) (addressing MMPA claim for failure to disclose drug risks; finding no loss where "Plaintiff received the drug she was prescribed, took the drug, and alleges neither that the drug failed to do its job … nor that she was injured by taking the drug"), *aff'd* 639 F.App'x 866 (3d Cir. 2016); *Mikhlin v. Johnson & Johnson*, 2014 WL 6084004, at *3 (E.D. Mo. Nov. 13, 2014) (rejecting claim for failure to disclose cancer risks where plaintiffs used talcum powder for moisture control without being harmed and thus received benefits of purchase).

Nor is there classwide evidence of promotion of TDF as "the safest antiviral HIV drug known to Gilead," that other putative class members had such a belief, or that they had any assumptions about TDF whatsoever other than the risks and benefits stated on the TDF medicines' label and communicated by their physicians. If a person purchased a TDF medicine based on the medicine's label, and the medicine performed "as represented," they received what they bargained for and suffered no ascertainable loss. *See BPA*, 2011 WL 6740338, at *3; *Avandia*, 100 F. Supp. 3d at 445; *Mikhlin*, 2014 WL 6084004, at *3; *see also Vitello v. Natrol, LLC*, 50 F.4th 689, 694 (8th Cir. 2022) (no loss for MMPA claim where product performed consistently with its label); *Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007, 1012 (E.D. Mo. 2014) (same).

Alleging that TAF is "safer" and should have been available sooner only raises more individual questions. For example, clinical guidelines state no clinically meaningful difference in safety has been shown between TDF and TAF for most people taking a medicine for PrEP (Glick ¶ 46; DX 12, at p. 37), but Plaintiffs have no feasible way to identify and exclude class members who took Truvada® for PrEP. *See Judy*, 2010 WL 3001745, at *4 (denying class certification because drug was taken for different indications and efficacy could vary).[52] Even for people living with HIV, the evidence shows that TDF medicines are safe and effective with low rates of risk that vary depending on an individual's condition and medical history; TDF at all times has remained a DHHS-recommended therapy; and many people continued purchasing TDF medicines even after TAF became available and long after the "truth" was allegedly known. *Supra* at 8-12; DX 22, at 207:16-208:6 (Dr. Zinser: difference in safety between TDF and TAF is "so small that I've never seen the difference in my patient population"). These inquiries are central to whether someone was

---

[52] Plaintiffs also do offer any evidence to establish that TAF is "superior" for all people with HBV, nor do they offer any feasible way of carving those individuals out of the class.

injured by the challenged conduct, and they cannot be resolved except by mini-trials into individual medical records and testimony from putative class members and their physicians.[53]

### 2. Whether Consumers Suffered Any Actual Loss of Money Cannot be Determined on a Classwide Basis, and There Is No Feasible Way to Exclude Those Without Standing.

Even if the Court were to indulge Plaintiffs' fictitious overpayment theory, Rule 23 still is not satisfied. As explained above, "a class cannot be certified if it contains members who lack standing," *Avritt*, 615 F.3d at 1034, and the MMPA also requires economic loss. *Supra* at 14.

Here, the evidence shows that a large portion of prescriptions were filled without any charge to the consumer, due to insurance or participation in a financial assistance program such as those offered by Gilead. *See, e.g.*, Baker ¶¶ 26, 162-68. A consumer who paid *nothing* for life-saving medicines that safely treated their condition cannot possibly claim they overpaid.

Even those who paid something would still need to show an overpayment compared to what they would have paid absent the challenged conduct, and relative to the value of the product received. Many putative class members paid fixed (often small) co-pays; whether Gilead allegedly "inflated" (Mem. 1) the market price paid by wholesalers, pharmacies, or third-party payors is irrelevant because that would not affect the consumer's co-pay.[54] Moreover, if someone paid an

---

[53] As noted above, Plaintiffs' purported "revealed preference analysis" merely looks at aggregate sales trends without analyzing actual switching behavior, individual choice factors, or other market dynamics—including generic substitution and the development of Biktarvy®. *See supra* at 8 & n.25. It thus cannot eliminate Defendants' due process right to litigate, among other things, whether or to what extent a given individual would have continued taking a TDF medicine even if TAF were available and the "truth" were known. *Wal-Mart*, 564 U.S. at 367.

[54] Consistent with the MMPA's standing requirement, Plaintiffs' putative class is limited to those who purchased a TDF medicine "for personal, family or household purposes" (Mot. 1; Mem. 7, 14)—i.e., "patients"/"consumers" (e.g., Mem. 1, 2). Plaintiffs never purport to be suing on behalf of third-party payors, which lack standing under the MMPA. *See, e.g., In re Express Scripts, Inc. Pharm. Benefit Mgmt. Litig.*, 2006 WL 2632328, at *10 (E.D. Mo. Sept. 13, 2006). Including third-party payors would also raise a host of additional individual issues, such as about their formulary decisions and individually negotiated contracts affecting what they pay. *See, e.g.*,

amount equal to or less than the price of generic TDF medicines—Plaintiffs' own benchmark for the "true" value of the medicine—they have not been injured, even under Plaintiffs' theory.



*Supra* at 12. As a matter of due process, Gilead is entitled to raise those facts as an individual defense ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████

Adjudicating who paid what and why would require a person-by-person analysis covering a 12-year class period, with disparate and likely incomplete records. Those inquiries, which are essential to the existence of liability and standing as to any given person, render the class unmanageable. *Van*, 2023 WL 8434456, at *11 (where "discounts were not consistently reflected on invoices or provided in the same ways to all customers" and such discounts "could vitiate standing in several different ways," individualized inquiries "would dwarf" common questions).

While Plaintiffs' expert *asserts* it would be "straightforward" to exclude those who paid nothing, at deposition he was unable to explain how he would do that or identify what dataset he would use, *see* DX 18, at 143:2-147:12, and his *ipse dixit* assertion is not evidentiary proof sufficient to satisfy Rule 23. *See* Baker ¶¶ 179-80 (explaining why inquiries would be unmanageable). Further, Plaintiffs have no ability to account for or exclude putative class members who lack economic injury for the other reasons explained above. *Id.* ¶¶ 27-28, 181-85.

---

Baker ¶¶ 49, 53-55; *In re Actiq Sales & Mktg. Litig.*, 307 F.R.D. 150, 169-71 (E.D. Penn. 2015) (citing testimony of now-Plaintiff expert Bradford and finding that individual inquiries precluded class treatment of third-party payor claims challenging prescription drug marketing).

Plaintiffs cannot sweep away these individualized inquiries away by relying on the "collateral source rule," Mem. 23–24, because that "*rule cannot create damages for Plaintiffs where none existed*." *Roberts v. BJC Health Sys.*, 391 S.W.3d 433, 439 (Mo. 2013) (emphasis added). *Roberts* thus held that the collateral source rule did not allow a plaintiff to assert an MMPA claim for alleged overpayments for medical services paid not by the plaintiff, but by his insurer. *Id.* In other words, under *Roberts*, that the collateral source rule can "come into play only *after* it is established that Plaintiff suffered ascertainable loss." *Cheatem v. Landmark Realty of Missouri, LLC*, 2022 WL 5144772, at *6 n.10 (W.D. Mo. July 1, 2022).

Courts across jurisdictions widely recognize the same point, including in cases alleging exposure to health risks: if the claim is for economic loss, the collateral source rule does not allow a plaintiff to establish either Article III standing or state law economic loss through payments made by others.[55] Simply put, the MMPA requires "an ascertainable *loss of money or property*." Mo. Rev. Stat. § 407.025.1(1) (emphasis added), and "Plaintiffs cannot proceed with claims to recover money that incontrovertibly they never lost." *Roberts*, 391 S.W.3d at 439.

Plaintiffs try to distinguish *Roberts*, arguing that "Gilead's unfair practices caused consumers to buy and take a needlessly risky drug." Mem. 23 n.73. But Plaintiffs are not suing because their TDF medicines caused them personal injury or in any way impacted their clinical outcomes. They are suing purely for economic loss, based on allegedly inflated charges that (as in

---

[55] *See, e.g.*, *Calderon v. Sixt Rent a Car, LLC*, 114 F.4th 1190, 1211 (11th Cir. 2024) (collecting cases); *Williamson v. Genentech, Inc.*, 2020 WL 1281532, at *6 (N.D. Cal. Mar. 18, 2020) ("[N]o court has used the collateral source rule to find Article III standing."); *In re Trasylol Prods. Liab. Litig.*, No. 08-MD-01928, 2010 WL 6098571, at *14-15 (S.D. Fla. Mar. 16, 2010) (applying same rule to California Unfair Competition Law claims, where plaintiff alleged drug maker misrepresented drug's kidney risks); *Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1060 (Ill. 2020) (citing *Roberts*; holding that collateral source rule cannot be invoked to "allow plaintiffs who have themselves suffered no injury, economic loss, or damages to sue anyway").

*Roberts* and other cases) the vast majority of putative class members never saw and never paid.[56]

Plaintiffs also contend "Gilead's arguments about the collateral source rule" were rejected in *In re HIV Antitrust Litigation*, 2023 WL 3603732 (N.D. Cal. May 23, 2023) (Mem. 24), but that case does not help them. The *HIV Antitrust Litigation* involved claims (which Gilead defeated at trial) that Gilead delayed entry of generic TDF medicines, thereby causing "end-payor plaintiffs" (e.g., PBMs or insurers) to overpay for certain branded medicines.[57] The court addressed the "collateral source rule" in the context of whether *third-party payor* damages could be reduced by Medicare Part D reimbursement. 2023 WL 3603732, at *2–3.[58] Critically, the third-party payors were claiming damages for payments *they made*. The court did not suggest that third-party payors could seek damages for payments they did not make in first place, or that *consumers* had standing to sue based on prices charged to the third-party payors (as Plaintiffs seek here).

In sum, neither Article III nor Missouri law allows Plaintiffs to claim monetary loss based on alleged overcharges they did not pay. Because individual inquiries are necessary to show injury-in-fact and whether putative class members suffered a loss of money, the class cannot be certified.

### 3. Plaintiffs' Authority Is Legally and Factually Inapposite.

Plaintiffs primarily rely on *Plubell v. Merck*, 289 S.W.3d 707 (Mo. Ct. App. 2009), but that case is inapposite. Legally, *Plubell* is a state case decided prior to *Wal-Mart v. Dukes*, and it does not reflect federal class certification standards, nor Article III standing principles. *Plubell* relied

---

[56] Benefits provided by Gilead's own financial assistance program, or any program that consumers did not contribute to, could not be subject to the collateral source rule even if the rule were potentially applicable. *See Tatum v. Van Liner Ins. Co. of Fenton*, 104 F.3d 223, 225 (8th Cir. 1997) (collateral source rule only applies to payments "wholly independent" from defendant and "depends on proof that the plaintiff has contributed to the fund he claims as a collateral source"). Even if the collateral source rule applies, it still would require individual inquiries.

[57] *See In re HIV Antitrust Litig.*, 2022 WL 22609107 (N.D. Cal. Sept. 27, 2022).

[58] Specifically, the court held the collateral source rule may or may not apply depending on the particular state law, but that the question of set-off would be for the court after the jury trial.

on state procedural rules that the "plaintiffs' allegations are accepted as true." 289 S.W.3d at 710 n.2, 712, 715 (emphasis added). Those standards conflict with the "rigorous analysis" required by Rule 23. *Comcast*, 569 U.S. at 33–34. Numerous federal courts have distinguished *Plubell* when confronted with MMPA claims. *See BPA*, 2011 WL 6740338, at *3 (denying certification despite *Plubell*); *Avandia*, 100 F. Supp. 3d at 446 (calling *Plubell* "of limited value"); *Saavedra*, 2014 WL 7338930, at *5 n.7 (distinguishing *Plubell* as "at odds with the Rule 23 inquiry"); *see also Povich*, 2017 WL 1058850, at *2 (rejecting reliance on *Plubell*; whether litigant can sue in state court "has no bearing on that party's Article III standing in federal court").[59]

   *Plubell* is also factually distinguishable, as it involved an alleged uniform failure to disclose cardiovascular risks (including risk of death) so severe that Vioxx was withdrawn from the market, meaning the product was alleged to have zero value. 289 S.W.3d at 710–11, 714. Here, although Plaintiffs initially alleged (as in *Plubell*) that the true value of TDF was "$0.00" (DX 35, at 21), they have abandoned that contention and now concede that the TDF medicines have life-saving benefits and are appropriately prescribed. *Supra* at 8. And unlike in *Vioxx*, Gilead made ongoing disclosures and announcements about TDF and TDF *during the class period*. *Supra* at 3-6. Thus, this case is far more similar to *BPA* than *Plubell*. *BPA*, 2011 WL 6740338, at *5-6.

   At bottom, "a class cannot be certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to individual claims." *Wal-Mart*, 564 U.S. at 367. Issues of varying information over the 12-year class period, patient-specific prescribing factors, and variation in payments (if any) would all be relevant for an individual MMPA claim. Those issues do not cease

---

[59] Plaintiffs also rely on *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 2014 WL 108197, at *7 (D. Mass. Jan. 10, 2014). Mem. 17, 18, 21. That court erroneously believed the MMPA does not even require *causation*, and it certified a class based on a "novel theory"—not asserted as the basis of loss here—that an inability to make an "informed decision" was itself a harm.

being relevant merely because they are not conducive to trying the case on a classwide basis.

**B.     Plaintiffs' Model for Calculating Classwide Loss Fails Under *Comcast*.**

Plaintiffs' motion should be denied for the reasons above, without needing to delve into their MMPA damages model. To the extent the Court considers that model, it cannot survive the rigorous analysis required by Rule 23 and *Comcast* (nor Gilead's motion to exclude).[60]

In *Comcast*, the Supreme Court emphasized that an expert must "must measure only those damages attributable" to the theory of liability, and "[i]f the model does not even attempt to do that," it cannot satisfy Rule 23. *Id.* at 35; *see also id.* at 32, 36-37 (rejecting model that did "not isolate damages" resulting from liability, and alleged overpayments could have been caused by "unrelated" factors). The Court rejected the notion that challenges to the model were a premature attacks on the merits, explaining that "[u]nder that logic, at the class-certification stage *any* method of measurement [would be] acceptable so long as it can be applied classwide," and "[s]uch a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* at 35-36.

Here, Plaintiffs seek to show classwide ascertainable loss under a "benefit of the bargain" overpayment theory based on "the difference between the value of the product as represented and the actual value of the product received." Mem. 19. Plaintiffs' expert uses "value" to refer to "market price" and he seeks to calculate the different between (a) the so-called **"retail" prices of branded TDF medicines** (purportedly to reflect "what Class Members paid" for the "as represented" value); and (b) the **price of generic TDF medicines** (purportedly to reflect "what Class Members would have paid," or the "actual" value, absent the challenged conduct). Bradford ¶¶ 57-58. As explained below, those benchmarks are unreliable and untethered to the facts and legal theories. The model cannot serve as classwide proof of an ascertainable loss, and thus

---

[60] The Court would also have to resolve Gilead's motion to exclude the opinion of Dr. Nagaich on when TAF could have been available, which provides the start date for Bradford's model.

individualized questions "will inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34; *see In re Emerson Elec. Co. Wet/Dry Vac Mktg. & Sales Litig.*, 2021 WL 5003102, at *4-7 (E.D. Mo. Oct. 28, 2021), 2022 WL 670131, at *3 (E.D. Mo. Mar. 7, 2022) (excluding expert and then denying certification due to failure of expert model).

### 1. Plaintiffs' "Retail Price" Metrics Do Not Appropriately Measure Consumers' Loss of Money or the Nature of Their "Bargain."

Plaintiffs' model would use the TDF medicines' historical brand "retail" prices to measure their "as represented" value. Bradford ¶ 60, 62-70. But the model's price metrics derive form Gilead's WAC prices for wholesale sales, with the "retail price" largely reflecting amounts that third-party payors (like insurers) pay. Baker ¶¶ 22, 32-38. So-called "retail" prices are themselves highly variable and, as noted above, have no relation to what most putative class members pay, are aware of, or what influences their choices. *Id.* ¶¶ 117–122. There is no basis to assume that the financial incentives, negotiations, and profit margins relating to transactions among *wholesalers*, *pharmacies*, and *third-party payors* define a uniform "bargain" or "value" for *consumers*. *See id.*; DX 18, at 120:5–125:19 (Bradford admitting commercial entities' incentives and decisions differ from consumers'; he is unaware of economic literature using "retail" price as measure of patient value; and in his research he used out-of-pocket costs); *Saavedra*, 2014 WL 7338930, at *5 ("[i]n an ordinary market, price is a proxy for value," but "the numerous complicating factors in the prescription drug market sever the relationship between price and value").[61]

Plaintiffs' approach leads to absurd results, as someone who paid $0 or a small co-pay for their TDF medicines somehow suffered a "loss of money" of *thousands of dollars* per prescription.

---

[61] *See also Heindel v. Pfizer Inc.*, 381 F. Supp. 2d 364, 380 (D.N.J. 2004) (calling it "patently absurd" to assume prescription drug market is an "efficient market" in which disclosures about a drug's risk affect what consumers pay); *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1336-37 (S.D. Fla. 2007) (rejecting similar "faulty premise").

Baker ¶ 164 & ex. 13. ███████████████████████████████████ ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ ███

████████████████████████████████████████████████. *Id.*

Accordingly, the model fails. Benefit-of-the-bargain damages should "place an injured party in the position he would have been in," but "should not place a plaintiff in a *better* position" than if the conduct never occurred. *Emerson*, 2021 WL 5003102, at *3. While courts generally use the benefit of the bargain rule—a common law fraud remedy—for MMPA claims, "the particular facts of each case determine which measure is appropriate." *Id.*; *see also BPA*, 2011 WL 6740338, at *6 (rejecting "benefit of the bargain" theory that would result in "inappropriate measure" of damages). Even if TAF has lower risks as Plaintiffs allege, it is not plausible that consumers "lost" thousands of dollars per prescription by taking an FDA-approved and DHHS-recommended medicine that saved their lives, caused no harm, and cost them little-to-nothing out-of-pocket.

Plaintiffs argue that a person's actual purchase price does not necessarily limit benefit-of-the-bargain damages, citing *Craft v. Philip Morris Co.*, 2003 WL 23139381 (Mo. Cir. Ct. Dec. 31, 2003). But the examples in *Craft* involve property with a market resale value: e.g., a "bidder at a private estate sale" purchases "an antique Bentley" for $150,000, expecting it to have an as-represented market price of $300,000. *Id.* at *7–8. Prescription drugs cannot legally be re-sold and do not have a "market" value in that sense. Further, the product in *Craft* (low-tar cigarettes) failed to deliver benefits expressly represented on the package—in contrast to the TDF medicines, which did perform as represented on the label. And *Craft* merely found that an expert *in theory* may be able to develop a model to show the "economic worth" of the "lost 'gain.'" *Id.* at *9. The court did not suggest, for example, that a $5 pack of cigarettes plausibly resulted in a $2,000 economic loss.

### 2. Generic TDF Pricing After the Class Period Is Not a Valid Measure for the Actual Value or But-For Market Price of the Brand Medicines.

Bradford's benchmark is also unreliable. For the alleged "actual value" of the Gilead's TDF medicines, Bradford uses the price of generic versions of TDF medicines, which began entering the market in 2017. *Supra* at 7. Yet Bradford concedes that he is not suggesting that generic competition would have started earlier in the but-for world (i.e., that TDF would have gone "off patent" earlier). DX 18, at 173:7–15. Generic pricing years after the class period is not a reasonable proxy for the market value of brand TDF drugs during the class period, i.e., the price at which Gilead would have sold its brand TDF medicines, absent the challenged conduct.

**First**, the "market value" of a product involves "the interaction of *both* supply *and* demand," defined not only based on the price at which buyers are willing to pay, but also the price at which *the seller would be willing to sell. Emerson*, 2021 WL 5003102, at *4. In *Emerson*, the court excluded a damages model—and thus denied class certification—where the expert opined that disclosures of a product defect would reduce demand for the drug but did not take into account supply considerations—i.e., the price at which manufacturer would be willing to sell. *Id.* at *5–7.

The same problem exists here. Bradford conceded at deposition that he is not opining that Gilead or any reasonable brand manufacturer would have sold brand TDF medicines at generic prices during the Class Period, even if TAF were available. DX 18, at 183:6–24, 222:9–226:13. Plaintiff's industry expert, Saskia Fontein, was asked whether she would expect Gilead to have priced its TDF medicines at generic levels once TAF became available, and she said no. DX 17, at 254:10-259:6. While Bradford says he conducted a so-called "revealed preference analysis" to show consumer preference (demand) for TAF over TDF, his analysis still is not a measurement of the *price* at which Gilead would have been willing to sell the TDF medicines in the but-for world.

Nor is there any need to speculate about what prices Gilead would have charged in the but-

for world because we know what happened in the real world: Gilead's price for its brand TDF medicines continued to rise, even as the market gained additional information about TDF and TAF, even after TAF came onto the market, and even after entry of generic TDF. *Supra* at 7 & n.24. To be consistent with Plaintiffs' theory of liability, one would have expected TDF's "market" prices to fall as additional disclosures about TDF's risks and TAF's potential benefits occurred. That the opposite happened shows "there is no record evidence" that the price of the TDF medicines was "in any way predicated" on the factors assumed by Plaintiffs' theory of liability. *Judy*, 2010 WL 3001745, at *4 (overpayment theory failed to support class treatment where there was no evidence that prices were premised on assumptions made by plaintiff); Baker ¶¶ 125–127 & ex. 6, 7.[62]

**Second**, the decline in generic pricing does not reflect a drug's "true" value or the impact of the alleged violations, but instead reflects the dynamics of generic competition once a brand drug's patents expire. Baker ¶¶ 24, 39-44, 129-136. As explained above (and as Bradford agrees), generic drugs are typically priced at a discount to brand, and as more generic sellers enter the market, generic prices fall further. That is what occurred here: the price of generic TDF medicines fell following entry of over a dozen generic sellers for reasons unrelated and disconnected in time to TAF's launch or any purported new information about TAF and TDF. *Supra* at 7.

Plaintiffs' expert concedes he made no attempt to measure the extent to which the decline in generic TDF pricing was caused by the challenged conduct, as opposed to the effects of generic competition. DX 18, at 198:2–7, 216:18–219:5; *see also id.* at 155:24–169:20. While experts have used brand-to-generic price comparisons for claims that a brand manufacturer delayed generic

---

[62] Further, Bradford did not analyze separately damages from their misrepresentation theory compared to their TAF-delay theory. DX 18, at 171:10-172:3. Thus, if the Court finds (as it should) individual issues as to the alleged misrepresentations (given varying information during the class period), or a lack of foundation for assumptions as to either form of alleged misconduct, the model cannot satisfy Rule 23. *See Comcast*, 569 U.S. at 37-38; Baker ¶¶ 146-155.

competition, *see HIV Antitrust Litig.*, 2022 WL 22609107, that is not Plaintiffs' theory here.

Thus, Plaintiffs' model based on a brand-to-generic retail price comparison does not fit their liability theory and "does not even attempt" to isolate and "measure only those damages attributable to" the conduct challenged. *Comcast*, 569 U.S. at 35. It thus cannot satisfy Rule 23 and absent such a model, Plaintiffs' MMPA claim devolves into individualized inquiries.

### C.    Individual Issues Predominate as to the Unjust Enrichment Claim.

The Court should also deny class treatment for the unjust enrichment claim, which requires that (1) the plaintiff "conferred a benefit and enriched" the defendant; (2) "the enrichment was at [the plaintiff's] expense"; and (3) it would be unjust for the defendant to retain the benefit. *Vitello v. Natrol, LLC*, 50 F.4th 689, 695 (8th Cir. 2022). A defendant's "receipt of benefits is not enough, absent a showing that it would be unjust for the defendant to retain the benefit." *Anderson v. Bass Pro Outdoor World, LLC*, 355 F. Supp. 3d 830, 839 (W.D. Mo. 2018). Where plaintiffs have "received the benefits they bargained for, there is no unjust enrichment." *Id.*

The individual issues above relating to causation, loss, and standing equally defeat predominance as to the unjust enrichment claims. *See Coca-Cola*, 249 S.W.3d at 858 & n.2 (denying certification based on individualized issues of whether consumers would purchase product even if truth were known; noting that "unjust enrichment claim and [MMPA] claim need not be distinguished" for class certification analysis); *White*, 2018 WL 3748405, at *4 (denying certification of MMPA and unjust enrichment claims); *BPA*, 2011 WL 6740338, at *4 (same).

If anything, the unjust enrichment claim is even more ill-suited to class treatment. Whatever standards purportedly apply to a pre-2020 statutory MMPA claim, an unjust enrichment claim depends on the equities "as between the two parties," and questions regarding individual consumers' knowledge and expectations, patient-specific prescribing factors, actual benefits received, and amounts paid are squarely relevant to that inquiry. *See BPA*, 2011 WL 6740338, *6;

*see also White*, 2018 WL 3748405, at *4.[63] Further, to recover for unjust enrichment, the money paid to the defendant must be paid "by that particular plaintiff," *Landers v. Monsanto Co.*, 2017 WL 3531378, at *7 (E.D. Mo. Aug. 17, 2017), confirming the need for individual inquiries into amounts that putative class members themselves paid (if any).

Plaintiffs' individual circumstances illustrate the point



. *Supra* at 10-11.

*Supra* at 11-12.

If Plaintiffs were to litigate their claims in individual actions, their cases would necessarily involve inquiries into, and likely turn on, their individual facts. The Court cannot deny Gilead its due process right to litigate the fact-specific equities as to other putative class members merely

---

[63] *Cf. Vitello*, 50 F.4th at 695 (holding that particular circumstances of plaintiff's purchase foreclosed claim that it was unjust for defendant to retain price paid, even if defendant allegedly false promoted product); *Hennessey v. Gap, Inc.*, 86 F.4th 823, 831 (8th Cir. 2023) ("[T]here can be no unjust enrichment if the parties receive what they intended to obtain.").

because the case was brought as a class action. *See Wal-Mart*, 564 U.S. at 367 (class cannot be certified on premise that defendant would be deprived of right to litigate individual defenses).[64]

### D. The Class Also Fails for Lack of Typicality and Adequacy, and Superiority.

Plaintiffs fail to satisfy Rule 23 for additional reasons. Proposed representatives are not typical or adequate when they are "subject to a unique defense that threatens to play a major role in the litigation," *In re Milk Prod. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999), or when their facts fail to support key allegations, *Marcormic v. Vi-Jon LLC*, 2023 WL 1100378, at *3-4 (E.D. Mo. Jan. 30, 2023).[65] Similar to *Marcormic*, Plaintiffs allege they would not have purchased TDF medicines if TAF were available and the truth about TDF's risks were known, but in fact, both Plaintiffs did so. *Supra* at 10-12. Such facts undermine Plaintiffs' sworn declarations and theory, raising credibility questions and disputes that would distract from any class claims.

Nor can Plaintiffs show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P 23(b)(3); *see also BPA*, 2011 WL 6740338, at *7–8. For the reasons explained above, the claims involve a host of manageability problems, including, among other things, varying information over the course of the class period, distinguishing the reasons and conditions for which the TDF medicines were prescribed, and carving out of the class those who have not suffered loss and lack standing.

### V.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.

---

[64] Bradford's unjust enrichment calculation is also fundamentally flawed, *see* Baker ¶¶ 191-95, but that is beside the point given the individual issues of liability to any given class member.

[65] *See also In re Teflon Prod. Liab. Litig.*, 254 F.R.D. 354, 366 (S.D. Iowa 2008) (no typicality where proposed representative continued using product even after informed of health risks); *Irvin E. Schermer Tr. by Kline v. Sun Equities Corp.*, 116 F.R.D. 332, 336-37 (D. Minn. 1987) (explaining that "the presence of even an arguable defense" may destroy typicality).

Date:  March 21, 2025

Respectfully submitted,

By: */s/ David R. Carpenter*
David R. Carpenter (*pro hac vice*)
drcarpenter@sidley.com
Sean A. Commons (*pro hac vice*)
scommons@sidley.com
SIDLEY AUSTIN LLP
350 S. Grand Avenue
Los Angeles, California 90071
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

William Michael Corrigan, Jr. (No. 33169
(MO))
Tyler Schwettman (No. 72457 (MO))
Shook, Hardy & Bacon L.L.P.
190 Carondelet Plaza
Suite 1350
Clayton, MO 63105
(314) 690-0200
bcorrigan@shb.com
tschwettman@shb.com

Jennifer A. Hill (No. 60696 (MO))
Shook, Hardy & Bacon L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
(816) 474-6550
jshill@shb.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

       I hereby certify that I electronically filed on this 21st day of March 2025, the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

J. Toji Calabro
Email: tojicalabro@calabro-law.com
Two Pershing Square
2300 Main Street, 9th Floor
Kansas City, MO 64108
Tel: (555) 585-1247


Patrick J. Stueve
Todd E. Hilton
Kasey A. Youngentob, *pro hac vice*
David A. Hickey
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
stueve@stuevesiegel.com
hilton@stuevesiegel.com
youngentob@stuevesiegel.com
hickey@stuevesiegel.com


*/s/ David R. Carpenter*
David R. Carpenter