**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**


|  |  |  |
|---|---|---|
| JONATHAN SEARCY, *et al.*, | ) ) ) | Case No. 4:20-cv-01523-MTS |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| GILEAD SCIENCES, INC., | ) ) | |
| Defendant. | ) | |


**PLAINTIFFS' REPLY IN SUPPORT OF THEIR**
**<u>MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

Introduction .................................................................................................................... 1

   A.  Common questions predominate for the MMPA claim. ....................................... 1

      1.  All class members were injured because none could choose TAF and all bought TDF at objectively inflated prices. ...................................................... 3

      2.  Gilead's collateral source rule argument fails. ............................................... 7

   B.  Plaintiffs' economist reliably calculates the classwide benefit of the bargain damages caused by Gilead's unfair practices, which easily satisfies *Comcast* ........................ 10

      1.  Dr. Bradford reliably measures TDF's represented value using retail price. ......................... 11

      2.  Dr. Bradford's "actual" value benchmark is reliable. ................................... 12

   C.  Common issues also predominate for the unjust enrichment claim. ................... 13

   D.  Gilead's typicality, adequacy and superiority arguments fail ........................... 15

Conclusion ................................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Anderson v. Bass Pro Outdoor World, LLC*,
    355 F.Supp.3d 830 (W.D. Mo. 2018) ................................................................. 14

*Alabama Aircraft Indus., Inc. v. Boeing Co.*,
    133 F.4th 1238 (11th Cir. 2025) ......................................................................... 15

*Barfield v. Sho-Me Power Elec. Coop.*,
    852 F.3d 795 (8th Cir. 2017) ......................................................................... 1, 2, 3

*Behlmann v. Century Sur. Co.*,
    794 F.3d 960 (8th Cir. 2015) .................................................................................. 7

*Boone v. PepsiCo, Inc.*,
    653 F.Supp.3d 635 (E.D. Mo. 2023) ..................................................................... 4

*Brown v. American Transfer and Storage Co.*,
    601 S.W.2d 931 (Tex. 1980) .................................................................................. 9

*Burnett v. National Ass'n of Realtors*,
    2022 WL 1203100 (W.D. Mo. Apr. 22, 2022) ..................................................... 3

*Busch v. Gorbachevskiy*,
    2023 WL 6121123 (Conn. Super. Ct. Sept. 14, 2023) .......................................... 8

*Calderon v. Sixt Rent A Car, LLC*,
    114 F.4th 1190 (11th Cir. 2024) ........................................................................... 8

*Carlsen v. GameStop, Inc.*,
    833 F.3d 903 (8th Cir. 2016) ................................................................................. 4

*Cheatem v. Landmark Realty of Missouri, LLC*,
    2022 WL 5144772 (W.D. Mo. July 1, 2022) ....................................................... 8

*Colon v. Waukegan Housing Authority*,
    729 F.Supp.3d 831 (N.D. Ill. 2024) ...................................................................... 9

*Cope v. Let's Eat Out, Inc.*,
    319 F.R.D. 544 (W.D. Mo. 2017) .......................................................................... 4

*Craft v. Phillip Morris Companies, Inc.*,
    2003 WL 23139381 (Mo. Cir. Ct. Dec. 31, 2003) ............................................... 2

*Deck v. Teasley*,
    322 S.W.3d 536 (Mo. 2010) ............................................................................ 7, 12

*Dennis v. The Andersons, Inc.*,
    2025 WL 1331795 (N.D. Ill. May 7, 2025) ................................................................ 4

*Diesel v. Mariani Packing Co.*,
    2024 WL 1674520 (E.D. Mo. Apr. 18, 2024) ...................................................... 3, 4

*Forsythe v. Teva Pharm. Indus. Ltd.*,
    102 F.4th 152 (3d Cir. 2024) ................................................................................ 10

*Green-Cooper v. Brinker Int'l, Inc.*,
    73 F.4th 883 (11th Cir. 2023) ............................................................................... 10

*Hibbs v. Jeep Corp.*,
    666 S.W.2d 792 (Mo. Ct. App. 1984) .................................................................... 7

*Hughes v. Wheeler*,
    364 F.3d 920 (8th Cir. 2004) ................................................................................ 15

*In re Avandia Mktg. Sales Prac. & Prods. Liab. Litig.*,
    100 F.Supp.3d 441 (E.D. Pa. 2015) ....................................................................... 4

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*,
    2011 6740338 (W.D. Mo. Dec. 22, 2011) .............................................................. 3

*In re Celexa and Lexapro Marketing and Sales Practices Litig.*,
    2014 WL 108197 (D. Mass. Jan. 10, 2014) ............................................................ 2

*In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*,
    2019 WL 1418292 (W.D. Mo. Mar. 21, 2019) ..................................................... 14

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
    2020 WL 1180550 (D. Kan. Mar. 10, 2020) ........................................................ 10

*In re Facebook, Inc. Internet Tracking Litigation*,
    956 F.3d 589 (9th Cir. 2020) ................................................................................ 15

*In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig.*,
    422 F.Supp.3d 194 (D.D.C. 2019) ....................................................................... 14

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
    268 F.R.D. 652 (S.D. Cal. 2010) ............................................................................ 5

*In re Polaris Mktg.*,
    9 F.4th 793 (8th Cir. 2021) .................................................................................... 5

*In re Pork Antitrust Litig.*,
    665 F.Supp.3d 967 (D. Minn. 2023) ............................................................... 2, 14

*In re St. Jude Med., Inc.,*
      522 F.3d 836 (8th Cir. 2008) .................................................................. 3

*In re Takata Airbag Prod. Liab. Litig.,*
      2022 WL 4594123 (S.D. Fla. July 19, 2022) ...................................... 13

*In re Trasylol Prods. Liab. Litig.,*
      2010 WL 6098571 (S.D. Fla. Mar. 16, 2010) ...................................... 8

*In re Zurn Pex Plumbing,*
      644 F.3d 604 (8th Cir. 2011) .................................................................. 4

*Johnson v. Gilead Scis., Inc.,*
      563 F.Supp.3d 981 (E.D. Mo. 2021) .................................................. 4, 6

*Judy v. Pfizer, Inc.,*
      2010 WL 30001745 (Mo. Cir. Ct. July 27, 2010) .............................. 4

*Kickham v. Carter,*
      335 S.W.2d 83 (Mo. 1960) .................................................................... 8

*Landers v. Monsanto Co.,*
      2017 WL 3531378 (E.D. Mo. Aug. 17, 2017) .................................... 15

*Lewis v. Lead Indus. Ass'n,*
      2020 IL 124107 .................................................................................... 8

*Liberty Surplus Ins. Corp. v. Kaufman Lynn Constr., Inc.,*
      130 F.4th 903 (11th Cir. 2025) ............................................................ 4

*Lizama v. Venus Labs.*, Inc.,
      679 F. Supp. 3d 848 (E.D. Mo. 2023) ................................................ 4

*May v. Makita U.S.A., Inc.,*
      2023 WL 417487 (E.D. Mo. Jan. 26, 2023) ........................................ 5

*Meek v. Kansas City Life Ins. Co.,*
      126 F.4th 577 (8th Cir. 2025) ..............................................................11

*Mikhlin v. Johnson & Johnson,*
      2014 WL 6084004 (E.D. Mo. Nov. 13, 2014) .................................... 5

*Murphy v. Gospel for Asia, Inc.,*
      327 F.R.D. 227 (W.D. Ark. 2018) ...................................................... 14

*Newman v. Bayer Corp.,*
      2025 WL 856225 (S.D.N.Y. Mar. 19, 2025) ......................................11

*Newport v. CVS Pharmacy, Inc.*,
    --- F.Supp.3d ---, 2024 WL 4836072 (E.D. Mo. Nov. 20, 2024) ...................................... 4

*Owen v. GMC*,
    2007 WL 1655760 (W.D. Mo. June 5, 2007) .................................................... 3

*Pitman v. City of Columbia*,
    309 S.W.3d 395 (Mo. Ct. App. 2010) .......................................................... 14

*Plubell v. Merck & Co.*,
    289 S.W.3d 707 (Mo. Ct. App. 2009) .......................................................... 2

*Povich v. Combe Inc*,
    2017 WL 1058850 (E.D. Mo. Mar. 21, 2017) .................................................. 5

*Prot. Sprinkler Co. v. Lou Charno Studio, Inc.*,
    888 S.W.2d 422 (Mo. Ct. App. 1994) .......................................................... 7

*Roberts v. BJC Health System*,
    391 S.W.3d 433 (Mo. 2013) .................................................................... 8

*Saavedra v. Eli Lilly & Co.*,
    2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ............................................. 3, 4

*Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*,
    601 F.3d 1159 (11th Cir. 2010) ............................................................... 10

*Simon and Simon, PC v. Align Tech., Inc*,
    2023 WL 8261297 (N.D. Cal. Nov. 29, 2023) ............................................... 10

*Starr v. VSL Pharmaceuticals, Inc.*,
    2025 WL 1258016 (D. Md. Apr. 30, 2025) .................................................. 14

*State ex. rel Coca-Cola v. Nixon*,
    249 S.W.3d 855 (Mo. 2008) ................................................................ 3, 13

*Thomas v. Ramushi*,
    674 S.W.3d 112 (Mo. Ct. App. 2023) .......................................................... 9

*Thompson v. Allergan USA, Inc.*,
    993 F.Supp.2d 1007 (E.D. Mo. 2014) .......................................................... 5

*Thornton v. Pinnacle Foods Grp. LLC*,
    2016 WL 4073713 (E.D. Mo. Aug. 1, 2016) .................................................. 4

*Van v. LLR, Inc.*,
    2023 WL 8434456 (D. Alaska Dec. 5, 2023) .................................................. 8

*Vitello v. Natrol, LLC,*
  50 F.4th 689 (8th Cir. 2022) ................................................................................. 4

*Walker v. Cedar Fair, L.P.,*
  750 F.Supp.3d 812 (N.D. Ohio 2024) .................................................................. 14

*White v. Just Born, Inc.,*
  2018 WL 3748405 (W.D. Mo. Aug. 7, 2018) ......................................................... 3

*Williamson v. Genentech, Inc.,*
  2020 WL 1281532 (N.D. Cal. Mar. 18, 2020) ....................................................... 8

## **Statutes**

Mo. Rev. Stat. § 490.715 .............................................................................. 7, 8

## <u>INTRODUCTION</u>

The Missouri Merchandising Practices Act serves as a bulwark against precisely the conduct at issue here. Under a documented profit-maximization strategy, Gilead hid information and suppressed a safer version of tenofovir to reap billions in profit selling needlessly toxic and risky TDF to vulnerable Missourians. Gilead only released the safer alternative, TAF, to extend its sales as its exclusive rights and windfall profits on TDF were set to expire.

To escape accountability for its scheme, Gilead effectively asks this Court to create a special pharmaceutical immunity for deceptive practices that simply does not exist in the statute. This Court declined to do so in denying Gilead's motion to dismiss and should not do so now. Gilead also tries to reframe this case as requiring patient-by-patient analysis. Yet its own business model tells a different story. Gilead set uniform pricing for its drugs and marketed TAF as categorically better than TDF for everyone—not for only select individuals. And while Gilead nitpicks around the edges of the market data, it marshals no contrary *evidence* of its own and cannot escape its own dispositive admission: purchasers with full, accurate information vastly prefer TAF over TDF. This acknowledgment alone undermines Gilead's entire position.

Gilead notes the "rigorous" analysis needed for class certification, but this goes both ways: "defenses must be subjected to the same rigorous inquiry as plaintiffs' claims." *Barfield v. Sho-Me Power Elec. Coop.*, 852 F.3d 795, 806 (8th Cir. 2017) (certifying class where defendant did not support its certification arguments with evidence). Gilead fails to marshal sufficient evidence to rebut Plaintiffs' comprehensive evidentiary record establishing the superiority of class treatment.

Plaintiffs have established the requirements of Rule 23, and the class should be certified.

### A.    Common questions predominate for the MMPA claim.

Gilead does not meaningfully contest that the core liability issues turn on common evidence. Pls.' Mem. in. Supp. of Mot. for Class Certification ("Mem.") at 18-19. Plaintiffs' evidence shows Gilead violated the MMPA by unlawfully delaying TAF development and

concealing its superior safety profile to maximize profits. *Id.* And Gilead's own expert explains why: "Gilead would have no economic incentive to price its TDF-containing medications to compete with its own TAF-containing medications because it values the profits from both." Baker Rpt., Doc. [227-3] ¶ 135. This deliberate, profit-maximizing decision from Gilead's upper management caused *all* consumers to suffer an ascertainable loss when they were deprived of the ability to choose TAF during the entire class period and bought TDF at inflated prices. Gilead disputes many of these well-supported allegations by relying on common evidence, thereby reinforcing that predominance is satisfied. *See In re Pork Antitrust Litig.*, 665 F.Supp.3d 967, 996 (D. Minn. 2023) (common evidence for defense supports predominance).

Gilead scrambles, and fails, to distinguish *Plubell v. Merck & Co.*, 289 S.W.3d 707 (Mo. Ct. App. 2009), which found that pharmaceutical claims under the MMPA require no special treatment. First, Gilead suggests *Plubell* "does not reflect federal class action standards." Def.'s Opp. to Mot. for Class Certification ("Opp.") at 21. But the Eighth Circuit has repeatedly recognized that *Plubell* contains the substantive requirements for MMPA claims under Missouri law, which facilitates Rule 23 certification. Mem. 17-18. Second, Gilead suggests *Plubell* "involved the failure to disclose . . . risks . . . so severe that Vioxx was withdrawn from the market." Opp. 22. But the MMPA is not limited to such cases. And in any case, like Vioxx, TDF medications carry severe risks that Gilead concealed while simultaneously delaying development of a safer alternative. Mem. 3-7. Though Plaintiffs do not claim TDF is worthless, the undisputed **evidence** shows a significant difference between what consumers expected and what they received: an objective, ascertainable loss under Missouri law, even if TDF remains on the market. *In re Celexa and Lexapro Marketing and Sales Practices Litig.*, 2014 WL 108197, at *7 (D. Mass. Jan. 10, 2014); *Craft v. Phillip Morris Companies, Inc.*, 2003 WL 23139381 (Mo. Cir. Ct. Dec. 31, 2003).

1.    **All class members were injured because none could choose TAF and all bought TDF at objectively inflated prices.**

Gilead's lead argument fails out of the gate. Gilead claims that those who (1) took TDF based on accurate labeling that performed as represented without causing them harm, or (2) would have taken TDF "regardless of the challenged conduct" cannot be injured. Opp. 14. But Gilead "point[s] to no *evidence* that even one class member" like that exists. *Barfield*, 852 F.3d at 806 (emphasis added). Here, the "challenged conduct" is that Gilead used deceptive practices to keep TAF off the market to artificially inflate TDF's market price. Because the class period closes before TAF came on the market and the deception ended, *no* putative class member had access to TAF during the class period, and *every* putative class member was harmed by buying TDF at objectively inflated market prices.[1] And this is proven by gold-standard market data. Once TAF came on the market, there was a precipitous shift to TAF over TDF. TDF sales began to stabilize only when the price dropped to generic levels. Expert testimony and Gilead's own documents confirm this practice was material to consumers. Mem. 9-10; *see* Harbour Rpt., Doc. [208-21] ¶ 42; Bradford Rpt., Doc. [208-28] ¶¶ 36-48. This evidence establishes an objective measure of damages for all class members, *Diesel v. Mariani Packing Co.*, 2024 WL 1674520, at *9 (E.D. Mo. Apr. 18, 2024) (rejecting the same arguments, and collecting cases distinguishing subjective and objective loss),[2] and distinguishes the cases Gilead cites.[3] Indeed, Plaintiffs' expert quantifies

---

[1] Thus, Gilead's citations to *In re St. Jude Med., Inc.*, 522 F.3d 836 (8th Cir. 2008), and *Owen v. GMC*, 2007 WL 1655760 (W.D. Mo. June 5, 2007), are inapposite because Gilead's MMPA violation caused *all* class members to overpay for TDF.

[2] The Missouri Supreme Court in *Coca-Cola* "made certain to distinguish the plaintiffs' subjective injury, which requires proof that the class members actually had a certain preference, from MMPA cases involving 'an economic injury that was based on an objective characteristic.'" *Burnett v. National Ass'n of Realtors*, 2022 WL 1203100, at *18 (W.D. Mo. Apr. 22, 2022) (citing *State ex. rel Coca-Cola v. Nixon*¸ 249 S.W.3d 855 (Mo. 2008). Thus, even if consumers could possess knowledge about Gilead's unfair practices, it is irrelevant to whether they suffered an ascertainable loss. *Diesel*, 2024 WL 1674520, at *9.

[3] In *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, 2011 6740338 (W.D. Mo. Dec. 22, 2011), and *White v. Just Born, Inc*., 2018 WL 3748405 (W.D. Mo. Aug. 7, 2018), concerned putative class members who could have purchased the product "regardless of the

the "price point at which a patient would agree to take a drug, despite the risk of side effects and despite the existence of other, equally effective drugs that do not carry such risk." *In re Avandia Mktg. Sales Prac. & Prods. Liab. Litig.*, 100 F.Supp.3d 441, 446 (E.D. Pa. 2015). And because class members purchased TDF for its intended and approved use, causation is clear. *Cf. Judy v. Pfizer, Inc.,* 2010 WL 30001745, at *4 (Mo. Cir. Ct. July 27, 2010) (Trial Order) (unintended use); *see also Vitello v. Natrol, LLC*, 50 F.4th 689, 694 (8th Cir. 2022) (off-label use). [4]

### a.    Gilead's standing and ascertainable loss argument fails.

Plaintiffs' evidence shows that "TDF was worth less than the product as represented[; thus they have] an objectively ascertainable loss under the MMPA using the benefit of the bargain rule."[5] *See Johnson v. Gilead Scis., Inc.*, 563 F.Supp.3d 981, 989 (E.D. Mo. 2021). And because

---

challenged conduct." But as set forth in text, that could not happen here. The court in *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) took pains to point out the plaintiffs' "novel" theory of damages based on "subjective" notions of "consumer utility—a **concept distinct from price**," that differs from "typical benefit-of-the-bargain claims" that focus on the "intersection of supply and demand." *Id.* at *4 (emphasis added). But here, Plaintiffs' evidence is **actual,** objective sales data.

   [4] Gilead notes both Plaintiffs purchased TDF medicine after it disclosed certain data about TAF. Opp. 16, 30. This fact provides further evidence of Gilead's unfair practices. Gilead only made limited disclosures about TAF after securing its dominant position in the market. There is no evidence Plaintiffs had actual knowledge of Gilead's purported disclosures. And both Plaintiffs ultimately transitioned to TAF-based medications when they overcame significant delays directly attributable to Gilead's strategic delay releasing TAF. Mem. 9-10.

   [5] This Court's decision is consistent with the Eighth Circuit's view of ascertainable loss and standing. *See Carlsen v. GameStop, Inc.,* 833 F.3d 903, 909 (8th Cir. 2016) (devaluation of game subscription sufficient for standing); *In re Zurn Pex Plumbing*, 644 F.3d 604, 617 (8th Cir. 2011) ("dry plaintiffs" had standing even though their plumbing systems had not yet leaked). *See also Newport v. CVS Pharmacy, Inc.*, --- F.Supp.3d ---, 2024 WL 4836072, at *7 (E.D. Mo. Nov. 20, 2024) (ascertainable loss related to purchase of cough suppressant); *Lizama v. Venus Labs.*, Inc., 679 F. Supp. 3d 848, 862 (E.D. Mo. 2023) (premium paid based on reasonable but mistaken belief was an ascertainable loss); *Boone v. PepsiCo, Inc.*, 653 F.Supp.3d 635, 643–44 (E.D. Mo. 2023) (similar); *Thornton v. Pinnacle Foods Grp. LLC*, 2016 WL 4073713, at *3-4 (E.D. Mo. Aug. 1, 2016) (ascertainable loss from food with artificial ingredients); *Liberty Surplus Ins. Corp. v. Kaufman Lynn Constr., Inc.,* 130 F.4th 903, 909 (11th Cir. 2025) (recognizing standing where plaintiff "received a policy different than the one it bargained for, and paid a premium that was not commensurate with the coverage [actually] provided").

this evidence is common to the class, Gilead's argument fails.[6] *See Diesel*, 2024 WL 1674520, at *9 ("objective, economic, 'benefit-of-the-bargain' loss" conveys standing for all class members).

Gilead cites *In re Polaris Mktg.*, 9 F.4th 793 (8th Cir. 2021), but that case supports Plaintiffs here. It distinguishes cases in which plaintiffs allege only a "risk" that their product will manifest a "defect," versus those cases in which a defect is "manifest" in the plaintiff's product. Because this is a consumer protection instead of a products liability case, the "manifest defect rule" does not apply. *See May v. Makita U.S.A., Inc.*, 2023 WL 417487, at *2-3 (E.D. Mo. Jan. 26, 2023) (under consumer protection statute, "plaintiff who overpays for a product has a cognizable Article III injury"). Even if it were, the injury here is manifest in every class member's product purchase: the member was deprived of the choice to take TAF, and they necessarily overpaid for TDF— based on objective market data and expert analysis.[7] *Polaris¸* 9 F.4th at 796 (distinguishing *Zurn*, noting expert testimony supported plaintiffs).[8]

---

[6] Setting aside all purchasers' objective loss, Gilead's argument suggesting uninjured class members still fails for three reasons: First, Gilead does not meaningfully dispute the "limited circumstances where customers still buy branded TDF after the class members are the direct result of Gilead's TAF delay." Mem. 9. Second, all class members are injured at the time of purchase and thus are injured even if they continued to purchase branded TDF later. *See Dennis v. The Andersons, Inc.*, 2025 WL 1331795, at *9 (N.D. Ill. May 7, 2025). And third, Eighth Circuit law is clear that "'fortuitous non-injury' to subset of class members will not necessarily defeat certification of an entire class, since a common policy or practice would expose the class as a whole to damages." *Cope v. Let's Eat Out, Inc.*, 319 F.R.D. 544, 553 (W.D. Mo. 2017) (citations omitted). And the data shows almost no people continue to purchase branded TDF.

[7] A manifest defect does not require physical injury to confer standing. Here, Gilead's unfair practices compelled consumers to use medications with higher doses of the drug's active ingredient, tenofovir. As Gilead's own research showed, tenofovir is toxic. And as the well-established toxicological principle recognizes, the dose makes the poison. Consider the case of lead-contaminated bottled water. Consumers who pay for pure water but receive contaminated water suffer an economic injury regardless of whether symptoms manifest or their thirst is quenched. All consumers received a product materially different from what was represented. The same is true here.

[8] None of Gilead's recycled motion to dismiss decisions are controlling or compelling. *See In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 664 (S.D. Cal. 2010) ("But the Court has already decided a motion to dismiss and cursory citations in opposition to class certification are the wrong place to find Plaintiffs' claims legally insufficient."). And none included evidence of objective, ascertainable loss caused by the defendant's deceptive conduct, like

### b.    Patient-specific prescribing decisions are irrelevant under the MMPA.

Because no class member had access to TAF, and every TDF purchase was overpriced based on objective data, Gilead's so-called "patient specific" arguments fail. While Gilead suggests some information about TDF's kidney and bone risks trickled out during the class period, this misses the point: no one had access to TAF during the class period. Opp. 16.

Further, Plaintiffs are "*not* obliged to plead or prove reliance as an element of an MMPA claim." *Johnson*, 563 F.Supp.3d at 989 (emphasis original). And Gilead has never sold drugs based on individual patient characteristics. As it repeatedly tells courts, Gilead sets a single price for its medication. Mem. 21; *see also United States v. Corvalan*, Case No. 1:23-cr-00110-MKV, Doc. [430] at 19. Gilead's contention that TAF's safety profile "only raises more individual questions" does not identify a single affected class member and contradicts its own marketing practices. Opp. 17. Gilead uniformly promoted patient transition from TDF to TAF based on TAF's superior safety profile for all patients, including PrEP users.[9] Mem. 9-10. Further, both the market and the medical community have rendered a clear verdict: healthcare providers overwhelmingly prefer prescribing TAF-based medications. Mem. 8-9. Although some patients continued using TDF after TAF became available, this was due to inertia from Gilead's unlawful practices, and more importantly: TDF's market share plummeted and only stabilized when generic versions entered the market at substantially reduced prices. Mem. 7-10, 25-26. This is undisputed.

The MMPA offers no safe harbor for misrepresenting consumable products. Gilead's interpretation would create an unprecedented exception for pharmaceutical and food manufactures,

---

Plaintiffs provide here. *See Povich v. Combe Inc*, 2017 WL 1058850, at *2 (E.D. Mo. Mar. 21, 2017) (plaintiff "does not dispute he received everything he intended to pay for"); *Mikhlin v. Johnson & Johnson*, 2014 WL 6084004, at *2-3 (E.D. Mo. Nov. 13, 2014) (dismissing because plaintiffs allege no fraudulent misrepresentation); *Thompson v. Allergan USA, Inc.*, 993 F.Supp.2d 1007 (E.D. Mo. 2014) (no misrepresentation alleged; package clearly said "single use" and that dosages was only two drops; no "logical or factual foundation").

[9] Angus Liu, Gilead's Converting Truvada PrEP Users to Descovy Faster Than Expected: Analyst, Fierce Pharma (Dec. 3, 2019), https://www.fiercepharma.com/marketing/gilead-s-converting-truvada-prep-users-to-descovy-faster-than-expected-analyst.

undermining the statute's core purpose of protecting consumers from marketplace deception. Gilead's position is contrary to Missouri law, public policy and common sense.

### 2.    Gilead's collateral source rule argument fails.

As noted above, all class members suffered an objective, ascertainable loss that satisfies standing and the MMPA. Yet Gilead argues its liability should be slashed or eliminated based on collateral payments made by *class members'* insurance. But evidence of those payments is inadmissible. Missouri law is unambiguous on this point:

> *No evidence of collateral sources*, or payments rendered under subsection 2 of this section, *shall be admissible* other than such evidence provided for in this section.

Mo. Rev. Stat. § 490.715(1) (emphasis added). "Section 490.715 applies to 'all causes of action.'" *Behlmann v. Century Sur. Co.*, 794 F.3d 960, 963 (8th Cir. 2015).[10] And the originating purpose of the rule is to "prevent[] a tortfeasor from reducing his or her liability to a plaintiff by proving that payments were made to the plaintiff by a collateral source," *Deck v. Teasley*, 322 S.W.3d 536, 538 (Mo. 2010),[11] which is exactly what Gilead attempts to do here.

The statute further provides that the "actual cost of the medical care or treatment" "shall be defined as a sum of money not to exceed the dollar amounts paid by *or on behalf of* a plaintiff or a patient whose care is at issue." § 490.715(5)(2) (emphasis added). Gilead has no response to this unambiguous statutory language. Thus, Gilead is simply wrong that Plaintiffs must show how much each individual class member paid out of pocket.

Gilead claims Searcy's experience "illustrates the individualized nature of the inquiry," and characterizes its copay assistance program as providing "free medicine." Opp. 19. This distorts

---

[10] *See also Hibbs v. Jeep Corp.*, 666 S.W.2d 792, 798–99 (Mo. Ct. App. 1984) (collateral source doctrine not limited to tort actions); *Prot. Sprinkler Co. v. Lou Charno Studio, Inc.*, 888 S.W.2d 422, 424 (Mo. Ct. App. 1994) (applying collateral source rule).

[11] *Behlmann* and *Deck* concerned an earlier version of the statute, but the rule's origin has not changed.

economic reality. Searcy (through insurance premiums and out of pocket costs) and his insurer paid Gilead tens of thousands of dollars per year for his TDF medications at artificially inflated prices. *See, e.g.,* Baker Rpt. 88, Ex. 14. Gilead's assistance program represents a small fraction of the price paid by and "on behalf of" Searcy. In any case, to the extent Gilead made any payments, such as through its financial assistance program, Gilead is "entitled to deduct and receive a credit for such payments from any judgment as provided for in section 490.710." § 490.715(3). But Gilead knows what qualifying payments it made, so crediting Gilead for such payments after a judgment is reached hardly renders those adjustments, or this class action, unmanageable.[12]

Still, Gilead's assertion "that the collateral source can 'come into play only after it is established that Plaintiff suffered ascertainable loss,'" by making an out of pocket payment personally, Opp. 20, contradicts section 490.715 and would undermine the MMPA's consumer-protection purpose by allowing pharmaceutical and medical-device manufacturers to escape liability when consumers have insurance coverage. *See Busch v. Gorbachevskiy*, 2023 WL 6121123, at *6 (Conn. Super. Ct. Sept. 14, 2023) ("Some courts state that plaintiffs who contract for insurance or other benefits with funds they could have used for other purposes are entitled to the benefit of their bargain." (citing *Kickham v. Carter*, 335 S.W.2d 83, 90 (Mo. 1960)).

Gilead relies on two inapposite cases, where plaintiffs merely challenged fees they were not responsible for.[13] *Roberts v. BJC Health System* addressed whether patients could recover for

---

[12] Gilead cites *Van v. LLR, Inc.*, 2023 WL 8434456 (D. Alaska Dec. 5, 2023), a tax collection dispute, which applied Alaska law and concerned several non-insurer third-party retailers who interacted directly with the putative class members and provided credits on a case-by-case basis.

[13] Gilead's references to cases applying ***other*** states' laws do not overrule Missouri law. *Calderon v. Sixt Rent A Car, LLC*, 114 F.4th 1190 (11th Cir. 2024) applied Florida statutory law to fraudulent rental car charges ***after*** the car was returned, which charges were paid by the plaintiffs' employer and car insurer. *Williamson v. Genentech, Inc.*, 2020 WL 1281532 (N.D. Cal. Mar. 18, 2020) and *In re Trasylol Prods. Liab. Litig.*, 2010 WL 6098571 (S.D. Fla. Mar. 16, 2010) turned on the particularities of California law that, unlike the MMPA, explicitly grants third-party payers standing to bring claims, reducing the collateral source rule's scope. *Lewis v. Lead Indus. Ass'n*,

overcharges—after treatment had occurred—billed directly to and paid only by insurers. 391 S.W.3d 433 (Mo. 2013). And in *Cheatem v. Landmark Realty of Missouri, LLC*, **both** the plaintiff **and** plaintiff's credit card company got all their money back. 2022 WL 5144772, at *6 (W.D. Mo. July 1, 2022) (noting that defendant did not dispute credit card chargeback).[14] Both cases lack crucial elements present here: those plaintiffs were not misled regarding a course of action (as Plaintiffs were concerning their medical treatment); and they did not buy anything of diminished value (as Plaintiffs did when they bought TDF while being deceived). Unlike here, the benefit of the bargain rule could not apply because the plaintiffs did not receive products different than represented. So unlike here, applying the collateral source rule in those cases *would* create an "injury where none exists," resulting in the type of windfall Missouri courts reject.

Here, consumers bought drugs at pharmacies that were objectively worth less than represented. The injury occurred at checkout when consumers received products materially different from what Gilead had led them to expect. Insurance coverage for a portion of these purchases does not eliminate consumer injury; it merely distributes the financial payment according to existing contracts between consumers and third parties. *Cf. Thomas v. Ramushi*, 674 S.W.3d 112, 116 (Mo. Ct. App. 2023) (insureds retain legal title to their claims notwithstanding insurer's potential right to subrogation). For example, in *Colon v. Waukegan Housing Authority*, the court rejected attempts to limit damages to out-of-pocket expenses when subsidies are involved, holding that "a more appropriate proxy for fair value of the premises—the expected benefit of the bargain—is the amount paid by each plaintiff out of pocket plus the subsidy payment." 729 F.Supp.3d 831, 835 (N.D. Ill. 2024); *see also Brown v. American Transfer and*

---

2020 IL 124107, an Illinois case, is even further off base because the plaintiffs never even purchased anything from the defendant.

[14] *See also* Marcus Decl., Doc. [40-1] ¶ 15 & Ex. G at ECF 50-51; *Cheatem v. Landmark Realty of Mo., LLC,* Case No. 20-00958-CV-W-BP (W.D. Mo.) ("we will be debiting the [defendant's] bank account").

*Storage Co.*, 601 S.W.2d 931, 934-936 (Tex. 1980) (applying collateral source rule to Texas consumer protection act). "The value of an expectancy interest in a contract is not a function of the source of the funding used to secure the contract." *Id.* at 836. The court recognized that allowing defendants to escape liability for the full value paid would create a windfall for wrongdoers who receive subsidies while violating their obligations. Just like Missouri law.

At any rate, "the question whether the collateral source doctrine applies to plaintiffs who used insurance to pay for their [TDF] purchases is a legal issue that presents a common question that applies classwide." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2020 WL 1180550, at *27 (D. Kan. Mar. 10, 2020). Moreover, Dr. Bradford can exclude transactions where patients received drugs at no cost (such as the few, if any, occasions where Gilead actually provided the drugs for free to a Missouri consumer). Gilead complains this will be difficult. But this concern is unfounded. This is simply a question of data analysis. Dr. Bradford's methodology is designed to address this situation. His model analyzes filled prescriptions and can exclude any transactions where no payment was made to Gilead.

**B.    Plaintiffs' economist reliably calculates the classwide benefit of the bargain damages caused by Gilead's unfair practices, which easily satisfies *Comcast*.**

Plaintiffs have already explained Dr. Bradford's qualifications (which Gilead does not challenge), and his methodology in their moving papers, Mem. 19-27, and their Opposition to Gilead's Motion to Exclude Bradford, Doc. [233]. To avoid repetition, Plaintiffs address here only those issues Gilead raises in its opposition to this motion, all of which fail. Plaintiffs' damage model easily meets the *Comcast* standard, which "poses a low bar to class certification." *Forsythe v. Teva Pharm. Indus. Ltd.*, 102 F.4th 152, 159 (3d Cir. 2024).[15] In any event, "[i]ndividualized

---

[15] *Comcast* itself demonstrates the adequacy of Plaintiffs' model here. There, the Supreme Court identified a fundamental disconnect between the damages model and liability case. While the district court accepted only one of four proposed antitrust theories (the "overbuilder" theory), plaintiffs' regression model incorporated all four theories rather than isolating the effects of the single approved theory. No such disconnect exists here. Dr. Bradford's model specifically

damages issues are . . . least likely to defeat predominance where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods." *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 893 (11th Cir. 2023) (quoting *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1179 (11th Cir. 2010)). *See also Meek v. Kansas City Life Ins. Co.*, 126 F.4th 577, 584 (8th Cir. 2025) ("Even if individual damages varied, what matter was [plaintiff] provided a way of measuring them on a classwide basis, ensuring that common questions of liability predominated over individual damage calculations" (citations and quotations omitted)); *Newman v. Bayer Corp.*, 2025 WL 856225, at *11-12 (S.D.N.Y. Mar. 19, 2025) (finding purported flaws in expert's benefit of the bargain methodology insufficient to defeat class certification).

### 1. Dr. Bradford reliably measures TDF's represented value using retail price.

Plaintiffs explain why Dr. Bradford's methodology for calculating TDF's "as represented" value is reliable. Mem. 22-24. Using the estimated retail price as the "price paid" for benefit of the bargain damages is hardly novel. It is well supported in the economic literature and case law. Gilead does not calculate a competing price or explain how it would do so.

Instead, Gilead cites only Dr. Baker's report, Opp. 24, where he discusses that retail prices are "highly variable" in the pharmaceutical industry generally. *See* Baker Rep. ¶¶ 22, 32-38, 117-122. But Baker presents no ***evidence*** that ***Gilead*** priced its TDF medication in this highly variable way. Indeed, as set forth above, Gilead has repeatedly admitted in court that it sets a single price for its medication. Mem. at 21; *see also United States v. Corvalan*, No. 1:23-cr-00110-MKV, Doc. [430] at 19. And, regardless of price variation, TDF drugs had a common, measurable, and

---

measures the economic effect of Gilead's scheme on TDF medications, directly aligning the damages calculation with Plaintiffs' liability theory. Plaintiffs' have no obligation "to show that their models match other liability theories that the defendant may argue for at summary judgment." *Compare Simon and Simon, PC v. Align Tech., Inc*, 2023 WL 8261297, at *3 (N.D. Cal. Nov. 29, 2023) *with* Opp. 27 n.62.

objective value on the market.

Gilead also recycles its argument that the Court should focus only on what consumers pay out of pocket. Opp. 24-25. But as noted above, this argument is foreclosed by Missouri law. Gilead argues that a plaintiff should not be in a "better" position than if the conduct had never occurred. But consumers are not "better"—the economic value they bargained for is simply being restored. Gilead gets the law backwards: Missouri law entitles consumers to the full economic benefit of their bargain, and "prevents a tortfeasor from reducing his or her liability to a plaintiff by proving that payments were made to the plaintiff by a collateral source." *Deck*, 322 S.W.3d at 538.

Finally, Gilead's attempt to distinguish *Craft* goes up in smoke. It claims that "the examples in *Craft* involve property with a market resale value." Opp. 25. But the products at issue in *Craft* were cigarettes, which are not resold.

### 2.    Dr. Bradford's "actual" value benchmark is reliable.

Plaintiffs have also explained how Dr. Bradford will calculate TDF's "actual" value using objective, "actual" market data of "actual" sales that took place after Gilead's unlawful conduct stopped—that is, when TAF is available and its superior safety to TDF is known. Mem. 24-26.

Gilead argues that this "actual" market data does not consider supply and demand. Opp. 26. Plaintiffs have already addressed this extensively. MTE Bradford Opp at 10-11. In short: of course actual sales data reflects both supply and demand. It shows the equilibrium price where real world demand intersects with real word supply, taking into account all material factors. Even Gilead's expert agrees. *Id.* 5 ("given all the characteristics of these options").  And that objective, market price was dramatically below the price Gilead extracted from the class during the class period. *Id.* That Gilead continued to raise its price on brand name TDF after the class period does not undermine Dr. Bradford's analysis. Gilead's sales plummeted at that price, which shows that Gilead's price ignored demand and was therefore not a competitive market price. *Id.* 14-15.

Next Gilead makes the puzzling argument that the market price for generic drugs does not reflect the "true" value of the alleged violations, "but instead reflects the dynamics of generic competition." Opp. 27. But a central point of Plaintiffs' claim is that Gilead withheld TAF from the market so it would not compete with TDF. Mem. 4-7. And the market data shows Gilead was right: when TAF competed with TDF, TDF's market value plummeted. Mem. 8-10.

Notably, there was a period when both TAF and TDF were on the market **before** generic TDF entered. And it was during this time that the most dramatic collapse in TDF sales in favor of TAF sales occurred. Mem. 8. Gilead has suggested that Plaintiffs cannot tie this to consumers switching from TDF to TAF. That argument directly contradicts Gilead's admissions in its SEC Filings. Doc. [4] ¶¶ 39, 41. ("The decrease in U.S. sales was primarily due to lower sales volume ***as a result of patients switching to newer regimens containing FTC/TAF*** . . . We expect a decline in our sales of Truvada in the United States ***as patients switch to Descovy for PrEP from Truvada for PrEP*** and the expected entry of generic versions in late 2020."). Thus, regardless of generic competition, when TAF is on the market, the market would not support the price Gilead charged for TDF. By deliberately withholding TAF from the market, Gilead extracted artificially high prices for TDF. MTE Bradford Opp 12-13. Courts routinely permit similar economic analyses. *See, e.g.*, *In re Takata Airbag Prod. Liab. Litig.*, 2022 WL 4594123, at *6 (S.D. Fla. July 19, 2022) (permitting economist's "natural experiment" comparing prices before and after disclosure).

## C.    Common issues also predominate for the unjust enrichment claim.

Gilead's arguments against certifying the unjust enrichment claim contradict Missouri's law on both liability and damages. Mem. 27. Gilead's only response is to ignore the cases Plaintiffs cite, Mem. 27-28, relying instead on *White* and *BPA* to recycle the same flawed arguments that Plaintiffs have already addressed.[16] These decisions have been criticized for misapplying Missouri

---

[16] In *Coca-Cola*, the plaintiff's claim "was based on a subjective preference against saccharin" without quantifying any economic value difference. 249 S.W.3d at 863. The Missouri Supreme

law. *In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig.*, 422 F.Supp.3d 194, 263 (D.D.C. 2019) (noting that *Coca-Cola* does not support *White's* conclusion.).

Gilead's claim that the unjust enrichment claim is "even more ill-suited to class treatment," overlooks that unjust enrichment centers on the defendant's conduct (just like the MMPA). *Pitman v. City of Columbia*, 309 S.W.3d 395, 403 (Mo. Ct. App. 2010). Courts in this circuit routinely certify unjust enrichment claims over similar arguments.[17] Here, Gilead's conduct was the same for all class members: It unlawfully withheld TAF from all class members, requiring them all to purchase TDF at prices that were objectively too high.[18] *See Starr v. VSL Pharmaceuticals, Inc.*, 2025 WL 1258016, at *16 (D. Md. Apr. 30, 2025) (rejecting argument that "claims will require individualized proof of the circumstances surrounding each purchase"); *Walker v. Cedar Fair, L.P.*, 750 F.Supp.3d 812, 821, 823 (N.D. Ohio 2024) (certifying claims for benefit-of-the-bargain and unjust enrichment for purchasers over the defendant's complaints about individualized issues relating to purchase conditions and usage). Gilead then sold TAF as better for all consumers.

And because Gilead fails to meaningfully challenge Dr. Bradford's methodology for calculating unjust enrichment damages, it effectively concedes that a common, reliable method exists for determining classwide unjust enrichment damages. Doc. [225]; *see also Corvalan*, Doc. [430] at 18 (Gilead explaining the straightforward process for calculating profits from drug sales). Its two arguments against the substance of those damages lack merit. First, Plaintiffs are not limited

---

Court explicitly distinguished this from valid claims in *Craft* where, as here, "all consumers suffered an economic injury that was based on an objective characteristic." *Id.*

[17] *See also In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, 2019 WL 1418292, at *27 (W.D. Mo. Mar. 21, 2019) (certifying 16 statewide unjust enrichment classes); *Murphy v. Gospel for Asia, Inc.*, 327 F.R.D. 227, 244 (W.D. Ark. 2018) (certifying statewide class for unjust enrichment claims); *In re Pork Antitrust Litigation*, 665 F.Supp.3d at 967 (certifying nationwide class for unjust enrichment claims in antitrust context).

[18] Gilead's citation to *Anderson v. Bass Pro Outdoor World, LLC*, is also inapplicable. 355 F.Supp.3d 830 (W.D. Mo. 2018). There, plaintiffs who were "lured" by unavailable items purchased entirely different products that equally benefitted them, creating no causal connection between the deceptive conduct and their purchase. *Id.* at 839.

14

to out-of-pocket payments. For example, *Vitello* confirms that benefits conferred indirectly—like wholesale purchase prices—qualify as a benefit conferred under unjust enrichment. 50 F.4th at 695. *Landers v. Monsanto Co.* doesn't contradict this; there, neighbors of Monsanto's customers sued over fertilizer damage to their land, and the court properly classified this as a tort claim because plaintiffs had not "conferred" any benefit on the defendant. 2017 WL 3531378, at *7 (E.D. Mo. Aug. 17, 2017). *Cf. In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 599-600 (9th Cir. 2020) ("California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss.").

Second, Plaintiffs need not isolate the "unjust" portion of enrichment because the remedy's purpose is to prevent wrongdoers from profiting through misconduct. *Alabama Aircraft Indus., Inc. v. Boeing Co.*, 133 F.4th 1238, 1254 (11th Cir. 2025) (noting under Missouri law "an unjust enrichment award seeks to deprive the wrongdoer defendant of the gain it obtained from conduct that inflicted the loss on the plaintiff" (citation omitted)); *Hughes v. Wheeler*, 364 F.3d 920, 924 (8th Cir. 2004) (Unjust enrichment "applies objective standards of fairness to insure that people do not profit from their own wrongs."). In any event, determining what portion of Gilead's enrichment is unjust can be resolved using common evidence that focuses on Gilead's conduct and the financial benefits it received.

## D.    Gilead's typicality, adequacy and superiority arguments fail

Gilead's alleged unique defenses against Plaintiffs only underscore their typicality and adequacy. Gilead cannot contest Plaintiffs switched to TAF and any delay is Gilead's fault alone. This is an issue common to the class. Mem. 13. Gilead's superiority arguments merely repeat the same failed arguments given above.

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be certified under Rule 23(b)(3).

Dated: May 20, 2025                         Respectfully submitted,

                                            **STUEVE SIEGEL HANSON LLP**

                                            /s/ *Patrick J. Stueve*
                                            Patrick J. Stueve,  37682(MO)
                                            Todd E. Hilton, 51388(MO)
                                            Kasey A. Youngentob, *pro hac vice*
                                            David A. Hickey, *pro hac vice*
                                            460 Nichols Road, Suite 200
                                            Kansas City, Missouri 64112
                                            Telephone: (816) 714-7100
                                            stueve@stuevesiegel.com
                                            hilton@stuevesiegel.com
                                            youngentob@stuevesiegel.com
                                            hickey@stuevesiegel.com

                                            **CALABRO | LAW OFFICE**
                                            J. Toji Calabro, 66574(MO)
                                            Two Pershing Square
                                            2300 Main Street, 9th Floor
                                            Kansas City, Missouri 64108
                                            Tel: (888) 585-12470
                                            tojicalabro@calabro-law.com

                                            *Attorneys for Plaintiffs*