**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| JONATHAN SEARCY, *on behalf of himself* ) | |
| *and all others similarly situated*, *et al.*,  ) | |
|                                               ) | |
| Plaintiffs,                       ) | |
|                                               ) | |
| vs.                                        ) | Case No. 4:20-cv-1523-MTS |
|                                               ) | |
| GILEAD SCIENCES, INC.,        ) | |
|                                               ) | |
| Defendant.                     ) | |

**MEMORANDUM AND ORDER**

Before the Court is Plaintiffs' Motion for Class Certification, Doc. [206], along with Defendant's Motions to Exclude Testimony, Docs. [215] & [216], and Plaintiff's Conditional Motion to Remand, Doc. [252].  After oral argument, a thorough review of the parties' briefing, and due consideration, the Court concludes that class certification is not appropriate here.  For the reasons explained below, the Court will deny each Motion.

**I.**

Not all that long ago, infection with the human immunodeficiency virus (HIV) typically progressed to acquired immunodeficiency syndrome (AIDS), and AIDS onset virtually always proved fatal.  *See* AIDS, *Stedman's Medical Dictionary* (Nov. 2014). That need not be so today.  Therapeutics have transformed HIV infection from a lethal disease into a manageable chronic condition.  *See id.*  Gilead Sciences, Inc. ("Gilead"), a biopharmaceutical company and the Defendant in this action, manufactures therapies that treat HIV.  Plaintiffs, two HIV-positive men, were prescribed and took medications, as

directed by their healthcare providers, that Gilead manufactured.  The medications they took worked exactly as prescribed, effectively managing their HIV.  What is more, the medications did so safely; neither Plaintiff alleges that he suffered *any* personal injury from taking them.  So why have they sued Gilead after taking its lifesaving medications without adverse effect?  Plaintiffs' operative Complaint claims that they overpaid for Gilead's medications based on its alleged misconduct.  And they now seek to represent a class of individuals who purchased the relevant medications in Missouri.

A.

Gilead owned the exclusive rights to tenofovir, and it sought to develop an oral prodrug[1] form of the compound.  At points in time, Gilead developed the two prodrugs that are relevant to this action, tenofovir disoproxil fumarate (TDF) and tenofovir alafenamide (TAF).  Plaintiffs maintain that TAF is safer and more effective than TDF.  They allege that though Gilead knew this to be true, it concealed TAF's allegedly superior safety profile and deliberately delayed TAF's release to prolong market share dominance through a patent-extension strategy.  Gilead then launched TAF around two years before TDF's patent expired, which Plaintiffs allege allowed Gilead to convince patients to switch from its patent-expiring TDF-based medications to TAF-based medications.

Plaintiffs Jonathan Searcy and Ervin Kirk each were prescribed, purchased, and took TDF-based medications but switched to TAF-based medications.  Each maintains

---

[1] That is, a biologically inactive compound that can be metabolized in the body to produce a desired drug.

that he would not have taken the TDF-based drugs were TAF-based alternatives available, and each alleges that he would not have "paid what he paid" for the TDF-based medications had he known they were "less effective and more dangerous than they needed to be," or had he "known of Gilead's deceptive and misleading conduct." Doc. [69] ¶¶ 48–49, 53–54.

Plaintiffs assert that when Gilead sold TDF-based medications as "the safest antiviral HIV drug known to [it]," Doc. [208] at 16, Gilead violated the Missouri Merchandising Practices Act and was unjustly enriched under Missouri law, Doc. [69] ¶¶ 73–82, 83–88. The Court previously denied Gilead's Motion to Dismiss both claims against it.[2] Now, Plaintiffs ask the Court to certify a class consisting of:

> All persons (as defined by Mo. Rev. Stat § 407.010.5) who purchased any TDF-based drug, including Atripla, Complera, Stribild, Truvada, or Viread, in Missouri, primarily for personal, family or household purposes between July 1, 2003, and November 1, 2015.

There are important exclusions from the class. Besides the usual conflict exclusions, specifically excluded from the class are Missouri residents who, before the entry of judgment in this case, have filed claims that they suffered a personal injury from TDF medication, including any person who is, has been, or becomes a plaintiff identified by name claiming personal injuries in (1) the coordinated proceeding entitled *Gilead*

---

[2] *See Johnson v. Gilead Scis., Inc.*, 563 F. Supp. 3d 981 (E.D. Mo. 2021). Intervening case law, along with Plaintiffs' acknowledgement that TDF-based drugs still have value, leads the Court to question whether it properly denied Defendant's Motion to Dismiss. *See, e.g.*, *Hennessey v. Gap, Inc.*, 86 F.4th 823, 827–831 (8th Cir. 2023); *Ellis v. Nike USA, Inc.*, 158 F.4th 932, 934 n.3 (8th Cir. 2025) (citing *id.*); *see also Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 482 (8th Cir. 2020) ("To survive a motion to dismiss, a complaint must contain 'sufficient factual matter' to state a facially plausible claim for relief.").

*Tenofovir Cases*, JCCP No. 5043 (S.F. Super. Ct.), (2) the action entitled *Holley v. Gilead Sciences, Inc.*, 4:18-cv-6972-JST (N.D. Cal.) ("*Holley*"), or (3) any action consolidated for pretrial purposes with *Holley*.

B.

Federal Rule of Civil Procedure 23 governs class actions and provides the necessary prerequisites.  It is Plaintiffs' burden to demonstrate that their proposed class satisfies those requirements.  *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 374 (8th Cir. 2018).  These include the threshold requirements of numerosity, commonality, typicality, and adequacy.  *See* Fed. R. Civ. P. 23(a).  The class must also be "clearly defined and adequately ascertainable," *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016), and fit "within 'one of the three subsections of Rule 23(b),'" *Stuart*, 910 F.3d at 374 (quoting *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1155 (8th Cir. 2017)).  Here, Plaintiffs seek certification pursuant to Rule 23(b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Although "[a] district court has broad discretion to determine whether certification is appropriate," *Stuart*, 910 F.3d at 375 (internal quotations omitted), it "must undertake a rigorous analysis to ensure that the requirements of Rule 23 are met," *Sandusky*, 821 F.3d at 998 (citation omitted).

## II.

Prior to a Rule 23 analysis, Plaintiffs face an initial issue that they have not shown they can overcome.  The U.S. Court of Appeals for the Eighth Circuit has recognized that the "constitutional requirement of standing is equally applicable to class actions."  *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010).   In *Avritt*, the Eighth Circuit held that "a class cannot be certified if it contains members who lack standing." *Id.* (citing *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263–64 (2d Cir. 2006)).   "[T]o put it another way," the Eighth Circuit held that "a named plaintiff cannot represent a class of persons who lack the ability to bring a suit themselves."  *Avritt*, 615 F.3d at 1034; *accord Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013) ("In order for a class to be certified, each member must have standing and show an injury in fact that is traceable to the defendant and likely to be redressed in a favorable decision."). Because the Court concludes that Plaintiffs' class definition "include[s] individuals who lack standing," the Court cannot certify it.  *See Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 988 & n.3 (8th Cir. 2021).[3]

---

[3] *Avritt*, like the Second Circuit in *Denney*, concluded that Article III bars certification when a class definition includes someone who lacks standing.  Since then, the Eighth Circuit seems to have hedged on whether the bar is a Rule 23(b)(3) one or an Article III one.  *See Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013) (discussing the standing issue in tandem with predominance); *see also Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 366 (3d Cir. 2015) (comparing *Avritt* and *Halvorson* and noting it was "not clear to us whether the Eighth Circuit's standing analysis rests on Article III or Rule 23").  Whether the issue is rooted in Article III or Rule 23, it leads to the same result—no certification here.

<u>A</u>.

To have Article III standing, a plaintiff "must have a personal stake in the case." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation modified). More specifically, Article III standing requires "(1) an injury in fact; (2) a causal connection between the injury and conduct complained of; and (3) [a] likelihood that the injury will be redressed by a favorable decision." *Id.* at 987 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).

At issue here is the injury in fact requirement. Many consumer cases against drug manufacturers easily establish Article III's injury requirement because they allege that the drug at issue caused them physical harm. *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352, 1353–54 (J.P.M.L. 2005). Physical injuries straightforwardly suffice as Article III injuries. *See TransUnion*, 594 U.S. at 425; *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 642 (2007) (Souter, J., dissenting). This case is an unusual one in that there is no physical harm alleged. While Plaintiffs claim that Gilead's decisions around tenofovir caused unnecessary deaths and injuries to others, the proposed class specifically excludes those who claim they suffered a personal injury from TDF-based medications. So, the putative class members cannot use physical injury as their concrete injury.

With no physical injury, Plaintiffs point to what would be another clearly concrete injury, monetary or economic harm, which "ha[s] long been recognized as sufficient to lay the basis for standing." *Sierra Club v. Morton*, 405 U.S. 727, 733 (1972). Plaintiffs themselves have plausibly alleged that they overpaid for their TDF-based medications given Gilead's misrepresentations, which is a concrete economic injury sufficient to establish Article III standing. *See George v. Omega Flex, Inc.*, 874 F.3d 1031, 1032 (8th Cir. 2017) (per curiam) ("George's assertions of paying more than CSST is worth . . . [is an] economic injury sufficient to establish Article III standing."); *accord In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 529 (7th Cir. 2024); *In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*, 54 F.4th 28, 35 (1st Cir. 2022); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 285 (3d Cir. 2018).

Take Plaintiff Searcy. *See Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (explaining that if at least one plaintiff has standing, the action may proceed). Searcy alleged that he would not have paid what he paid for his TDF-based medications had he known that "they were less effective and more dangerous than they needed to be," or had he known of Gilead's "deceptive and misleading conduct." Doc. [69] ¶ 54. Admissible evidence shows that, for at least one of his TDF-based prescriptions, he spent $200. These facts support a reasonable inference that this alleged overpayment suffices as an economic injury here.[4] *See McNaught v. Nolen*, 76 F.4th 764, 770 (8th Cir. 2023)

---

[4] There may be several reasons why this amount will not suffice as a statutory injury under the Missouri Merchandising Practices Act or that Searcy is not entitled to damages, but this

(explaining that a plaintiff must allege sufficient facts to support a reasonable inference that he can satisfy the elements of standing).  Put differently, Plaintiffs "plausibly allege an injury in fact—that they paid more for [the medications] than they would have paid had they known [the relevant information].  This difference in price states a concrete economic harm that satisfies Article III standing's injury in fact element, no matter the label we give it." *Debernardis*, 942 F.3d at 1090 (Sutton, J., concurring).

But while Plaintiff Searcy has standing, not everyone encompassed in the class definition would.  The products at issue here, prescription medications, are not standard retail goods.  Not every consumer pays the same price—or even close to the same price— for them at the point of sale.  *See* Doc. [227-3] ¶ 81; *see also* Marc A. Rodwin, *Negotiating Medicare Drug Prices: A New Attempt to Control Purchase Prices*, 53 J.L. Med. & Ethics 147, 147 (2025) (noting drug prices and copayment amounts vary widely among patients within the United States).  The same is true for the medications at issue here, and that is where Plaintiffs' class definition runs into problems.  Plaintiffs propose a class of *all* persons who purchased a TDF-based drug.  This definition encompasses those who paid nothing for the medication at the point of sale.  *See* Doc. [250] at 33 (answering in the affirmative that those who "paid very little, to nothing, for" the medications were encompassed in the class definition).  And many class members paid nothing.  For example, evidence in the record shows that across all prescriptions for TDF-containing

---

overpayment is a plausible economic injury.  *See Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1090 (11th Cir. 2019) (Sutton, J., concurring).  For this reason, the Court will deny Plaintiffs' Conditional Motion to Remand.  *See* Doc. [252]; *see also Davis v. United States*, 564 U.S. 229, 249 n.10 (2011) (faulting a party for "confus[ing] weakness on the merits with absence of Article III standing").

medications filled at CVS pharmacies in Missouri between January 1, 2010, and October 31, 2015, consumers paid nothing for approximately fifty-six percent of these prescriptions. Doc. [227-3] ¶ 164.

Though many paid nothing for these medications, they are life-saving ones that undeniably have value and worth. TDF-based medications remain approved by the Food and Drug Administration. Doctors prescribe them, pharmacists dispense them, and patients take them even today. While a jury could (at least theoretically) agree that Plaintiffs overpaid for the medications, Plaintiffs themselves acknowledge that these drugs have value. Doc. [208-28] ¶ 73. For this reason, purchasers who paid *nothing* out of pocket for medications that are worth *something* necessarily lack an economic injury. *See In re Johnson & Johnson*, 903 F.3d at 288 (concluding that plaintiff "received the benefit of her bargain" and "suffered no economic injury" where she failed to allege that she received "an economic benefit worth one penny less than what she paid"); *Mathison v. Bumbo*, 8:08-cv-0369-DOC, 2008 WL 8797937, at *5 (C.D. Cal. Aug. 18, 2008) (noting that if plaintiffs "did not pay anything" for product at issue, then "they got exactly what they paid for," which "does not confer standing to sue").

In response to this problem, Plaintiffs argue that even those who paid nothing or miniscule amounts still suffered an Article III injury because Missouri law entitles them to benefit of the bargain damages. But "under Article III, an injury in law is not an injury in fact." *TransUnion*, 594 U.S. at 427. Therefore, there is no such thing as an anything-hurts-so-long-as-the-Missouri-General-Assembly-says-it-hurts theory of Article III injury. *See Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 463 (6th Cir. 2019); *see also*

- 9 -

*Dinerstein v. Google, LLC*, 73 F.4th 502, 521 (7th Cir. 2023) (noting "*TransUnion* put an end to federal courts hearing claims premised on *nonexistent* injuries"). Article III "requires at a minimum that the injury 'exist' in the real world independent of a legislature's choice to confer the right to sue and independent of the plaintiff's claim to be hurt." *Debernardis*, 942 F.3d at 1089 (Sutton, J., concurring). Claiming that a legal entitlement to benefit of the bargain damages is itself a cognizable Article III injury, misses the "easy-to-miss distinctions between (1) injury in fact (a constitutional imperative), (2) statutory injury (an element of the plaintiff's cause of action), and (3) damages (a remedies calculation)." *Id.* at 1090. For these reasons, the Court concludes that Plaintiffs have not shown that each member of the proposed class would have standing to assert an MMPA claim.

<u>B.</u>

No different is the standing analysis for the unjust enrichment claims of individuals who paid nothing for their TDF-based medications at the point of sale. After all, those who paid nothing out of pocket conferred no benefit upon Defendant. *See Xpedior Creditor Tr. v. Credit Suisse First Bos. (USA) Inc.*, 341 F. Supp. 2d 258, 273 (S.D.N.Y. 2004) (finding no standing to assert unjust enrichment claim where plaintiff "d[id] not allege that [defendant] was enriched at [plaintiff's] expense"); *Fed. Deposit Ins. Corp. v. Brit.-Am. Corp.*, 755 F. Supp. 1314, 1324 (E.D.N.C. 1991) (finding no standing to assert unjust enrichment claim where plaintiff did not show that he conferred the benefit); *Weiner v. Bank of King of Prussia*, 358 F. Supp. 684, 704 (E.D. Pa. 1973) ("The plaintiff cannot possibly assert a cause of action for unjust enrichment against

banks which never received any money from him.").  They did not do so even if they caused another entity (i.e., a third-party payor) to do so.  *See Calderon v. Sixt Rent a Car, LLC*, 114 F.4th 1190, 1211 (11th Cir. 2024) (noting courts have concluded that the collateral source doctrine cannot be used to satisfy a requirement of showing injury-in-fact for standing purposes); *Emery v. Roanoke City Sch. Bd.*, 432 F.3d 294, 299 (4th Cir. 2005) (concluding plaintiff lacked standing where "he suffered no out-of-pocket loss himself" because plaintiff's "medical insurance provided by his employer paid the [relevant] expenses").

Put "[i]n more pedestrian terms," even under a theory of unjust enrichment, a patient who paid nothing out-of-pocket when she purchased her lifesaving prescription, and suffered no personal injury as a result, could not satisfactorily answer the question: "What's it to you?" *See* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983).  Therefore, the Court concludes that it cannot certify Plaintiffs' class for their unjust enrichment claim.

*   *   *

In sum, individuals who paid nothing for their lifesaving TDF medications, which caused them no bodily injury, lack standing.  Plaintiffs' proposed class definition concededly contains individuals who lack standing.  *See* Doc. [250] at 33.  The Court therefore cannot certify it.  Further, altering the class definition to somehow exclude these individuals—were that even possible—would be to no avail because Plaintiffs' proposed class suffers from other maladies.

- 11 -

## III.

As explained above, certification is proper only if the trial court is satisfied, after a "rigorous analysis," that the prerequisites of Rule 23 have been satisfied. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Beyond the standing issue that Plaintiffs fail to overcome as discussed above, Rule 23 issues also stand in the way of class certification here. The Court chooses to briefly address a few of them given that all of them would be independent grounds for denial of Plaintiffs' Motion for Class Certification. *See United States v. Files*, 63 F.4th 920, 935 n.4 (10th Cir. 2023) (Newson, J., joined by Tjoflat, J., concurring) (discussing when it may be advisable for district courts to provide alternative grounds for their decisions).

### A.

To certify a damages class under Rule 23(b)(3), Plaintiffs must meet the "more demanding" requirement that "'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Comcast*, 569 U.S. at 33–34. This analysis "necessarily requires an examination of the underlying elements necessary to establish liability for plaintiffs' claims." *Blades v. Monsanto*, 400 F.3d 562, 569 (8th Cir. 2005) (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001)). Here, individual issues predominate because prescribing decisions are patient-specific and give rise to individualized issues that are central to questions of causation and loss.

An ascertainable loss is a necessary element of an MMPA claim. *Owen v. Gen. Motors Corp.*, 533 F.3d 913, 922 (8th Cir. 2008). So too is causation. *Id.* ("[T]here is

- 12 -

no denying that causation is a necessary element of an MMPA claim.").  And "the plain language of the MMPA demands a causal connection between the ascertainable loss and the unfair or deceptive merchandising practice."  *Id.*  Here, Plaintiffs maintain that they "and the class purchased TDF-based drugs with the expectation that TDF-based drugs had a certain risk profile, and that they were the most effective and safest version of the therapy known to Gilead."  Doc. [69] ¶ 82.  That contention might establish causation for an ascertainable loss, at least for those purchasers who had such an expectation and belief.  But Gilead's allegedly unfair or deceptive practices would not have caused an ascertainable loss for those who had no such expectation or belief, that is, those who would have taken a TDF-based drug regardless of the challenged conduct.  *See In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 100 F. Supp. 3d 441, 446 (E.D. Pa. 2015), *aff'd*, 639 F. App'x 866 (3d Cir. 2016) (finding no ascertainable loss under the MMPA where plaintiff "received the drug she was prescribed, took the drug, and alleges neither that the drug failed to do its job . . . nor that she was injured by taking the drug").

Plaintiffs simply assume that every person who took TDF-based medications not only believed that they were the most effective and safest medications but also that they would not have purchased the medications had they known the truth (as Plaintiffs see it). Evidence in the record says otherwise, as does common sense.  *First*, in line with industry practice, Gilead repeatedly updated the labeling on its drugs during the proposed class period as more information became available.  Doc. [227-1] ¶ 34 ("Similar to all prescription medications, TDF medication labels have been iterative, modified over time to reflect evolving science around potential bone and kidney risks as we learned more

about the drug."). *Compare also, e.g.*, Doc. [220-57] (prescribing information for Stribild, revised Aug. 2012), *with* Doc. [220-58] (prescribing information for Stribild, revised Dec. 2014). What Gilead communicated to putative class members, and what each understood, unquestionably will vary and be subject to individual proof. *Second*, doctors make prescribing decisions—and patients choose whether to take prescribed medications—for a host of different reasons. The record shows that numerous patients continued purchasing TDF-based medications even after TAF-based ones became available. In fact, Plaintiff Searcy is among them.

Searcy alleged in the Third Amended Complaint that he "would not have taken" his TDF-based drug "at any point" if a TAF-based drug was "available and known to him." Doc. [69] ¶ 53. Evidence in the record, though, shows that Searcy remained on his TDF-based medication even after the release of a TAF-based drug because of insurance considerations. Doc. [214-17] at 236–37. What is more, Plaintiff Searcy finished the remaining TDF-pills he had already purchased even *after* he moved to an insurance plan that covered the new TAF-based drug. *Id.*[5]

Even putting aside Plaintiffs' burden to prove the merits of their MMPA claim, Defendant also has "the right . . . to present evidence negating [Plaintiffs'] direct or circumstantial showing of causation and reliance." *In re St. Jude Med., Inc.*, 522 F.3d

---

[5] This inconsistency, which goes to the heart of Plaintiffs' claims, also raises adequacy issues. *See Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (noting that named plaintiff's offering of "differing accounts about the [things] that form the very basis for his lawsuit surely would create serious concerns as to his credibility at any trial"); 1 *McLaughlin on Class Actions* § 4:27 (21st ed.) (noting lapses in credibility will render the proposed representative inadequate when they "go to the heart of the claims in the case").

836, 840 (8th Cir. 2008); *accord Hudock v. LG Elecs. U.S.A., Inc.*, 12 F.4th 773, 776–77 (8th Cir. 2021) ("Defendants may offer individualized proof that class members did not react in a uniform or even similar manner to the defendant's misrepresentations." (citation modified)).  Thus, "it is clear that resolution of [Gilead's] potential liability to each plaintiff under the consumer fraud statutes will be dominated by individual issues." *St. Jude*, 522 F.3d at 840.  Indeed, a recent decision by the Eighth Circuit now renders this conclusion abundantly clear.  *See In re Folgers Coffee Mktg.*, 159 F.4th 1151 (8th Cir. 2025).

In *Folgers*, the plaintiffs identified over two dozen coffee products that allegedly overstated how many cups they could make.  *Id.* at 1153–54.  A 30.5-ounce container, for example, claimed it made "up to 240" six-ounce cups, based on brewing directions that included both a less efficient single-serving method and a more efficient pot method.  *Id.* at 1154.  But the "up to 240" cups figure is achievable only under the more efficient pot method, which uses less coffee per cup.  *Id.*  The district court granted the plaintiffs' motion for class certification, *see* 2024 WL 4093111 (W.D. Mo. July 31, 2024), but the Eighth Circuit concluded that common questions would not predominate over individual ones and therefore reversed.

"The difficulty for [the plaintiff]," the Eighth Circuit explained, was that "for many people in his proposed class, the representations on the containers would not have caused them any ascertainable loss; instead, they got exactly what they had bargained for when they purchased the Folgers products at issue." *Folgers*, 159 F.4th at 1156.  It was "ineluctable that a significant proportion of the proposed class did not read th[e]

representations or, if they did, did not care about them one way or the other." *Id.* (citing *State ex rel. Coca-Cola Co. v. Nixon*, 249 S.W.3d 855, 862 (Mo. banc 2008)).   And a "significant proportion" of those who read and cared about the representations, "likely did not interpret the representations in the manner [the plaintiff] suggest[ed.]" *Id.*  Some "read the representations and believed that the promised number of cups could be achieved only some of the time under certain conditions" or "understood the representations to mean that other, non-recommended brewing methods could brew the promised number of cups." *Id.*

In sum, the court in *Folgers* concluded that "many class members weren't deceived, and figuring out who was and who wasn't w[ould] require consumer-by-consumer inquiries into each class member's individual . . . circumstances, undermining the efficiencies class actions are intended to provide."  *See Folgers*, 159 F.4th at 1156. *Folgers* dooms any vestige of merit in Plaintiffs' argument that common questions predominate.

Many more factors go into a doctor's prescribing decisions and a patient's choice to take a prescribed medication than choosing what coffee to buy.  The "ineluctable" conclusion from *Folgers* is true here.  That is, even *if* Gilead hid from Plaintiffs and the class members "the risk profile for the TDF-based drugs, and misrepresented, suppressed, and concealed the reasons why the development of the TAF-based drugs were abandoned in 2004," Doc. [69] ¶ 82, some proportion of the proposed class did not believe that TDF-based medications were the most effective and safest version of the therapy known to Gilead or, even if they did, did not care about that representation one way or the other.

As discussed above, the record bears this out even among the named Plaintiffs here.  As such, determining which members of the class had an ascertainable loss is hopelessly individualized, and class certification is therefore improper.  *See Orduno v. Pietrzak*, 932 F.3d 710, 716 (8th Cir. 2019) ("Where too many individual questions predominate over common ones, certification is inappropriate."); *Folgers*, 159 F.4th at 1158 ("Since common questions would not predominate over individual questions with respect to the MMPA claim, we conclude that class certification was inappropriate.").

Plaintiffs attempt to sidestep this predominance problem by arguing that individualized inquiries are unnecessary since every member of the class automatically suffered an ascertainable loss.  Doc. [244] at 3 (arguing that all class members were injured because "all bought TDF at objectively inflated prices"); Doc. [69] ¶ 82 ("[T]he prices Gilead commanded for TDF-based drugs prior to the release of the TAF-based analogs did not reflect the true value of those drugs, and Gilead was able to command such prices only because of their unlawful conduct and misrepresentations concerning TAF and TDF.").  *Folgers* dispenses with this argument, too.  There, the plaintiff argued that the misleading cup-count statements increased consumer demand for Folgers coffee, which in turn raised market prices.  *Id.*  Because of this price inflation, *all* buyers, the plaintiff argued, paid more than they otherwise would have—even those who were not personally deceived—since the alleged misrepresentation drove up the market price for everyone.  *Id.*  The Eighth Circuit turned away this "price-premium argument," noting it

"would allow those who suffered no ascertainable loss from Folgers's representations to piggyback on the injuries of others to pursue a remedy." *Id.*[6]

"[A]ccepting [the plaintiff's] price-inflation theory," the Eighth Circuit explained, "would write the ascertainable-loss requirement out of the statute and permit any purchaser of these Folgers products to bring an MMPA claim, even if the purchaser didn't care about the representations or wasn't misled by them." *Id.* at 1158.  And it recognized the absurdity that such a theory would allow "a purchaser, fully aware of the representations and their potential shortcomings, [to] buy the product for the sole purpose of bringing an MMPA claim on behalf of others." *Id.*  "Surely someone with full knowledge of the facts and a willingness to make the purchase anyway cannot have suffered an ascertainable loss from the representations of the seller." *Id.* (citing *Coca-Cola Co.*, 249 S.W.3d at 862).

## B.

"[Plaintiffs'] unjust-enrichment claim fares no better." *Folgers*, 159 F.4th at 1158. The Eighth Circuit explained in *Folgers* that "[w]hether a particular transaction might be considered inequitable or unjust turns on the specific circumstances of each transaction, which again places individual inquiries front and center." *Id.*  It concluded, as "several [other] courts and commentators" have, that unjust-enrichment claims "are generally inappropriate for class treatment" for that reason. *Id.*  With no further analysis, it

---

[6] And, again, even if Plaintiffs were excused "from presenting direct proof of individual reliance," it "would not foreclose [Defendant] from presenting evidence of a lack of causation or reliance, which too would raise individualized questions." *Folgers*, 159 F.4th at 1156.

concluded there was "no reason that general rule shouldn't apply here," *id.*, and this Court sees no reason it shouldn't apply here, either.

C.

At least one additional shortcoming on Plaintiffs' MMPA class certification prospects bears mention, Plaintiffs' damages model for calculating class-wide benefit of the bargain damages does not pass muster.  The Supreme Court has explained that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to th[e] theory" of liability.  *Comcast*, 569 U.S. at 35.  "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Id.*  Plaintiffs' model purports to calculate class-wide damages by finding the difference between two values, "each TDF drug's artificially inflated market value over the class period" and "each TDF drug's true market value without Gilead's [allegedly] unlawful practices."  Doc. [208] at 20.  Put another way, Plaintiffs' model purports to calculate the difference between the "as represented" value of the product and the "as is" or "actual" value of the product.  *Id.*  It sounds straightforward enough, but the Court agrees with Defendant that the way Plaintiffs calculate both measures is fundamentally flawed.

The "as represented" value bases the amount that putative class members paid on prices for wholesale sales.  But it is undisputed that most putative class members had some third-party payor, like insurance, Medicare, or Medicaid.  Thus, for most transactions at issue here, pharmacies broke them into two charges: the amount the pharmacy charged to the consumer and the amount the pharmacy charged to the third-

- 19 -

party payor.  Doc. [227-3] ¶¶ 59–70.  Putative class members were not even always aware of these charges, let alone responsible to pay them.  The damages model applied to the named Plaintiffs illustrates its absurdity.  As Defendants explain, the model would award Plaintiff Searcy more than $25,000 for eight Stribild prescriptions and would award Plaintiff Kirk more than $27,000 for thirteen Atripla prescriptions; however, Searcy paid *nothing* out of pocket for his prescriptions, and Kirk paid only a total of $400.01.  *See* Doc. [224] at 24–25.[7]

What the Court views as worse, though, is the second half of Plaintiffs' formula, the supposed benchmark actual value of the medications.  To determine the actual value of Defendant's TDF-based medications, Plaintiffs' expert uses the price of *generic* versions of the TDF-based medications.  Doc. [208-28] ¶ 80.  The Court agrees with Defendant that the price of generic versions of the medications years after the class period is not a reasonable proxy for the price at which Defendant would have sold its *branded* TDF medicines, absent the challenged conduct.

Generic medications typically cost less than branded ones.  *See* Doc. [227-3] ¶ 130; *see also* Mo. Rev. Stat. § 338.056.2 (allowing Missouri pharmacists generally to select the "less expensive generically equivalent" drug instead of a prescribed brand name drug).  The size of the generic-to-brand price discount is commonly related to the number of generic competitors.  Doc. [227-3] ¶ 130; *see also* Frazer A. Tessema et al.,

---

[7] In the same irrational way, this model would improperly assess damages to uninjured class members, *see In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 143–44 (D.D.C. 2017) (finding plaintiffs' class-wide damages model unreliable because it, in part, assessed damages to uninjured class members), putting aside the antecedent issue of the propriety of having uninjured class members in the class in the first place.

*Generic but Expensive: Why Prices Can Remain High for Off-Patent Drugs*, 71 Hastings L.J. 1019, 1021 (2020) (noting that while drugs with "just three" generic competitors attain a 40% median reduction from brand-name price, "those with six manufacturers attain a 62% median reduction").  Thus, regardless of Defendant's alleged misconduct, the market would expect to see generic TDF-based medication prices lower than brand-name prices and would expect that the generic prices would continue to decrease as generic competition increased.  It follows then that Plaintiffs' model simply observes the effect of normal generic competition.  All the while, the record shows that the prices Defendant charged for its branded TDF-based medications increased over time—even as the market gained additional information about TDF and TAF, after TAF came onto the market, and even after entry of generic TDF-based medications.  Doc. [227-3] ¶¶ 125–26.  The Supreme Court has made clear that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Comcast*, 569 U.S. at 35.  Since the "model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.*  For this reason, Plaintiffs' damages model fails Rule 23.

## IV.

Given the multiple outcome-determinative issues discussed above, the Court chooses not to rule on the Defendant's Motion to Exclude Testimony of Akhilesh Nagaich.  *See also Cody v. St. Louis*, 103 F.4th 523, 535 (8th Cir. 2024) ("The ultimate *admissibility* of an expert's opinion is therefore a red herring at the class-certification stage.").  The Court notes, though, that in a case where Nagaich used the same timelines

he used here, the United States District Court for the Northern District of California ruled that "Nagaich may not testify as to any specific timelines because his opinions regarding 'optimal TAF timelines' lack sufficient basis in fact." *Holley v. Gilead Scis., Inc.*, 4:18-cv-6972-JST, 2023 WL 2469632, at *5 (N.D. Cal. Feb. 27, 2023) (Tigar, J.).  While a review of the briefing on the Motion and Judge Tigar's opinion appears to show that Defendants' Motion to Exclude is well taken, the Court will deny this Motion without prejudice at this time.  Defendant may reassert its arguments in the future, if necessary.

**V.**

For these reasons, class certification would not be appropriate in this action.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Class Certification, Doc. [206], is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motions to Exclude Testimony, Docs. [215] & [216], are **DENIED** without prejudice.

**IT IS FINALLY ORDERED** that Plaintiffs' Conditional Motion for Remand, Doc. [252], is **DENIED**.

Dated this 22nd day of January 2026.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE