# United States Court of Appeals
## For the Eighth Circuit

**JONATHAN SEARCY et al.,**

*Plaintiffs- Petitioners,*

v.

**GILEAD SCIENCES, INC.**

*Defendant- Respondent.*



**26-8003**

On Petition for Permission to Appeal from the
U.S. District Court for the Eastern District of Missouri
The Honorable Matthew T. Schelp

District Court Case No. 4:20-cv-01523-MTS

## PETITION FOR PERMISSION TO APPEAL

J. Toji Calabro
CALABRO | LAW OFFICE
Two Pershing Square
2300 Main St, 9th Floor
Kansas City, Missouri 64108
T: 888-585-1247

Patrick J. Stueve
Todd E. Hilton
Kasey A. Youngentob
David A. Hickey
STUEVE SIEGEL HANSON LLP
460 Nicholas Road, Suite 200
Kansas City, Missouri 64112
T: 816-714-7100

*Attorneys for Plaintiffs-Petitioners*

**RECEIVED**

FEB 02 2026

**U.S. COURT OF APPEALS
EIGHTH CIRCUIT**

# TABLE OF CONTENTS

Table of Contents ...................................................................................i

Table of Authorities................................................................. iii

Introduction ...................................................................................1

Questions Presented....................................................................2

Background...................................................................................2

Factual Background .....................................................................2

Procedural Background................................................................5

    A.    Plaintiffs Seek Certification Based on Objective Market Data ........................................................................6

    B.    Gilead Attacks Standing Using the Named Plaintiffs as Proof...........................................................................7

    C.    Plaintiffs Respond and Move for Conditional Remand..........9

    D.    The District Court Denies Both Motions..............................10

        1.    Standing: Two Standards for the Same Question.......10

        2.    Predominance: Answering an Argument Plaintiffs Did Not Make............................................13

        3.    Damages: Faulting the Model for Following Missouri Law................................................................14

The Relief Sought ......................................................................15

Reasons This Appeal Should Be Allowed .................................16

Argument....................................................................................18

    A.    The District Court Applied Two Standards to the Same Question ...............................................................18

    B.    Standing Requires Evidence at the Certification Stage ......19

    C.    Gilead Bore the Burden; Its Evidence Defeats Standing.....21

    D.    The District Court's Own Authority Requires Remand.......21

    E.    Subjective Belief Cannot Establish Injury-in-Fact .............23

i

F.    Remand is Required ............................................................. 25

   1.    Section 1447(c) is Mandatory ...................................... 25

   2.    Comity Counsels the Same Result ............................. 26

Conclusion ..................................................................................... 27

ii

# TABLE OF AUTHORITIES

**Cases**

*ASARCO, Inc. v. Kadish,*
490 U.S. 605 (1989)...................................................................................25

*Blades v. Monsanto Co.,*
400 F.3d 562 (8th Cir. 2005)....................................................................20

*Cent. Microfilm Serv. Corp. v. Basic/Four Corp.,*
688 F.2d 1206 (8th Cir. 1982)..................................................................15

*Craft v. Phillip Morris Co.,*
2003 WL 23139381 (Mo. Cir. Ct. Dec. 31, 2003) ..................................13

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006)..................................................................................19

*Debernardis v. IQ Formulations, LLC,*
942 F.3d 1076 (11th Cir. 2019)...........................................................22, 23

*DZ Rsrv. v. Meta Platforms, Inc.,*
96 F.4th 1223 (9th Cir. 2024) ..................................................................20

*Est. of Pew v. Cardarelli,*
527 F.3d 25 (2d Cir. 2008) .......................................................................16

*Froud v. Anadarko E&P Co.,*
607 F.3d 520 (8th Cir. 2010).....................................................................16

*Gallagher v. Santander Consumer USA, Inc.,*
125 F.4th 865 (8th Cir. 2025) ..............................................................21, 25

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.,*
594 U.S. 113 (2021)...................................................................................20

*Gregoire v. Class,*
236 F.3d 413 (8th Cir. 2000).....................................................................26

*Halvorson v. Auto-Owners Ins. Co.*,
718 F.3d 773 (8th Cir. 2013)......................................................................20

*Hart v. FedEx Ground Package Sys., Inc.*,
457 F.3d 675 (7th Cir. 2006)......................................................................16

*In re Folgers Coffee Mktg.*,
159 F.4th 1151 (8th Cir. 2025).................................................................26

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*,
903 F.3d 278 (3d Cir. 2018)................................................................. 19, 24

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
2023 WL 4765409 (S.D. Fla. July 26, 2023)...........................................23

*Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*,
500 U.S. 72 (1991).....................................................................................25

*Koronthaly v. L'Oréal USA, Inc.*,
374 F. App'x 257 (3d Cir. 2010).............................................................24

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)...................................................................................19

*McNaught v. Nolen*,
76 F.4th 764 (8th Cir. 2023) .............................................. 19, 21, 24

*Moore v. Hamline Univ.*,
2024 WL 1932801 (D. Minn. May 1, 2024)..............................................26

*Murphy v. Stonewall Kitchen, LLC*,
503 S.W.3d 308 (Mo. App. 2016)......................................................... 12, 14

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) .....................................................................20

*Plubell v. Merck & Co., Inc.*,
289 S.W.3d 707 (Mo. App. 2009).......................................................... 13, 14

iv

*Smith v. Tracy,*
   372 S.W.2d 925 (Mo. 1963) ...................................................................15

*St. Louis Heart Ctr., Inc. v. Nomax, Inc.,*
   899 F.3d 500 (8th Cir. 2018) ..............................................................25

*Tershakovec v. Ford Motor Co.,*
   79 F.4th 1299 (11th Cir. 2023) ..........................................................26

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ..................................................................... 17, 18

*Tyrnauer v. Ben & Jerry's Homemade, Inc.,*
   739 F. Supp. 3d 246 (D. Vt. 2024) .....................................................23

*Wallace v. ConAgra Foods, Inc.,*
   747 F.3d 1025 (8th Cir. 2014) ............................................................25

## Statutes

28 U.S.C. § 1447(c) ...................................................................... 24, 25

28 U.S.C. § 1453(c) ................................................................. 15, 16, 27

R.S.Mo. § 407.010 ............................................................................3

## Rules

Fed. R. App. P. 32 .............................................................................29

Fed. R. Civ. P. 23 .......................................... 15, 16, 17, 19, 20, 27

Fed. R. Civ. P. 56 .............................................................................19

## Other Authorities

The Paradox of Exclusive State-Court Jurisdiction Over
   Federal Claims,
   105 Minn. L. Rev. 1211 (2021) ..........................................................17

## INTRODUCTION

Standing is not static. A plaintiff must prove it with increasing rigor at each successive stage of the litigation. Allegations suffice at the pleading stage; evidence is required by class certification.

Gilead invoked this principle to defeat certification. It argued that absent class members lacked standing and used the named plaintiffs as its proof: if their circumstances showed no injury, neither did many others. But that argument has a necessary consequence. If the named plaintiffs lack standing, the district court loses subject matter jurisdiction and must remand. Gilead wanted the benefit of its standing argument without consequence.

The district court obliged. It held that absent class members lacked standing sufficient to satisfy certification. Yet it preserved standing for one named plaintiff on a novel pleadings-based theory rooted in nothing more than his supposed subjective beliefs. That decision cannot be reconciled with itself. The same standard applies to named plaintiffs and absent class members alike at the certification stage. A finding that absent members lack standing is a finding that the named plaintiffs lack standing too.

1

The decision below thus creates untenable asymmetry that flouts constitutional limitations on federal jurisdiction. After invoking federal jurisdiction via removal, defendants can defeat certification by arguing that class members lack standing, then avoid remand by insisting the court apply a different standard to the named plaintiffs. Class certification is often the most important moment in a case; its denial frequently ends litigation as a practical matter. The district court's approach allows federal courts to render that dispositive ruling without any constitutional basis to act. This Court should grant review (either summarily or with further briefing), close that loophole, and instruct the case be remanded.

## QUESTIONS PRESENTED

1.   Whether a district court must remand when the defendant's own evidence, offered to defeat class certification, establishes that the named plaintiffs lack Article III standing.

## BACKGROUND

## FACTUAL BACKGROUND

Scientists in Czechoslovakia developed the HIV drug tenofovir in the 1980s. R.Doc. 69 ¶ 8. Gilead did not invent it. But Gilead acquired the rights to commercialize it and developed two oral "prodrug" versions:

2

tenofovir disoproxil fumarate ("TDF") and tenofovir alafenamide ("TAF"). *Id.* ¶ 11.

Gilead's financial position in the early 2000s was precarious. Its 2004 10-K warned investors that growing its HIV drug business was critical to viability. *Id.* ¶¶ 23–24. Plaintiffs contend that Gilead responded by putting profits over patients, artificially extending its HIV franchise in violation of the Missouri Merchandising Practices Act. R.S.Mo. § 407.010 *et seq.*

The evidence shows that shortly after releasing TDF, Gilead realized TAF would be safer and more effective. TDF causes serious toxicity to kidneys and bones. R.Doc. 205-1 at 2–3. TAF worked at a much lower dose, cutting those risks. *Id.* at 3–4. Gilead's scientists were excited by these "remarkable results" showing TAF "would be much safer for patients in the long term." *Id.*

Gilead's executives were not. Gilead had been falsely promoting TDF as a "miracle drug" that was "extremely safe" with no "toxicities." *Id.* at 4–5. News about TAF would undermine that message. Worse, if consumers could choose between TDF and TAF, TAF would cannibalize TDF sales. *Id.*

3

So Gilead shelved TAF. It claimed publicly that TAF was not much different from TDF. *Id.* That wasn't true. Gilead then waited, reaping billions from TDF while TAF sat on the shelf. *Id.* at 5–6.

Two years before TDF's patent was set to expire, Gilead resurrected TAF, touting it as an "improved" version of TDF—based on the same research it had buried years earlier. *Id.*

The market confirmed what Gilead had long known. When consumers finally had a choice for the safer, more effective drug, TDF sales collapsed to almost nothing:



*Id.* at 8.

4

Brand-name TAF sales plateaued only after generic TDF entered the market at generic pricing. But even then, demand for TAF at elevated brand-name prices far exceeded demand for generic TDF at a fraction of the cost. Consumers not only preferred the safer drug, they paid more for it. That is exactly what Gilead feared, and why it suppressed TAF for years.

## PROCEDURAL BACKGROUND

Plaintiffs filed this class action in Missouri state court, alleging that Gilead violated the Missouri Merchandising Practices Act by deceptively delaying development of a safer drug, TAF, to extend the commercial life of its predecessor, TDF that it unfairly represented as the safest drug available. R.Doc. 4; R.Doc. 69 ¶¶ 73–82. They alleged an economic injury: Gilead deprived them of the choice between TDF and TAF until 2015, causing them to receive a drug worth less than the product they thought they had purchased had Gilead's representations been true. R.Doc.69 ¶¶73-82. Plaintiffs did not allege physical injury. Gilead removed under the Class Action Fairness Act ("CAFA"). R.Doc. 1 at 3.

Appellate Case: 26-8003   Page: 11   Date Filed: 02/02/2026 Entry ID: 5603934

## A.  Plaintiffs Seek Certification Based on Objective Market Data

After significant discovery, Plaintiffs moved to certify a class under Rule 23(b)(3). R.Doc. 205. The proposed class includes all persons who purchased a TDF-based drug in Missouri for personal, family, or household purposes between July 1, 2003, and November 1, 2015. R.Doc. 205-1 at 12. That end date matters: the class period closes before TAF entered the market. Every class member, by definition, was denied the choice between TDF and TAF and the price of TDF during that period was set in a market without competition from the safer, more effective TAF.

Plaintiffs supported certification with objective market data (rather than conjoint analysis or consumer surveys). Their economist, Dr. Bradford, developed a classwide damages model using real-world pricing of the drugs both before TAF entered the market and after. R.Doc. 208-28. The model measures what class members lost. They received a drug (TDF) valued by the market at one price; it was worth far less due to Gilead's deceptive conduct and manipulation of the market. The difference, their lost benefit of the bargain, is the measure of damages. Dr. Bradford measured actual worth by looking at what the market would

6

pay for TDF once TAF was available. That figure, the real-world data showed, was the price of generic TDF. *Id.* ¶¶ 73–80.

One example illustrates the point. Atripla, a TDF drug, retailed for $1,960 to $3,192 during the class period. Its generic price after TAF entered the market was $415.02. *Id.* ¶ 88. Classwide damages require only multiplication: the number of purchases times the price differential.

Because damages flow from objective (not subjective) market value, every class member was harmed in the same way.

## B.     Gilead Attacks Standing Using the Named Plaintiffs as Proof

Under this Circuit's precedent that a class cannot be certified if it is defined in a manner to include individuals without Article III standing, Gilead opposed certification. R.Doc. 214 at 18–21. Its central argument, and the one the district court accepted, was that injury-in-fact can be met only by out-of-pocket cost. Under this theory, a class member "need[s] to show an [out-of-pocket] overpayment compared to what they would have paid absent the challenged conduct, and relative to the value of the product received." R.Doc. 214 at 18.

Gilead then trained this argument on the named plaintiffs as illustrative of why the proposed class contained individuals without standing.

7

Plaintiff Searcy, Gilead observed, "paid $200 [out-of-pocket] for one Atripla [TDF] prescription . . . and received the rest of his Atripla prescriptions for free" after reimbursements made by his insurance and co-pay assistance were considered. *Id.* at 18–19. And recall Dr. Bradford's benchmark: the actual value of Atripla, measured by its generic price, was $415.02 even in a market where TAF was available. Gilead did the math. Because "the value of the medicine [Searcy] received (even if measured by Plaintiffs' benchmark, generic market value) clearly exceeded the amount he paid," Searcy had no injury. *Id.* at 19. No injury, no standing.

Based on its insistence that only "out-of-pocket" payments greater than the alleged actual value counted toward injury, Gilead illustrated the point for both named plaintiffs at the hearing:

## Plaintiff Searcy's Payments Show He Has No Economic Loss

| Date | Medicine | Actual Payment | Alleged "Actual" Value |
|---|---|---|---|
| 11/6/14 | Atripla® | $200.00 | $415.02 |
| 11/30/14 | Atripla® | $0.00 | $415.02 |
| 1/2/15 | Atripla® | $0.00 | $415.02 |
| 2/1/15 | Stribild® | $0.00 | $531.19 |
| 3/9/15 | Stribild® | $0.00 | $531.19 |
| 4/23/15 | Stribild® | $0.00 | $531.19 |
| 5/27/15 | Stribild® | $0.00 | $531.19 |
| 6/26/15 | Stribild® | $0.00 | $531.19 |
| 7/25/15 | Stribild® | $0.00 | $531.19 |
| 8/29/15 | Stribild® | $0.00 | $531.19 |
| 9/25/15 | Stribild® | $0.00 | $531.19 |
| 10/26/15 | Stribild® | $0.00 | $531.19 |
| TOTAL | 12 prescriptions | $200.00 | $6,025.77 |

8

## Plaintiff Kirk's Payments Show He Has No Economic Loss

| Date | Medicine | Actual Payment | Alleged "Actual" Value |
|---|---|---|---|
| 5/3/10 | Atripla® | $50.00 | $415.02 |
| 6/1/10 | Atripla® | $0.00 | $415.02 |
| 7/19/10 | Atripla® | $0.00 | $415.02 |
| 2/8/11 | Atripla® | $0.00 | $415.02 |
| 3/7/11 | Atripla® | $0.00 | $415.02 |
| 4/4/11 | Atripla® | $0.00 | $415.02 |
| 6/6/11 | Atripla® | $40.00 | $415.02 |
| 6/30/11 | Atripla® | $0.01 | $415.02 |
| 7/16/11 | Atripla® | $40.00 | $415.02 |
| 10/4/11 | Atripla® | $40.00 | $415.02 |
| 11/8/11 | Atripla® | $40.00 | $415.02 |
| 12/30/11 | Atripla® | $40.00 | $415.02 |
| 7/17/14 | Atripla® | $150.00 | $415.02 |
| TOTAL | 13 prescriptions | $400.01 | $5,395.26 |

R.Doc. 250 at Tr: 65:2-20 (discussing above slides).[1]

## C.    Plaintiffs Respond and Move for Conditional Remand

Plaintiffs promptly recognized the corner that Gilead had put itself in and brought it to the district court's attention. First, Plaintiffs argued that injury turns on Missouri's objective benefit-of-the-bargain measure, not out-of-pocket expenditure. Every class member purchased and received TDF at an inflated price and value. What any individual paid, or how that payment was allocated between the individual and its insurer, is irrelevant to the "as is" versus "as represented" value of the TDF.

---

[1] Attached as Ex. A.

9

R.Doc. 244 at 7–10. The district court recognized the stakes: standing turned on whether Missouri's objective benefit-of-the-bargain rule applies in federal court. R.Doc. 252 at 2 (citing Tr. 43:24-44:3).

Second, Plaintiffs also filed a conditional motion for remand. R.Doc. 252. The logic was simple. If Gilead was correct that the named plaintiffs lack Article III standing then remand was required. If Plaintiffs were correct, every class member suffered the same objective injury and the class should be certified. *Id.* Either way, the case cannot remain in federal court with certification denied.

## D.   The District Court Denies Both Motions

On January 22, 2026, the district court denied both remand and class certification. R.Doc. 263.

### 1.   *Standing: Two Standards for the Same Question*

The court applied two standards to the same question. For Plaintiff Searcy, the court found standing based on the allegation in the complaint that "he would not have 'paid what he paid' for his TDF-based medications." R.Doc. 263 at 7 (citing R.Doc. 69 ¶ 54). The court noted the "[a]dmissible evidence" that Searcy paid $200 out-of-pocket for one

10

prescription and concluded that "[t]hese facts support a reasonable inference that this alleged overpayment suffices as an economic injury here." *Id.*

But the court never completed the analysis. The record at class certification had developed far beyond the mere allegations. Searcy's complaint did not allege that his out-of-pocket cost exceeded the drug's value. And nowhere did the court compare what Searcy paid to what the evidence showed the drug was worth. The court simply declared that "[t]here may be several reasons why this amount will not suffice as a statutory injury under the Missouri Merchandising Practices Act . . . but this overpayment is a plausible economic injury." *Id.* at 7–8 n.4. That was enough, the court held, to deny remand.

Yet the court's position is radical—that Article III injury for economic loss is *broader* than injury under the MMPA. *Id.* Even Gilead argued the opposite: "Article III standing . . . is a federal requirement that operates regardless of whether state law decides they want to give away money to people who aren't actually injured." R.Doc. 252 4–5 (quoting Tr. 56:5-10) *see id.* (asserting that benefit-of-the-bargain theory "doesn't supersede the fundamental Article III injury-in-fact requirement" (quoting

11

Tr. 56:23-25). And no cases support the district court's view that a "plausible economic injury" that is sufficient to support Article III standing is insufficient to show "ascertainable loss" under the MMPA.

For absent class members, however, the court demanded more. It compared the evidence of what the drugs were worth (generic value after TAF was brought to market) against what class members paid out-of-pocket (which included contributions from insurance and other collateral sources). Because some class members paid nothing, and because "Plaintiffs themselves acknowledge that these drugs have value," the court concluded that the proposed class included members without Article III standing. R.Doc. 263 at 8–9. The court dismissed that any injury could be satisfied by Missouri's benefit-of-the-bargain rule (receiving a drug valued less than the objective value of the drug as represented) declaring that "there is no such thing as an anything-hurts-so-long-as-the-Missouri-General-Assembly-says-it-hurts theory of Article III injury." *Id.*[2]

---

[2] Missouri courts have consistently recognized, for decades, that "an ascertainable loss under the benefit-of-the-bargain rule . . . compares the actual value of the item to the value of the item if it had been as represented at the time of the transaction." *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 313 (Mo. App. 2016) ("The rule is also applicable in MMPA cases to meet the element of ascertainable loss."). This "does not

12

> 2.   *Predominance: Answering an Argument Plaintiffs Did Not Make.*

The court also held that common issues did not predominate. Its reasoning compounded the error. The court focused on Searcy's allegation that he subjectively believed TDF was the safest therapy known to Gilead. R.Doc. 263 at 13. Because proving injury would require asking whether each class member shared that belief, the court concluded, individual inquiries would overwhelm common questions. *Id.* at 13–18.

But Plaintiffs never argued that injury depended on proving subjective belief of value. Their theory rested on objective facts: during the class period, Gilead's conduct deprived all class members of the choice between TAF and TDF, causing all of them to receive a drug at artificially inflated prices measurable through objective market data. R.Doc. 244 at 3–4; R.Doc. 259 at 3–6.

---

require that an unlawful practice cause a 'purchase.'" *Plubell v. Merck & Co., Inc.*, 289 S.W.3d 707, 714 (Mo. App. 2009) ("a plaintiff's *loss* should be a result of the defendant's unlawful practice, but the statute does not require that the *purchase* be caused by the unlawful practice"). And the benefit-of-the-bargain loss is tethered to objective market values not the amounts paid out-of-pocket. *See Craft v. Phillip Morris Co.*, 2003 WL 23139381 (Mo. Cir. Ct. Dec. 31, 2003).

13

Missouri law required that approach. Under the MMPA what matters is the objectively ascertainable loss determined by comparing actual market values, not personal feelings about a purchase. *Murphy*, 503 S.W.3d at 314; *Plubell*, 289 S.W.3d at 715. Missouri's pattern jury instruction defines the measure as "the difference between the actual value" of what was sold and "what its value would have been" if as represented. Mo. Approved Jury Instr. (Civ.) 4.03 (8th ed.). "Actual value" means objective market value. *Id.*

Plaintiffs' damages model tracked this standard. Damages didn't depend on what subjective value *anyone* placed on the drugs but on what the drugs were worth based on the market both without and with Gilead's deception. A plaintiff's subjective belief is irrelevant under Missouri law. The court's predominance analysis answered an argument Plaintiffs did not make and ignored the one they did.

### 3. *Damages: Faulting the Model for Following Missouri Law*

Finally, the court rejected Dr. Bradford's model on two grounds. First, the court faulted the model for measuring damages by market price rather than out-of-pocket payment. R.Doc. 263 at 19–20. That critique echoes the court's standing analysis, and it suffers from the same flaw:

14

Missouri law permits Plaintiffs to measure damages by market value, not out-of-pocket cost.[3] Second, the court questioned whether generic pricing was the proper comparator, reasoning that generic prices reflect competition. *Id.* at 20–21.

The second criticism misses the point. Plaintiffs' entire theory is that Gilead unlawfully suppressed competition between TAF and TDF. The generic price captures what TDF would have been worth in a competitive market (*i.e.,* but for the unlawful conduct). That is precisely the right benchmark. R.Doc. 244 at 13; R.Doc. 259 at 5.

## THE RELIEF SOUGHT

The district court denied class certification and remand in the same order, but its reasoning cannot support both results. It held that absent

---

[3] Missouri is not unique. The benefit-of-the-bargain rule stems from common-law tradition for fraud damages. *See Smith v. Tracy*, 372 S.W.2d 925, 938 (Mo. 1963) (citing treatises that "[a]ccording to the weight of authority generally, the proper measure of damages in a case of this kind is that 'the defrauded party is entitled to the difference between the actual value of the property and what its value would have been if it had been as represented.' This is often referred to as the majority or 'Benefit of the Bargain' rule . . . The courts of Missouri have adopted and constantly adhered to the majority rule," citing Missouri case from 1907). This Court has not only recognized Missouri law on this point but expressly distinguishing this rule from "a reliance or out-of-pocket loss theory" which is an *alternative,* form of damages. *Cent. Microfilm Serv. Corp. v. Basic/Four Corp.*, 688 F.2d 1206, 1220 (8th Cir. 1982)

Appellate Case: 26-8003   Page: 21   Date Filed: 02/02/2026 Entry ID: 5603934

class members lack Article III standing. That same analysis, applied to the named plaintiffs, defeats federal jurisdiction entirely. This petition seeks permission to appeal and requests remand to Missouri state court. R.Doc. 263; 28 U.S.C. § 1453(c); Fed. R. Civ. P. 23(f).

## REASONS THIS APPEAL SHOULD BE ALLOWED

The Eighth Circuit grants discretionary review under § 1453(c) to "address . . . important question[s]" of CAFA jurisdiction whose resolution "will alleviate uncertainty in the district courts." *Froud v. Anadarko E&P Co.*, 607 F.3d 520, 523 (8th Cir. 2010) (quoting *Hart v. FedEx Ground Package Sys., Inc.*, 457 F.3d 675, 678 (7th Cir. 2006); *Est. of Pew v. Cardarelli*, 527 F.3d 25, 29 (2d Cir. 2008)). In addition, the Court has discretion to "permit an appeal from an order granting or denying class-action certification[.]" Fed. R. Civ. P. 23(f). This case satisfies the criteria for immediate review.

*The question is important*. This appeal presents a fundamental question about the intersection of Article III standing, Rule 23 certification, and statutory remand provisions. Believing federal courts more favorable than state courts on the issue of class certification, Defendants almost always remove class actions filed in state court under CAFA's

16

generous removal provisions. Yet, Defendants then, often, argue that class actions present Article III standing problems based on recent narrowing of the injury requirement, such as those recognized in *TransUnion LLC v. Ramirez,* 594 U.S. 413, 459 (2021).

In his dissent in *TransUnion,* Justice Thomas expressly acknowledged that by narrowing the definition of injury the Court left state courts "as the sole forum for such cases, with defendants unable to seek removal to federal court." *Id.* at 459 n.9 (Thomas, J. dissenting) (citing Bennett, The Paradox of Exclusive State-Court Jurisdiction Over Federal Claims, 105 Minn. L. Rev. 1211 (2021)). Yet the district court here purported to rescue Defendants from that outcome.

This Court should right that jurisdictional wrong. A district court may not apply one evidentiary standard to named plaintiffs and another to absent class members, then use that inconsistency to deny both remand and certification. That is the equivalent of wrongly assuming jurisdiction to decide an issue the Court has no authority to decide.

This Court has held that, at class certification, allegations are not enough. Evidentiary proof is required. Other circuits have made explicit what this Court has implied: standing at certification must be proved by

17

a preponderance of the evidence. This appeal presents an opportunity to confirm that the same standard governs Article III standing and Rule 23's requirements.

*Resolution will alleviate uncertainty*. The decision below creates a template for gamesmanship. Defendants can now defeat certification by proving that class members lack standing, then retain the federal forum by asking the court to assess the named plaintiffs under a forgiving pleading-stage standard. District courts need guidance on whether that asymmetry is permissible, fair or consistent with Article III's important limitations on the federal courts. The answer should be a resounding no. But without this Court's intervention, the decision below will generate confusion and inconsistent results across the Circuit.

## ARGUMENT

### A.   The District Court Applied Two Standards to the Same Question

Article III standing is a constitutional requirement rooted in the separation of powers. Federal courts "do not possess a roving commission to publicly opine on every legal question." *TransUnion*, 594 U.S. at 423. "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so."

18

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). Courts must resolve standing as a threshold matter, and the presumption runs against it: federal courts lack jurisdiction unless the contrary appears affirmatively from the record. *McNaught v. Nolen*, 76 F.4th 764, 769 n.2 (8th Cir. 2023); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 288–89 (3d Cir. 2018) (collecting cases).

The district court's order cannot be squared with these principles. It applied one set of rules to the named plaintiffs and another to absent class members.

## B.   Standing Requires Evidence at the Certification Stage

Allegations may establish standing at the pleading stage. Proof is required thereafter. At summary judgment, the party must "'set forth' by affidavit or other evidence 'specific facts.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citing Fed. R. Civ. P. 56). At trial, the facts "must be supported adequately by the evidence adduced." *Id.* (citation and quotation omitted).

Class certification is no exception. Courts apply a preponderance-of-the-evidence standard in determining whether the requirements of

19

Rule 23 have been met.[4] *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc) (collecting cases). So if it matters to class certification, standing "must be established by a preponderance of the evidence." *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1240 (9th Cir. 2024). Likewise, this Court has said courts must look "behind the pleadings," *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005), and parties must "satisfy through evidentiary proof" Rule 23's requirements, *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 777 (8th Cir. 2013).

Although the district court understood this when evaluating predominance, it reverted to the pleadings when evaluating Searcy's standing. It relied on his allegation that "he would not have paid what he paid." R.Doc. 263 at 7. That is not evidentiary proof. It is the standard for surviving a motion to dismiss.[5]

---

[4] The Supreme Court appears to be in accord. *See Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 126-27 (2021) ("The district court's task is simply to assess *all* the evidence of price impact—direct and indirect—and determine whether it is *more likely than not* that the alleged misrepresentations had a price impact." (emphasis added)).

[5] Indeed, the district court's cited cases confirm the point. R.Doc. 263 at 7. They all addressed standing at the motion-to-dismiss stage. The one

## C.    Gilead Bore the Burden; Its Evidence Defeats Standing

The district court compounded its error by ignoring the removal context. In removal cases, "the defendant, as the proponent of federal jurisdiction, must establish the plaintiff's Article III standing." *Gallagher v. Santander Consumer USA, Inc.*, 125 F.4th 865, 867 (8th Cir. 2025) (citation and quotations omitted). Yet Gilead offered evidence that the named plaintiffs themselves lacked standing to show why the class should not be certified. The district court used that evidence to deny certification but refused to apply it when considering remand.

## D.    The District Court's Own Authority Requires Remand

The district court never explained its inconsistent approach. It faulted Plaintiffs for conceding that the value of TDF was more than zero. R.Doc. 263 at 3 n.2. But Plaintiffs were bound to apply the evidence at class certification. As reflected in the figure on page 4, the market showed a residual value of TDF even after TAF entered the market—the generic price of TAF was above zero. If Plaintiffs had insisted TAF was worth

---

exception, *McNaught*, cuts the other way. That case reached this Court after evidentiary hearings at the NTSB, and this Court held that the record *did not* establish Article III standing. 76 F.4th at 769–70.

21

zero, Defendants, and the district court, would certainly have attacked that as unreliable. There was no failure of proof. The district court had it backwards.

Chief Judge Sutton's concurrence, the very authority the district court relied on to deny remand, explains why. *Id.* at 7 n.4. Allegations of economic injury is not enough forever. Eventually the court "need[s] evidence to back the point up. Why was the product worthless to each of them? How did it deliver less than expected?" *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1090 (11th Cir. 2019) (Sutton, J., concurring). Here, Plaintiffs answered those questions by quantifying the objective market value of TDF using real-world pricing data. Neither named plaintiff paid more out-of-pocket than TDF's "actual" objective market value. Under the district court's own framework, neither has standing.

Lack of standing, however, is not the end of the case. It is the end of federal jurisdiction. Chief Judge Sutton made the point explicit: "Even if the plaintiffs' state-law claims eventually fail for lack of Article III standing at the summary judgment stage, they may be able to vindicate them in state court. The States, it's well to remember, take a variety of

22

approaches to standing, with many of them having no case-or-controversy requirement at all." *Id.* at 1090–91.

### E.     Subjective Belief Cannot Establish Injury-in-Fact

In any event, the district court's standing analysis fails on its own terms. Even at the pleading stage, injury-in-fact requires concrete, objective harm. But defendants repeatedly insist, and courts repeatedly accept, that a plaintiff's subjective belief that he overpaid is not enough.

*In re Zantac* is instructive. There, plaintiffs claimed economic injury from purchasing a drug they alleged was worthless. The court rejected the theory that plaintiffs could "prove that a Plaintiff believed [the product] was worthless" in lieu of proving it "was objectively worthless." *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2023 WL 4765409, at *9 (S.D. Fla. July 26, 2023). "The Plaintiffs' position is that they can establish economic injury not because of an objective criterion, but because of a consumer's subjective belief. This position is contrary to well established caselaw." *Id.*

Other courts agree. Subjective belief cannot establish standing. A "benefit of the bargain" or "overpayment" theory "based on a mere subjective belief in a product's quality will not suffice." *Tyrnauer v. Ben &*

23

*Jerry's Homemade, Inc.*, 739 F. Supp. 3d 246, 255 (D. Vt. 2024). Instead, a plaintiff "must allege facts that would permit a factfinder to value the purported injury at something more than zero dollars without resorting to mere conjecture." *Johnson & Johnson*, 903 F.3d at 285; *see also Koronthaly v. L'Oréal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010) ("subjective allegation" that product was "unacceptable to her" insufficient).

This Circuit has said the same. Injury "must be 'concrete and particularized' to support standing," and "naked assertions . . . fall short of plausibly establishing injury." *McNaught*, 76 F.4th at 771–72 (cleaned up).

The district court found standing based solely on Searcy's allegation that he "would not have paid what he paid for Atripla and Stribild had he known" of Gilead's unlawful conduct. R.Doc. 69 ¶ 54; R.Doc. 263 at 7. That is not an objective measure of injury. It is a statement about what Searcy believes he could have paid. But the market evidence shows otherwise, and, at this stage, evidence trumps allegations.

24

## F.    Remand is Required

### 1.    *Section 1447(c) is Mandatory*

Remand is not discretionary. Section 1447(c) provides that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). The word "shall" means what it says. A district court has "no discretion to dismiss rather than remand an action" removed from state court. *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 89 (1991). This Court has repeatedly enforced that mandate. *See Gallagher v. Santander Consumer USA, Inc.*, 125 F.4th 865 (8th Cir. 2025); *St. Louis Heart Ctr., Inc. v. Nomax, Inc.*, 899 F.3d 500, 505 (8th Cir. 2018); *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1033 (8th Cir. 2014).

The reason is straightforward. A lack of Article III standing does not mean a lack of any forum. State courts are "not bound by the limitations of an Article III case or controversy." *St. Louis Heart Ctr.*, 899 F.3d at 505; *see also ASARCO, Inc. v. Kadish*, 490 U.S. 605, 617 (1989) ("We have recognized often that the constraints of Article III do not apply to state courts.").

25

The district court found that absent class members lack Article III standing. That finding, applied consistently, compels the same result for the named plaintiffs. And if the named plaintiffs lack standing, Section 1447(c) leaves no room for discretion. Remand is required.

### 2.    *Comity Counsels the Same Result*

Comity reinforces the point. CAFA has drawn most MMPA class actions into federal court, leaving the Missouri Supreme Court with few opportunities to interpret its own consumer protection statute. This Court recently flagged the problem, noting a circuit split on an MMPA issue with no controlling guidance from Missouri's highest court. *See In re Folgers Coffee Mktg.*, 159 F.4th 1151, 1157–58 (8th Cir. 2025) (noting tension with *Tershakovec v. Ford Motor Co.*, 79 F.4th 1299 (11th Cir. 2023)).

The Eighth Circuit has long "stress[ed] the need to exercise judicial restraint and avoid state law issues wherever possible." *Gregoire v. Class*, 236 F.3d 413, 420 (8th Cir. 2000). Even when "federal courts are equipped to resolve matters of state law, [state] courts should have the opportunity to rule on issues of purely state law when possible." *Moore v. Hamline*

26

*Univ.*, 2024 WL 1932801, at *7 (D. Minn. May 1, 2024), *aff'd*, 2024 WL 4747168 (8th Cir. July 2, 2024).

The Missouri Supreme Court cannot accept certified questions from federal courts. Remand is the only path to a definitive interpretation of these recurring claims under Missouri law.

## CONCLUSION

For the above reasons, the Court should grant this Petition. It should accept review of the order denying remand and denying class certification under Section 1453(c) and Rule 23(f). If the district court's standing analysis survives review, the class should have been certified. If the standing analysis fails, the order denying class certification was without jurisdiction and must be vacated before remand.

Dated: February 2, 2026

Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

/s/ Patrick J. Stueve
Patrick J. Stueve, Mo. Bar #37682
Todd E. Hilton, Mo. Bar #51388
David A. Hickey, Mo. Bar #62222
Kasey Youngentob (pro hac vice)
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100

27

stueve@stuevesiegel.com
hilton@stuevesiegel.com
youngentob@stuevesiegel.com

J. Toji Calabro, Mo. Bar #66574
CALABRO | LAW OFFICE
Two Pershing Square
2300 Main St, 9th Floor
Kansas City, MO 64108
T: 888-585-1247
tojicalabro@calabro-law.com

*Attorneys for Plaintiffs-Petitioners*

28

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing Brief:

1.    Complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 4,959 words; and

2.    Complies with typeface and type style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: February 2, 2026

/s/ Patrick J. Stueve
*Attorney for Plaintiffs-Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that, on February 2, 2026, I electronically the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system. Notice of this filing will be sent by operation of the CM/ECF system to all counsel of record.

Dated: February 2, 2026

*/s/ Patrick J. Stueve*
*Attorney for Plaintiffs-Petitioners*

Case: 4:20-cv-01523-MTS    Doc. #:  264    Filed: 02/03/26    Page: 37 of 68 PageID #: 27409

# EXHIBIT A

Appellate Case: 26-8003    Page: 1    Date Filed: 02/02/2026 Entry ID: 5603934

# *Searcy v. Gilead Sciences*

*Hearing on Plaintiffs' Motion for Class Certification & Defendants' Motions to Exclude Expert Testimony*

*August 20, 2025*



# Plaintiff Searcy's Payments Show He Has No Economic Loss

| Date | Medicine | Actual Payment | Alleged "Actual" Value |
|------|----------|----------------|------------------------|
| 11/6/14 | Atripla® | $200.00 | $415.02 |
| 11/30/14 | Atripla® | $0.00 | $415.02 |
| 1/2/15 | Atripla® | $0.00 | $415.02 |
| 2/1/15 | Stribild® | $0.00 | $531.19 |
| 3/9/15 | Stribild® | $0.00 | $531.19 |
| 4/23/15 | Stribild® | $0.00 | $531.19 |
| 5/27/15 | Stribild® | $0.00 | $531.19 |
| 6/26/15 | Stribild® | $0.00 | $531.19 |
| 7/25/15 | Stribild® | $0.00 | $531.19 |
| 8/29/15 | Stribild® | $0.00 | $531.19 |
| 9/25/15 | Stribild® | $0.00 | $531.19 |
| 10/26/15 | Stribild® | $0.00 | $531.19 |
| TOTAL | 12 prescriptions | $200.00 | $6,025.77 |

Purchase information from Baker Rpt., DX 3, ¶ 165 & ex. 14

14

# Plaintiff Kirk's Payments Show He Has No Economic Loss

| Date | Medicine | Actual Payment | Alleged "Actual" Value |
|---|---|---|---|
| 5/3/10 | Atripla® | $50.00 | $415.02 |
| 6/1/10 | Atripla® | $0.00 | $415.02 |
| 7/19/10 | Atripla® | $0.00 | $415.02 |
| 2/8/11 | Atripla® | $0.00 | $415.02 |
| 3/7/11 | Atripla® | $0.00 | $415.02 |
| 4/4/11 | Atripla® | $0.00 | $415.02 |
| 6/6/11 | Atripla® | $40.00 | $415.02 |
| 6/30/11 | Atripla® | $0.01 | $415.02 |
| 7/16/11 | Atripla® | $40.00 | $415.02 |
| 10/4/11 | Atripla® | $40.00 | $415.02 |
| 11/8/11 | Atripla® | $40.00 | $415.02 |
| 12/30/11 | Atripla® | $40.00 | $415.02 |
| 7/17/14 | Atripla® | $150.00 | $415.02 |
| TOTAL | 13 prescriptions | $400.01 | $5,395.26 |

Purchase information from Baker Rpt., DX 3, ¶ 165 & ex. 14

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| JONATHAN SEARCY, *on behalf of himself and all others similarly situated*, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 4:20-cv-1523-MTS |
| GILEAD SCIENCES, INC., | ) ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Before the Court is Plaintiffs' Motion for Class Certification, Doc. [206], along with Defendant's Motions to Exclude Testimony, Docs. [215] & [216], and Plaintiffs' Conditional Motion to Remand, Doc. [252]. After oral argument, a thorough review of the parties' briefing, and due consideration, the Court concludes that class certification is not appropriate here. For the reasons explained below, the Court will deny each Motion.

**I.**

Not all that long ago, infection with the human immunodeficiency virus (HIV) typically progressed to acquired immunodeficiency syndrome (AIDS), and AIDS onset virtually always proved fatal. *See* AIDS, *Stedman's Medical Dictionary* (Nov. 2014). That need not be so today. Therapeutics have transformed HIV infection from a lethal disease into a manageable chronic condition. *See id.* Gilead Sciences, Inc. ("Gilead"), a biopharmaceutical company and the Defendant in this action, manufactures therapies that treat HIV. Plaintiffs, two HIV-positive men, were prescribed and took medications, as

directed by their healthcare providers, that Gilead manufactured.  The medications they took worked exactly as prescribed, effectively managing their HIV.  What is more, the medications did so safely; neither Plaintiff alleges that he suffered *any* personal injury from taking them.  So why have they sued Gilead after taking its lifesaving medications without adverse effect?  Plaintiffs' operative Complaint claims that they overpaid for Gilead's medications based on its alleged misconduct.  And they now seek to represent a class of individuals who purchased the relevant medications in Missouri.

<u>A</u>.

Gilead owned the exclusive rights to tenofovir, and it sought to develop an oral prodrug[1] form of the compound.  At points in time, Gilead developed the two prodrugs that are relevant to this action, tenofovir disoproxil fumarate (TDF) and tenofovir alafenamide (TAF).  Plaintiffs maintain that TAF is safer and more effective than TDF.  They allege that though Gilead knew this to be true, it concealed TAF's allegedly superior safety profile and deliberately delayed TAF's release to prolong market share dominance through a patent-extension strategy.  Gilead then launched TAF around two years before TDF's patent expired, which Plaintiffs allege allowed Gilead to convince patients to switch from its patent-expiring TDF-based medications to TAF-based medications.

Plaintiffs Jonathan Searcy and Ervin Kirk each were prescribed, purchased, and took TDF-based medications but switched to TAF-based medications.  Each maintains

---

[1] That is, a biologically inactive compound that can be metabolized in the body to produce a desired drug.

- 2 -

that he would not have taken the TDF-based drugs were TAF-based alternatives available, and each alleges that he would not have "paid what he paid" for the TDF-based medications had he known they were "less effective and more dangerous than they needed to be," or had he "known of Gilead's deceptive and misleading conduct."  Doc. [69] ¶¶ 48–49, 53–54.

Plaintiffs assert that when Gilead sold TDF-based medications as "the safest antiviral HIV drug known to [it]," Doc. [208] at 16, Gilead violated the Missouri Merchandising Practices Act (MMPA) and was unjustly enriched under Missouri law, Doc. [69] ¶¶ 73–82, 83–88.  The Court previously denied Gilead's Motion to Dismiss both claims against it.[2]  Now, Plaintiffs ask the Court to certify a class consisting of:

> All persons (as defined by Mo. Rev. Stat § 407.010.5) who purchased any TDF-based drug, including Atripla, Complera, Stribild, Truvada, or Viread, in Missouri, primarily for personal, family or household purposes between July 1, 2003, and November 1, 2015.

There are important exclusions from the class.  Besides the usual conflict exclusions, specifically excluded from the class are Missouri residents who, before the entry of judgment in this case, have filed claims that they suffered a personal injury from TDF medication, including any person who is, has been, or becomes a plaintiff identified by name claiming personal injuries in (1) the coordinated proceeding entitled *Gilead*

---

[2] *See Johnson v. Gilead Scis., Inc.*, 563 F. Supp. 3d 981 (E.D. Mo. 2021).  Intervening case law, along with Plaintiffs' acknowledgement that TDF-based drugs still have value, leads the Court to question whether it properly denied Defendant's Motion to Dismiss.  *See, e.g.*, *Hennessey v. Gap, Inc.*, 86 F.4th 823, 827–831 (8th Cir. 2023); *Ellis v. Nike USA, Inc.*, 158 F.4th 932, 934 n.3 (8th Cir. 2025) (citing *id.*); *see also Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 482 (8th Cir. 2020) ("To survive a motion to dismiss, a complaint must contain 'sufficient factual matter' to state a facially plausible claim for relief.").

- 3 -

*Tenofovir Cases*, JCCP No. 5043 (S.F. Super. Ct.), (2) the action entitled *Holley v. Gilead Sciences, Inc.*, 4:18-cv-6972-JST (N.D. Cal.) ("*Holley*"), or (3) any action consolidated for pretrial purposes with *Holley*.

B.

Federal Rule of Civil Procedure 23 governs class actions and provides the necessary prerequisites. It is Plaintiffs' burden to demonstrate that their proposed class satisfies those requirements. *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 374 (8th Cir. 2018). These include the threshold requirements of numerosity, commonality, typicality, and adequacy. *See* Fed. R. Civ. P. 23(a). The class must also be "clearly defined and adequately ascertainable," *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016), and fit "within 'one of the three subsections of Rule 23(b),'" *Stuart*, 910 F.3d at 374 (quoting *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1155 (8th Cir. 2017)). Here, Plaintiffs seek certification pursuant to Rule 23(b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Although "[a] district court has broad discretion to determine whether certification is appropriate," *Stuart*, 910 F.3d at 375 (internal quotations omitted), it "must undertake a rigorous analysis to ensure that the requirements of Rule 23 are met," *Sandusky*, 821 F.3d at 998 (citation omitted).

- 4 -

## II.

Prior to a Rule 23 analysis, Plaintiffs face an initial issue that they have not shown they can overcome. The U.S. Court of Appeals for the Eighth Circuit has recognized that the "constitutional requirement of standing is equally applicable to class actions." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010). In *Avritt*, the Eighth Circuit held that "a class cannot be certified if it contains members who lack standing." *Id.* (citing *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263–64 (2d Cir. 2006)). "[T]o put it another way," the Eighth Circuit held that "a named plaintiff cannot represent a class of persons who lack the ability to bring a suit themselves." *Avritt*, 615 F.3d at 1034; *accord Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013) ("In order for a class to be certified, each member must have standing and show an injury in fact that is traceable to the defendant and likely to be redressed in a favorable decision."). Because the Court concludes that Plaintiffs' class definition "include[s] individuals who lack standing," the Court cannot certify it. *See Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 988 & n.3 (8th Cir. 2021).[3]

---

[3] *Avritt*, like the Second Circuit in *Denney*, concluded that Article III bars certification when a class definition includes someone who lacks standing. Since then, the Eighth Circuit seems to have hedged on whether the bar is a Rule 23(b)(3) one or an Article III one. *See Halvorson*, 718 F.3d at 778 (discussing the standing issue in tandem with predominance); *see also Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 366 (3d Cir. 2015) (comparing *Avritt* and *Halvorson* and noting that it was "not clear to us whether the Eighth Circuit's standing analysis rests on Article III or Rule 23"). Whether the issue is rooted in Article III or Rule 23, it leads to the same result—no certification here.

Appellate Case: 26-8003    Page: 5    Date Filed: 02/02/2026 Entry ID: 5603934

A.

To have Article III standing, a plaintiff "must have a personal stake in the case." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation modified). More specifically, Article III standing requires "(1) an injury in fact; (2) a causal connection between the injury and conduct complained of; and (3) [a] likelihood that the injury will be redressed by a favorable decision." *Id.* at 987 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).

At issue here is the injury in fact requirement. Many consumer cases against drug manufacturers easily establish Article III's injury requirement because they allege that the drug at issue caused them physical harm. *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352, 1353–54 (J.P.M.L. 2005). Physical injuries straightforwardly suffice as Article III injuries. *See TransUnion*, 594 U.S. at 425; *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 642 (2007) (Souter, J., dissenting). This case is an unusual one in that there is no physical harm alleged. While Plaintiffs claim that Gilead's decisions around tenofovir caused unnecessary deaths and injuries to others, the proposed class specifically excludes those who claim they suffered a personal injury from TDF-based medications. So, the putative class members cannot use physical injury as their concrete injury.

- 6 -

With no physical injury, Plaintiffs point to what would be another clearly concrete injury, monetary or economic harm, which "ha[s] long been recognized as sufficient to lay the basis for standing." *Sierra Club v. Morton*, 405 U.S. 727, 733 (1972). Plaintiffs themselves have plausibly alleged that they overpaid for their TDF-based medications given Gilead's misrepresentations, which is a concrete economic injury sufficient to establish Article III standing. *See George v. Omega Flex, Inc.*, 874 F.3d 1031, 1032 (8th Cir. 2017) (per curiam) ("George's assertions of paying more than CSST is worth . . . [is an] economic injury sufficient to establish Article III standing."); *accord In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 529 (7th Cir. 2024); *In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*, 54 F.4th 28, 35 (1st Cir. 2022); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 285 (3d Cir. 2018).

Take Plaintiff Searcy. *See Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (explaining that if at least one plaintiff has standing, the action may proceed). Searcy alleged that he would not have paid what he paid for his TDF-based medications had he known that "they were less effective and more dangerous than they needed to be," or had he known of Gilead's "deceptive and misleading conduct." Doc. [69] ¶ 54. Admissible evidence shows that, for at least one of his TDF-based prescriptions, he spent $200. These facts support a reasonable inference that this alleged overpayment suffices as an economic injury here.[4] *See McNaught v. Nolen*, 76 F.4th 764, 770 (8th Cir. 2023)

---

[4] There may be several reasons why this amount will not suffice as a statutory injury under the Missouri Merchandising Practices Act or that Searcy is not entitled to damages, but this

- 7 -

(explaining that a plaintiff must allege sufficient facts to support a reasonable inference that he can satisfy the elements of standing).  Put differently, Plaintiffs "plausibly allege an injury in fact—that they paid more for [the medications] than they would have paid had they known [the relevant information].  This difference in price states a concrete economic harm that satisfies Article III standing's injury in fact element, no matter the label we give it." *Debernardis*, 942 F.3d at 1090 (Sutton, J., concurring).

But while Plaintiff Searcy has standing, not everyone encompassed in the class definition would.  The products at issue here, prescription medications, are not standard retail goods.  Not every consumer pays the same price—or even close to the same price— for them at the point of sale.  *See* Doc. [227-3] ¶ 81; *see also* Marc A. Rodwin, *Negotiating Medicare Drug Prices: A New Attempt to Control Purchase Prices*, 53 J.L. Med. & Ethics 147, 147 (2025) (noting drug prices and copayment amounts vary widely among patients within the United States).  The same is true for the medications at issue here, and that is where Plaintiffs' class definition runs into problems.  Plaintiffs propose a class of *all* persons who purchased a TDF-based drug.  This definition encompasses those who paid nothing for the medication at the point of sale.  *See* Doc. [250] at 33 (answering in the affirmative that those who "paid very little, to nothing, for" the medications were encompassed in the class definition).  And many class members paid nothing.  For example, evidence in the record shows that across all prescriptions for TDF-containing

_____

overpayment is a plausible economic injury.  *See Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1090 (11th Cir. 2019) (Sutton, J., concurring).  For this reason, the Court will deny Plaintiffs' Conditional Motion to Remand.  *See* Doc. [252]; *see also Davis v. United States*, 564 U.S. 229, 249 n.10 (2011) (faulting a party for "confus[ing] weakness on the merits with absence of Article III standing").

- 8 -

medications filled at CVS pharmacies in Missouri between January 1, 2010, and October 31, 2015, consumers paid nothing for approximately fifty-six percent of these prescriptions.  Doc. [227-3] ¶ 164.

Though many paid nothing for these medications, they are life-saving ones that undeniably have value and worth.  TDF-based medications remain approved by the Food and Drug Administration.  Doctors prescribe them, pharmacists dispense them, and patients take them even today.  While a jury could (at least theoretically) agree that Plaintiffs overpaid for the medications, Plaintiffs themselves acknowledge that these drugs have value.  Doc. [208-28] ¶ 73.  For this reason, purchasers who paid *nothing* out of pocket for medications that are worth *something* necessarily lack an economic injury. *See In re Johnson & Johnson*, 903 F.3d at 288 (concluding that plaintiff "received the benefit of her bargain" and "suffered no economic injury" where she failed to allege that she received "an economic benefit worth one penny less than what she paid"); *Mathison v. Bumbo*, 8:08-cv-0369-DOC, 2008 WL 8797937, at *5 (C.D. Cal. Aug. 18, 2008) (noting that if plaintiffs "did not pay anything" for product at issue, then "they got exactly what they paid for," which "does not confer standing to sue").

In response to this problem, Plaintiffs argue that even those who paid nothing or minuscule amounts still suffered an Article III injury because Missouri law entitles them to benefit of the bargain damages.  But "under Article III, an injury in law is not an injury in fact." *TransUnion*, 594 U.S. at 427.  Therefore, there is no such thing as an anything-hurts-so-long-as-the-Missouri-General-Assembly-says-it-hurts  theory of  Article  III injury. *See Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 463 (6th Cir. 2019); *see also*

- 9 -

*Dinerstein v. Google, LLC*, 73 F.4th 502, 521 (7th Cir. 2023) (noting "*TransUnion* put an end to federal courts hearing claims premised on *nonexistent* injuries"). Article III "requires at a minimum that the injury 'exist' in the real world independent of a legislature's choice to confer the right to sue and independent of the plaintiff's claim to be hurt." *Debernardis*, 942 F.3d at 1089 (Sutton, J., concurring). Claiming that a legal entitlement to benefit of the bargain damages is itself a cognizable Article III injury, misses the "easy-to-miss distinctions between (1) injury in fact (a constitutional imperative), (2) statutory injury (an element of the plaintiff's cause of action), and (3) damages (a remedies calculation)." *Id.* at 1090. For these reasons, the Court concludes that Plaintiffs have not shown that each member of the proposed class would have standing to assert an MMPA claim.

<u>B</u>.

No different is the standing analysis for the unjust enrichment claims of individuals who paid nothing for their TDF-based medications at the point of sale. After all, those who paid nothing out of pocket conferred no benefit upon Defendant. *See Xpedior Creditor Tr. v. Credit Suisse First Bos. (USA) Inc.*, 341 F. Supp. 2d 258, 273 (S.D.N.Y. 2004) (finding no standing to assert unjust enrichment claim where plaintiff "d[id] not allege that [defendant] was enriched at [plaintiff's] expense"); *Fed. Deposit Ins. Corp. v. Brit.-Am. Corp.*, 755 F. Supp. 1314, 1324 (E.D.N.C. 1991) (finding no standing to assert unjust enrichment claim where plaintiff did not show that he conferred the benefit); *Weiner v. Bank of King of Prussia*, 358 F. Supp. 684, 704 (E.D. Pa. 1973) ("The plaintiff cannot possibly assert a cause of action for unjust enrichment against

- 10 -

banks which never received any money from him.").  They did not do so even if they caused another entity (i.e., a third-party payor) to do so.  *See Calderon v. Sixt Rent a Car, LLC*, 114 F.4th 1190, 1211 (11th Cir. 2024) (noting courts have concluded that the collateral source doctrine cannot be used to satisfy a requirement of showing injury-in-fact for standing purposes); *Emery v. Roanoke City Sch. Bd.*, 432 F.3d 294, 299 (4th Cir. 2005) (concluding plaintiff lacked standing where "he suffered no out-of-pocket loss himself" because plaintiff's "medical insurance provided by his employer paid the [relevant] expenses").

Put "[i]n more pedestrian terms," even under a theory of unjust enrichment, a patient who paid nothing out-of-pocket when she purchased her lifesaving prescription, and suffered no personal injury as a result, could not satisfactorily answer the question: "What's it to you?" *See* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983).  Therefore, the Court concludes that it cannot certify Plaintiffs' class for their unjust enrichment claim.

* * *

In sum, individuals who paid nothing for their lifesaving TDF medications, which caused them no bodily injury, lack standing.  Plaintiffs' proposed class definition concededly contains individuals who lack standing.  *See* Doc. [250] at 33.  The Court therefore cannot certify it.  Further, altering the class definition to somehow exclude these individuals—were that even possible—would be to no avail because Plaintiffs' proposed class suffers from other maladies.

- 11 -

## III.

As explained above, certification is proper only if the trial court is satisfied, after a "rigorous analysis," that the prerequisites of Rule 23 have been satisfied. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Beyond the standing issue that Plaintiffs fail to overcome as discussed above, Rule 23 issues also stand in the way of class certification here. The Court chooses to briefly address a few of them given that all of them would be independent grounds for denial of Plaintiffs' Motion for Class Certification. *See United States v. Files*, 63 F.4th 920, 935 n.4 (10th Cir. 2023) (Newson, J., joined by Tjoflat, J., concurring) (discussing when it may be advisable for district courts to provide alternative grounds for their decisions).

### A.

To certify a damages class under Rule 23(b)(3), Plaintiffs must meet the "more demanding" requirement that "'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Comcast*, 569 U.S. at 33–34. This analysis "necessarily requires an examination of the underlying elements necessary to establish liability for plaintiffs' claims." *Blades v. Monsanto*, 400 F.3d 562, 569 (8th Cir. 2005) (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001)). Here, individual issues predominate because prescribing decisions are patient-specific and give rise to individualized issues that are central to questions of causation and loss.

An ascertainable loss is a necessary element of an MMPA claim. *Owen v. Gen. Motors Corp.*, 533 F.3d 913, 922 (8th Cir. 2008). So too is causation. *Id.* ("[T]here is no

- 12 -

denying that causation is a necessary element of an MMPA claim."). And "the plain language of the MMPA demands a causal connection between the ascertainable loss and the unfair or deceptive merchandising practice." *Id.* Here, Plaintiffs maintain that they "and the class purchased TDF-based drugs with the expectation that TDF-based drugs had a certain risk profile, and that they were the most effective and safest version of the therapy known to Gilead." Doc. [69] ¶ 82. That contention might establish causation for an ascertainable loss, at least for those purchasers who had such an expectation and belief. But Gilead's allegedly unfair or deceptive practices would not have caused an ascertainable loss for those who had no such expectation or belief, that is, those who would have taken a TDF-based drug regardless of the challenged conduct. *See In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 100 F. Supp. 3d 441, 446 (E.D. Pa. 2015), *aff'd*, 639 F. App'x 866 (3d Cir. 2016) (finding no ascertainable loss under the MMPA where plaintiff "received the drug she was prescribed, took the drug, and alleges neither that the drug failed to do its job . . . nor that she was injured by taking the drug").

Plaintiffs simply assume that every person who took TDF-based medications not only believed that they were the most effective and safest medications but also that they would not have purchased the medications had they known the truth (as Plaintiffs see it). Evidence in the record says otherwise, as does common sense. *First*, in line with industry practice, Gilead repeatedly updated the labeling on its drugs during the proposed class period as more information became available. Doc. [227-1] ¶ 34 ("Similar to all prescription medications, TDF medication labels have been iterative, modified over time to reflect evolving science around potential bone and kidney risks as we learned more

- 13 -

about the drug."). *Compare also, e.g.*, Doc. [220-57] (prescribing information for Stribild, revised Aug. 2012), *with* Doc. [220-58] (prescribing information for Stribild, revised Dec. 2014). What Gilead communicated to putative class members, and what each understood, unquestionably will vary and be subject to individual proof. *Second*, doctors make prescribing decisions—and patients choose whether to take prescribed medications—for a host of different reasons. The record shows that numerous patients continued purchasing TDF-based medications even after TAF-based ones became available. In fact, Plaintiff Searcy is among them.

Searcy alleged in the Third Amended Complaint that he "would not have taken" his TDF-based drug "at any point" if a TAF-based drug was "available and known to him." Doc. [69] ¶ 53. Evidence in the record, though, shows that Searcy remained on his TDF-based medication even after the release of a TAF-based drug because of insurance considerations. Doc. [214-17] at 236–37. What is more, Plaintiff Searcy finished the remaining TDF-pills he had already purchased even *after* he moved to an insurance plan that covered the new TAF-based drug. *Id.*[5]

Even putting aside Plaintiffs' burden to prove the merits of their MMPA claim, Defendant also has "the right . . . to present evidence negating [Plaintiffs'] direct or circumstantial showing of causation and reliance." *In re St. Jude Med., Inc.*, 522 F.3d

---

[5] This inconsistency, which goes to the heart of Plaintiffs' claims, also raises adequacy issues. *See Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (noting that named plaintiff's offering of "differing accounts about the [things] that form the very basis for his lawsuit surely would create serious concerns as to his credibility at any trial"); 1 *McLaughlin on Class Actions* § 4:27 (21st ed.) (noting lapses in credibility will render the proposed representative inadequate when they "go to the heart of the claims in the case").

- 14 -

836, 840 (8th Cir. 2008); *accord Hudock v. LG Elecs. U.S.A., Inc.*, 12 F.4th 773, 776–77 (8th Cir. 2021) ("Defendants may offer individualized proof that class members did not react in a uniform or even similar manner to the defendant's misrepresentations." (citation modified)).  Thus, "it is clear that resolution of [Gilead's] potential liability to each plaintiff under the consumer fraud statutes will be dominated by individual issues." *St. Jude*, 522 F.3d at 840.  Indeed, a recent decision by the Eighth Circuit now renders this conclusion abundantly clear.  *See In re Folgers Coffee Mktg.*, 159 F.4th 1151 (8th Cir. 2025).

In *Folgers*, the plaintiffs identified over two dozen coffee products that allegedly overstated how many cups they could make.  *Id.* at 1153–54.  A 30.5-ounce container, for example, claimed it made "up to 240" six-ounce cups, based on brewing directions that included both a less efficient single-serving method and a more efficient pot method.  *Id.* at 1154.  But the "up to 240" cups figure is achievable only under the more efficient pot method, which uses less coffee per cup.  *Id.*  The district court granted the plaintiffs' motion for class certification, *see* 2024 WL 4093111 (W.D. Mo. July 31, 2024), but the Eighth Circuit concluded that common questions would not predominate over individual ones and therefore reversed.

"The difficulty for [the plaintiff]," the Eighth Circuit explained, was that "for many people in his proposed class, the representations on the containers would not have caused them any ascertainable loss; instead, they got exactly what they had bargained for when they purchased the Folgers products at issue." *Folgers*, 159 F.4th at 1156.  It was "ineluctable that a significant proportion of the proposed class did not read th[e]

- 15 -

representations or, if they did, did not care about them one way or the other." *Id.* (citing *State ex rel. Coca-Cola Co. v. Nixon*, 249 S.W.3d 855, 862 (Mo. banc 2008)).  And a "significant proportion" of those who read and cared about the representations, "likely did not interpret the representations in the manner [the plaintiff] suggest[ed.]" *Id.*  Some "read the representations and believed that the promised number of cups could be achieved only some of the time under certain conditions" or "understood the representations to mean that other, non-recommended brewing methods could brew the promised number of cups." *Id.*

In sum, the court in *Folgers* concluded that "many class members weren't deceived, and figuring out who was and who wasn't w[ould] require consumer-by-consumer inquiries into each class member's individual . . . circumstances, undermining the efficiencies class actions are intended to provide." *See Folgers*, 159 F.4th at 1156. *Folgers* dooms any vestige of merit in Plaintiffs' argument that common questions predominate.

Many more factors go into a doctor's prescribing decisions and a patient's choice to take a prescribed medication than choosing what coffee to buy.  The "ineluctable" conclusion from *Folgers* is true here.  That is, even *if* Gilead hid from Plaintiffs and the class members "the risk profile for the TDF-based drugs, and misrepresented, suppressed, and concealed the reasons why the development of the TAF-based drugs were abandoned in 2004," Doc. [69] ¶ 82, some proportion of the proposed class did not believe that TDF-based medications were the most effective and safest version of the therapy known to Gilead or, even if they did, did not care about that representation one way or the other.

- 16 -

As discussed above, the record bears this out even among the named Plaintiffs here. As such, determining which members of the class had an ascertainable loss is hopelessly individualized, and class certification is therefore improper. *See Orduno v. Pietrzak*, 932 F.3d 710, 716 (8th Cir. 2019) ("Where too many individual questions predominate over common ones, certification is inappropriate."); *Folgers*, 159 F.4th at 1158 ("Since common questions would not predominate over individual questions with respect to the MMPA claim, we conclude that class certification was inappropriate.").

Plaintiffs attempt to sidestep this predominance problem by arguing that individualized inquiries are unnecessary since every member of the class automatically suffered an ascertainable loss. Doc. [244] at 3 (arguing that all class members were injured because "all bought TDF at objectively inflated prices"); Doc. [69] ¶ 82 ("[T]he prices Gilead commanded for TDF-based drugs prior to the release of the TAF-based analogs did not reflect the true value of those drugs, and Gilead was able to command such prices only because of their unlawful conduct and misrepresentations concerning TAF and TDF."). *Folgers* dispenses with this argument, too. There, the plaintiff argued that the misleading cup-count statements increased consumer demand for Folgers coffee, which in turn raised market prices. *Id.* Because of this price inflation, *all* buyers, the plaintiff argued, paid more than they otherwise would have—even those who were not personally deceived—since the alleged misrepresentation drove up the market price for everyone. *Id.* The Eighth Circuit turned away this "price-premium argument," noting it

- 17 -

"would allow those who suffered no ascertainable loss from Folgers's representations to piggyback on the injuries of others to pursue a remedy." *Id.*[6]

"[A]ccepting [the plaintiff's] price-inflation theory," the Eighth Circuit explained, "would write the ascertainable-loss requirement out of the statute and permit any purchaser of these Folgers products to bring an MMPA claim, even if the purchaser didn't care about the representations or wasn't misled by them." *Id.* at 1158. And it recognized the absurdity that such a theory would allow "a purchaser, fully aware of the representations and their potential shortcomings, [to] buy the product for the sole purpose of bringing an MMPA claim on behalf of others." *Id.* "Surely someone with full knowledge of the facts and a willingness to make the purchase anyway cannot have suffered an ascertainable loss from the representations of the seller." *Id.* (citing *Coca-Cola Co.*, 249 S.W.3d at 862).

**B.**

"[Plaintiffs'] unjust-enrichment claim fares no better." *Folgers*, 159 F.4th at 1158. The Eighth Circuit explained in *Folgers* that "[w]hether a particular transaction might be considered inequitable or unjust turns on the specific circumstances of each transaction, which again places individual inquiries front and center." *Id.* It concluded, as "several [other] courts and commentators" have, that unjust-enrichment claims "are generally inappropriate for class treatment" for that reason. *Id.* With no further analysis, it

---

[6] And, again, even if Plaintiffs were excused "from presenting direct proof of individual reliance," it "would not foreclose [Defendant] from presenting evidence of a lack of causation or reliance, which too would raise individualized questions." *Folgers*, 159 F.4th at 1156.

- 18 -

concluded there was "no reason that general rule shouldn't apply here," *id.*, and this Court sees no reason it shouldn't apply here, either.

C.

At least one additional shortcoming on Plaintiffs' MMPA class certification prospects bears mention, Plaintiffs' damages model for calculating class-wide benefit of the bargain damages does not pass muster. The Supreme Court has explained that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to th[e] theory" of liability. *Comcast*, 569 U.S. at 35. "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* Plaintiffs' model purports to calculate class-wide damages by finding the difference between two values, "each TDF drug's artificially inflated market value over the class period" and "each TDF drug's true market value without Gilead's [allegedly] unlawful practices." Doc. [208] at 20. Put another way, Plaintiffs' model purports to calculate the difference between the "as represented" value of the product and the "as is" or "actual" value of the product. *Id.* It sounds straightforward enough, but the Court agrees with Defendant that the way Plaintiffs calculate both measures is fundamentally flawed.

The "as represented" value bases the amount that putative class members paid on prices for wholesale sales. But it is undisputed that most putative class members had some third-party payor, like insurance, Medicare, or Medicaid. Thus, for most transactions at issue here, pharmacies broke them into two charges: the amount the pharmacy charged to the consumer and the amount the pharmacy charged to the third-

- 19 -

party payor.  Doc. [227-3] ¶¶ 59–70.  Putative class members were not even always aware of these charges, let alone responsible to pay them.  The damages model applied to the named Plaintiffs illustrates its absurdity.  As Defendants explain, the model would award Plaintiff Searcy more than $25,000 for eight Stribild prescriptions and would award Plaintiff Kirk more than $27,000 for thirteen Atripla prescriptions; however, Searcy paid *nothing* out of pocket for his prescriptions, and Kirk paid only a total of $400.01.  *See* Doc. [224] at 24–25.[7]

What the Court views as worse, though, is the second half of Plaintiffs' formula, the supposed benchmark actual value of the medications.  To determine the actual value of Defendant's TDF-based medications, Plaintiffs' expert uses the price of *generic* versions of the TDF-based medications.  Doc. [208-28] ¶ 80.  The Court agrees with Defendant that the price of generic versions of the medications years after the class period is not a reasonable proxy for the price at which Defendant would have sold its *branded* TDF medicines, absent the challenged conduct.

Generic medications typically cost less than branded ones.  *See* Doc. [227-3] ¶ 130; *see also* Mo. Rev. Stat. § 338.056.2 (allowing Missouri pharmacists generally to select the "less expensive generically equivalent" drug instead of a prescribed brand name drug).  The size of the generic-to-brand price discount is commonly related to the number of generic competitors.  Doc. [227-3] ¶ 130; *see also* Frazer A. Tessema et al.,

---

[7] In the same irrational way, this model would improperly assess damages to uninjured class members, *see In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 143–44 (D.D.C. 2017) (finding plaintiffs' class-wide damages model unreliable because it, in part, assessed damages to uninjured class members), putting aside the antecedent issue of the propriety of having uninjured class members in the class in the first place.

- 20 -

*Generic but Expensive: Why Prices Can Remain High for Off-Patent Drugs*, 71 Hastings L.J. 1019, 1021 (2020) (noting that while drugs with "just three" generic competitors attain a 40% median reduction from brand-name price, "those with six manufacturers attain a 62% median reduction"). Thus, regardless of Defendant's alleged misconduct, the market would expect to see generic TDF-based medication prices lower than brand-name prices and would expect that the generic prices would continue to decrease as generic competition increased. It follows then that Plaintiffs' model simply observes the effect of normal generic competition. All the while, the record shows that the prices Defendant charged for its branded TDF-based medications increased over time—even as the market gained additional information about TDF and TAF, after TAF came onto the market, and even after entry of generic TDF-based medications. Doc. [227-3] ¶¶ 125–26. The Supreme Court has made clear that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Comcast*, 569 U.S. at 35. Since the "model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* For this reason, Plaintiffs' damages model fails Rule 23.

## IV.

Given the multiple outcome-determinative issues discussed above, the Court chooses not to rule on Defendant's Motion to Exclude Testimony of Akhilesh Nagaich. *See also Cody v. St. Louis*, 103 F.4th 523, 535 (8th Cir. 2024) ("The ultimate *admissibility* of an expert's opinion is therefore a red herring at the class-certification stage."). The Court notes, though, that in a case where Nagaich used the same timelines

- 21 -

he used here, the United States District Court for the Northern District of California ruled that "Nagaich may not testify as to any specific timelines because his opinions regarding 'optimal TAF timelines' lack sufficient basis in fact." *Holley v. Gilead Scis., Inc.*, 4:18-cv-6972-JST, 2023 WL 2469632, at *5 (N.D. Cal. Feb. 27, 2023) (Tigar, J.).  While a review of the briefing on the Motion and Judge Tigar's opinion appears to show that Defendant's Motion to Exclude is well taken, the Court will deny this Motion without prejudice at this time.  Defendant may reassert its arguments in the future, if necessary.

**V.**

For these reasons, class certification would not be appropriate in this action.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Class Certification, Doc. [206], is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motions to Exclude Testimony, Docs. [215] & [216], are **DENIED** without prejudice.

**IT IS FINALLY ORDERED** that Plaintiffs' Conditional Motion for Remand, Doc. [252], is **DENIED**.

Dated this 22nd day of January 2026.

MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE

- 22 -

# United States Court of Appeals
### *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Susan E. Bindler**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

February 03, 2026

David Ryan Carpenter
SIDLEY & AUSTIN
350 S. Grand Avenue
Los Angeles, CA  90071

William Michael Corrigan Jr.
SHOOK & HARDY
Suite 1350
190 Carondelet Plaza
Clayton, MO  63105

  RE:  26-8003  Jonathan Searcy, et al v. Gilead Sciences (GILD)

Dear Counsel:

  A petition for permission to appeal has been filed under the caption and miscellaneous case number shown above.

  Counsel for the respondent is directed to file a response to this application within 10 days from service of the petition.

  Upon receipt of the response, the matter will be submitted to the court for a ruling. All counsel will be advised of the court's decision. No briefing schedule will be established unless the court grants the petition.

  The Clerk of the United States District Court is being notified of the filing of the petition. If the petition is granted, petitioner must pay the district court all required fees. Please refer to Federal Rule of Appellate Procedure 5 and the applicable statutory sections for further guidance and information.

      Susan E. Bindler
      Clerk of Court

CJO

Enclosure(s)

cc:     Eric Anielak
        J. Toji Calabro
        Clerk, U.S. District Court, Eastern District of Missouri
        Sean A. Commons
        Susan L. Gutierrez
        David A. Hickey
        Jennifer A. Hill
        Todd E. Hilton
        Charles Noah Insler
        James N. Kramer
        Michael L. Lisak
        Thomas Joseph Magee
        Lisa B. Markofsky
        Patrick Leo Oot Jr.
        Adriane Kayoko Peralta
        Michelle A. Ramirez
        Tyler Schwettman
        Marc R. Shapiro
        Patrick Joseph Stueve
        Kasey Youngentob

        District Court/Agency Case Number(s):   4:20-cv-01523-MTS

**Caption For Case Number:   26-8003**

Jonathan Searcy, on behalf of himself and all other similarly situated; Ervin Kirk, on behalf of himself and all others similarly situated

       Petitioners

v.

Gilead Sciences (GILD), Inc., a foreign corporation

       Respondent

**Addresses For Case Participants:   26-8003**

David Ryan Carpenter
SIDLEY & AUSTIN
350 S. Grand Avenue
Los Angeles, CA  90071

William Michael Corrigan Jr.
SHOOK & HARDY
Suite 1350
190 Carondelet Plaza
Clayton, MO  63105

Eric Anielak
SHOOK & HARDY
2555 Grand Boulevard
Kansas City, MO  64108-2613

J. Toji Calabro
CALABRO LAW OFFICE
Two Pershing Square, 9th Floor
2300 Main Street
Kansas City, MO  64108

Clerk, U.S. District Court, Eastern District of Missouri
U.S. DISTRICT COURT
Eastern District of Missouri
111 S. Tenth Street
Saint Louis, MO  63102-0000

Sean A. Commons
SIDLEY & AUSTIN
350 S. Grand Avenue
Los Angeles, CA  90071

Susan L. Gutierrez
PROSKAUER & ROSE
Suite 2400
2029 Century Park, E.
Los Angeles, CA  90067

David A. Hickey
STUEVE & SIEGEL
Suite 200
460 Nichols Road
Kansas City, MO  64112

Jennifer A. Hill
SHOOK & HARDY
Suite 1000
1800 K Street, N.W.
Washington, DC  20006

Todd E. Hilton
STUEVE & SIEGEL
Suite 200
460 Nichols Road
Kansas City, MO  64112

Charles Noah Insler
HEPLER & BROOM
130 N. Main Street
P.O. Box 510
Edwardsville, IL  62025-0510

James N. Kramer
ORRICK & HERRINGTON
405 Howard Street
San Francisco, CA  94105-2669

Michael L. Lisak
SIDLEY & AUSTIN
Suite 2800
1 S. Dearborn Street
Chicago, IL  60603-0000

Thomas Joseph Magee
HEPLER & BROOM
Suite 1400
701 Market Street
Saint Louis, MO  63101

Lisa B. Markofsky
PROSKAUER & ROSE
Suite 421 Atrium
2255 Glades Road
Boca Raton, FL  33431

Patrick Leo Oot Jr.
SHOOK & HARDY
Suite 1000
1800 K Street, N.W.
Washington, DC  20006

Adriane Kayoko Peralta
SIDLEY & AUSTIN
350 S. Grand Avenue
Los Angeles, CA  90071

Michelle A. Ramirez
SIDLEY & AUSTIN
Suite 2800
1 S. Dearborn Street
Chicago, IL  60603-0000

Tyler Schwettman
BLITZ & BARDGETT
Suite 1500
120 S. Central Avenue
Saint Louis, MO  63105-0000

Marc R. Shapiro
ORRICK & HERRINGTON
51 W. 52nd Street
New York, NY  10019

Patrick Joseph Stueve
STUEVE & SIEGEL
Suite 200
460 Nichols Road
Kansas City, MO  64112

Kasey Youngentob
STUEVE & SIEGEL
Suite 200
460 Nichols Road
Kansas City, MO  64112