**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JONATHAN SEARCY, on behalf of himself and all others similarly situated and | ) ) ) ) | |
| ERVIN KIRK, on behalf of himself and all others similarly situated | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 4:20-cv-1523-MTS |
| GILEAD SCIENCES, INC., | ) ) | |
| Defendant. | ) | |

**DEFENDANT GILEAD SCIENCES, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

I.   INTRODUCTION ...................................................................................... 1

II.  BACKGROUND ....................................................................................... 2

    A.   Gilead Develops Lifesaving HIV Medicines Containing TDF and TAF. ............. 3

    █   ██████████████████████████████ ............................................... 4

    █   ███████████████████████████████ ............................................. 5

    D.   After Offering Shifting Theories of Economic Loss, Plaintiffs Double Down on Dr. Bradford's Fundamentally Flawed Model. ....................................... 6

III. LEGAL STANDARD.................................................................................. 7

IV.  ARGUMENT ............................................................................................ 8

    A.   Plaintiffs Cannot Show an Ascertainable Economic Loss Caused by Gilead's Challenged Conduct, as Required for Their MMPA Claims. .................. 8

    B.   Plaintiffs Cannot Establish Ascertainable Loss or Damages Through Dr. Bradford's Model........................................................................................... 12

    C.   The TAF Delay Theory Fails as a Matter of Law................................................ 13

    D.   Plaintiffs' Unjust Enrichment Claims Fail for Similar Reasons.......................... 14

V.   CONCLUSION......................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albin v. Resort Sales Mo., Inc.*,
  2021 WL 5106365 (W.D. Mo. Sept. 7, 2021) ............................................................9

*Anderson v. Bass Pro Outdoor World, LLC*,
  355 F. Supp. 3d 830 (W.D. Mo. 2018) ....................................................................15

*In re Avandia Mktg. Sales Prac. & Prods. Liab. Litig. ("Avandia")*,
  100 F. Supp. 3d 441 (E.D. Pa. 2015), *aff'd*, 639 F. App'x 866 (3d Cir. 2016) .......................10

*Bratton v. Hershey Co.*,
  2018 WL 934899 (W.D. Mo. Feb. 16, 2018) ............................................................15

*Dedloff v. Whole Foods Market Grp., Inc.*,
  688 F. Supp. 3d 893 (E.D. Mo. 2023)....................................................................15

*Diesel v. Mariani Packing Co., Inc.*,
  2024 WL 4263944 (E.D. Mo. Sept. 23, 2024)............................................................10

*In re Emerson Elec. Co. Wet/Dry Vac Mktg. & Sales Litig.*,
  2021 WL 5003102 (E.D. Mo. Oct. 28, 2021) ......................................................13, 14

*Faltermeier v. FCA US LLC*,
  2017 WL 1128467 (W.D. Mo. Mar. 24, 2017)............................................................9

*In re Folgers Coffee Mktg.*,
  159 F.4th 1151 (8th Cir. 2025) ................................................................. *passim*

*Gilead Tenofovir Cases*,
  No. S283862, 2026 WL 2223748 (Cal. Aug. 3, 2026) ...................................................13

*Hennessey v. Gap, Inc.*,
  86 F.4th 823 (8th Cir. 2023) ....................................................................8, 10, 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)........................................................................................8

*McCall v. Monro Muffler Brake, Inc.*,
  2013 WL 1282306 (E.D. Mo. Mar. 27, 2013) ............................................................9

*Owen v. Gen. Motors Corp.*,
  533 F.3d 913 (8th Cir. 2008) ..............................................................................8

*Saavedra v. Eli Lilly & Co.*,
   2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) .......................................................................12

*Thompson v. Allergan USA, Inc.*,
   993 F. Supp. 2d 1007 (E.D. Mo. 2014).................................................................................10

*Torgerson v. City of Rochester*,
   643 F.3d 1031 (8th Cir. 2011) ...............................................................................................8

*Vitello v. Natrol, LLC*,
   50 F.4th 689 (8th Cir. 2022) ....................................................................................8, 10, 15

**Statutes**

Mo. Rev. Stat. § 407.025 .................................................................................................................8

**Other Authorities**

FDA, *The History of FDA's Role in Preventing the Spread of HIV/AIDS* (Mar. 14,
   2019) *https://www.fda.gov/about-fda/fda-history-exhibits/history-fdas-role-
   preventing-spread-hivaids* ......................................................................................................3

Fed. R. Civ. P. 56(a) .......................................................................................................................7

## I.    **INTRODUCTION**

Plaintiffs Jonathan Searcy and Ervin Kirk have sued Gilead Sciences, Inc. ("Gilead") under the Missouri Merchandising Practices Act ("MMPA") and for unjust enrichment, arising from their purchase of medicines containing tenofovir disoproxil fumarate ("TDF"). As this Court has already observed, Plaintiffs' medicines were "lifesaving," "worked exactly as prescribed," and "did so safely." Doc. 263, at 2.[1] Gilead now seeks summary judgment because Plaintiffs cannot show any ascertainable economic loss caused by the challenged conduct (as required under the MMPA), nor can they show that Gilead unjustly retained a benefit at their expense.

*First*, Plaintiffs cannot show that Gilead made any statement that caused their purchases or otherwise deprived them of the benefit of their purchases. While Plaintiffs allege that Gilead deceptively sold TDF as the safest and most effective therapy known to Gilead, there is no evidence that Gilead made any such representation in connection with their purchases or that either Plaintiff saw or relied on any Gilead promotional materials. Rather, the TDF medicines Plaintiffs received were as represented: the labeling disclosed certain kidney and bone risks, and the medicines performed as desired. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ On the undisputed facts, Plaintiffs got what they bargained for and cannot show causation of ascertainable economic loss under any theory.

*Second*, Plaintiffs cannot manufacture an ascertainable economic loss by relying on Dr. Bradford's damages model. As the Eighth Circuit recently held, MMPA plaintiffs cannot avoid the need to show causation by offering a price-inflation theory as a substitute form of proof. *In re*

---

[1] "TDF medicines" and "TAF medicines" (or "TDF-based medications" and "TAF-based medications") have the same meanings as used in connection with the class certification briefing and in this Court's prior order. *See, e.g.*, Doc. 263, at 2, 3.

*Folgers Coffee Mktg.*, 159 F.4th 1151, 1155 (8th Cir. 2025). Moreover, in denying class certification, the Court rejected Plaintiffs' model as "fundamentally flawed" and "absurd[]" as applied to their facts. Doc. 263, at 19–20. Because that model is not a valid measure of Plaintiffs' loss or damages, their MMPA claims necessarily fail.

*Third*, Plaintiffs' "TAF delay" theory fails as a matter of law. The Court should exclude the "TAF timeline" offered by Dr. Nagaich, leaving Plaintiffs with no alternative date for TAF being available sooner. More fundamentally, in the related product liability cases, the California Supreme Court recently refused to recognize a duty to innovate under these circumstances—i.e., it held there is no legal duty to have developed TAF sooner—and its logic applies equally here.

*Fourth*, Plaintiffs' unjust enrichment claims fail for similar reasons, as each Plaintiff took a lifesaving medication that worked, that caused them no adverse effects, and for which they paid at most a co-payment (and often nothing out-of-pocket at all). There was no unjust enrichment.

Accordingly, summary judgment should be granted on each Plaintiff's claims.

## II.     **BACKGROUND**

As previously summarized by this Court, Gilead has developed medicines for the treatment of human immunodeficiency virus (HIV), including medicines containing TDF and medicines containing TAF. Doc. 263, at 1–2. Plaintiffs maintain that TAF is safer and more effective than TDF, and that Gilead deliberately delayed TAF's development. Plaintiffs further assert that Gilead sold the TDF-based medications as "the safest antiviral HIV drug known to Gilead" when those medicines allegedly were "less effective and more dangerous than they needed to be," and that Plaintiffs would not have purchased the TDF-based medicines absent Gilead's allegedly wrongful conduct. Doc. 206-13, ¶¶ 5–7 (Searcy Decl.); Doc. 206-14, ¶¶ 5–7 (Kirk Decl.); Doc. 263, at 2–3. The Sections to follow recite the facts relevant to the Motion.

**A.      Gilead Develops Lifesaving HIV Medicines Containing TDF and TAF.**

HIV is the retrovirus that causes acquired immunodeficiency syndrome ("AIDS"), and if left untreated, can be fatal. SOF ¶ 1; Doc. 263, at 1. In October 2001, FDA approved TDF, which was marketed under the brand name Viread®, for the treatment and management of HIV. SOF ¶ 2. Subsequently, Gilead developed "fixed dose combination" medicines that combine TDF with other medicines. SOF ¶ 3. FDA approved Truvada® (TDF and FTC) in 2004; Atripla® (TDF/FTC/efavirenz) in 2006; Complera® (TDF/FTC/rilpivirine) in 2011; and Stribild® (TDF/FTC/elvitegravir/cobicistat) in 2012. SOF ¶ 4.[2]

As with all medicines, TDF has potential side effects. As pertinent here and to the named Plaintiffs, the FDA-approved labeling for the TDF medicines has long disclosed risks of renal impairment (including cases occurring in patients without identified risk factors), as well as potential bone effects with recommendations for bone density monitoring. SOF ¶ 5.

Gilead initially began evaluating TAF as a potential backup to TDF. SOF ¶ 6. As of 2004, Gilead had conducted a small, preliminary Phase I/II trial in which "TAF achieved higher intercellular concentrations of tenofovir," but "the pre set target for the internal go decision, one log difference in viral load between [TDF] and [TAF], was not met." SOF ¶ 7. At that time, no large-scale Phase III clinical trials had been conducted.

Gilead discontinued TAF's development in October 2004 but resumed development in 2010 and thereafter issued press releases on TAF's development and data on its safety profile. SOF ¶ 8. FDA approved the first TAF medicine, Genvoya® (TAF/FTC/elvitegravir/cobicistat), in

---

[2] FDA called Atripla®, in particular, a "watershed" because it was the first "single tablet regimen" that combined the three components of an antiviral regimen in one pill. *See* FDA, *The History of FDA's Role in Preventing the Spread of HIV/AIDS* (Mar. 14, 2019) *https://www.fda.gov/about-fda/fda-history-exhibits/history-fdas-role-preventing-spread-hivaids*.

November 2015. SOF ¶ 9. Additional TAF medicines were approved in the years to follow, including Biktarvy® (TAF/emtricitabine/bictegravir), which featured a newly developed "second generation" integrase inhibitor, bictegravir. SOF ¶ 10.

TDF medicines have remained on the market as FDA-approved therapies, and the Department of Health and Human Services continues to list TDF as among the recommended therapies for treating HIV. SOF ¶ 11. Plaintiffs do not claim Gilead withheld information from FDA or that FDA at any time should have withdrawn the TDF medicines' approval. SOF ¶ 12.



[t]he difference is so small that I've never seen the difference in my patient population." SOF ¶ 17. In his practice, he prescribes HIV therapies "based on the . . . integrase inhibitor" rather than a preference for TAF versus TDF. SOF ¶ 16.



Kirk agreed that Atripla® and Truvada® provided lifesaving benefits and did not cause him any adverse health effect, and he relied on his doctor's recommendations. SOF ¶¶ 13, 19. He assumed Gilead's TDF medicines were the best and safest HIV medicines known to Gilead at the time (Kirk Decl. ¶ 5), but he admits no one at Gilead ever told him that and he does not recall seeing any Gilead statements or promotional materials before starting a TDF medicine. SOF ¶ 20.

5

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

Searcy agrees Atripla® and Stribild® were effective. SOF ¶ 29. He asserts he purchased them believing they were the "most effective and safest antiretrovirals known to Gilead at the time," SOF ¶ 30, but that was an assumption, not based on anything Gilead or anyone else told him. SOF ¶ 31. Indeed, Searcy has never seen any Gilead press release or advertisement, and has never read any medical literature. SOF ¶ 32███████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████

### D.     After Offering Shifting Theories of Economic Loss, Plaintiffs Double Down on Dr. Bradford's Fundamentally Flawed Model.

As noted above, each Plaintiff has asserted that he "believed that TDF-based medications … were the most effective and safest antiviral known to [Gilead]," and he "would not have purchased these TDF-based drugs" absent the challenged conduct. Doc. 206-13, ¶¶ 5–7; Doc. 206-14, ¶¶ 5–7. Plaintiffs' initial damages theory asserted that the actual value of the TDF medicines was *$0*, and thus they (and all putative class members) overpaid by purchasing a TDF medicine. *See* Doc. 206-14, at 11 (asserting that "no one would have paid what they paid (*if anything*) for the TDF-based drugs" but for the challenged conduct (emphasis added)); Carpenter Decl. Ex. 20, at 23 (initial interrogatory response that the true value of TDF was "$0.00").

At class certification, Plaintiffs pivoted to a different classwide damages model supplied

6

by Dr. W. David Bradford. As this Court observed, Dr. Bradford's model purports "to calculate the difference between the 'as represented' value of the [TDF medicines] and the 'as is' or 'actual' value of the product." Doc. 263, at 19. But the Court agreed with Gilead that the model "does not pass muster" because the way it calculates "both measures is fundamentally flawed." *Id*. Indeed, the "damages model applied to the named Plaintiffs illustrates its absurdity." *Id.* at 20.

After the denial of class certification, Gilead served discovery asking Plaintiffs to identify the bases for their *individual* damage claims under the MMPA, and Plaintiffs had the opportunity to offer new merits expert reports. Carpenter Decl. ¶ 8. Yet Plaintiffs continue to rely on Dr. Bradford's expert report without modification and have adopted his formula as the sole basis for their individual MMPA damages. SOF ¶ 36.

Thus, Plaintiffs seek damages based on the difference between the purported full "retail" price of their TDF medicines (irrespective of what they paid)[3] and a purported average generic TDF price. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

## III.   LEGAL STANDARD

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). After the movant

---

[3] For the "retail" price, Plaintiffs use either (a) the full transaction price for a given prescription reflected in pharmacy records or (b) Bradford's estimate of the retail price from that period. Consistent with the prior definition of the class period, Plaintiffs seek damages for any TDF prescriptions prior to November 2015, when the first TAF medicine launched. Thus, the "class period" for Dr. Bradford's model equates to the "damages period" for Plaintiffs' claims.

meets its initial burden, "[t]he nonmovant . . . must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). There is no triable dispute "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## IV.    **ARGUMENT**

### A.    **Plaintiffs Cannot Show an Ascertainable Economic Loss Caused by Gilead's Challenged Conduct, as Required for Their MMPA Claims.**

Under the MMPA, Mo. Rev. Stat. § 407.025, a plaintiff must prove that he "suffered an ascertainable loss of money or property . . . as a result of an act declared unlawful under the [MMPA]." *Vitello v. Natrol, LLC*, 50 F.4th 689, 693 (8th Cir. 2022). These elements necessarily require "a causal connection between the ascertainable loss and the unfair or deceptive merchandising practice," *Owen v. Gen. Motors Corp.*, 533 F.3d 913, 922 (8th Cir. 2008), which "[a]s a practical matter" often requires proof of reliance on a defendant's challenged statement, *In re Folgers Coffee Mktg.*, 159 F.4th 1151, 1155 (8th Cir. 2025).

Generally speaking, the ascertainable-loss element incorporates the "benefit of the bargain" common-law fraud remedy, which compares "the difference between the value of the product as represented and the actual value of the product as received." *Vitello*, 50 F.4th at 693 (quoting *Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007, 1012 (E.D. Mo. 2014)); *see also Hennessey v. Gap, Inc.*, 86 F.4th 823, 828 (8th Cir. 2023) (ascertainable loss requires "a difference between the representations of the defendants and the actual quality of the products purchased or received by the plaintiffs"). If a consumer "got exactly what they had bargained for," then the alleged violation "would not have caused them any ascertainable loss." *Folgers*, 159 F.4th at 1155.

Under these standards and on the undisputed facts, Plaintiffs cannot establish that they

8

suffered any ascertainable loss caused by an alleged violation, for several independent reasons.

*First*, there is no evidence that Gilead made any statement that Plaintiffs saw or that affected their purchases. Plaintiffs assert that they purchased TDF medicines expecting them to be "the most effective and safest version of the therapy known to Gilead," but neither Plaintiff identifies seeing any statement by Gilead creating that expectation. SOF ¶¶ 20, 31–32. And although the Complaint alleges that Gilead misrepresented the reasons for discontinuing TAF development in a 2004 press release, that is immaterial as Plaintiffs do not offer any evidence that they (or their physicians) saw that statement. *See* SOF ¶¶ 20, 32. Whether Plaintiffs' theory is characterized as based on an affirmative misrepresentation or omission, Plaintiffs do not identify any marketing materials or promotional statements that they saw or that affected their decision, and thus they cannot show causation.[4] *See McCall v. Monro Muffler Brake, Inc.*, 2013 WL 1282306, at *5 (E.D. Mo. Mar. 27, 2013) (granting summary judgment on MMPA claim; plaintiffs could not have been misled by material they did not see or read); *Albin v. Resort Sales Mo., Inc.*, 2021 WL 5106365, at *4 (W.D. Mo. Sept. 7, 2021) (granting summary judgment on MMPA claim where plaintiffs alleged a failure to disclose but could not recall receiving any representations that created the allegedly misleading impression); *see also Faltermeier v. FCA US LLC*, 2017 WL 1128467, at *3–4 (W.D. Mo. Mar. 24, 2017) (granting summary judgment where plaintiff offered no evidence allegedly misleading press release was used in connection with his purchase).

*Second*, Plaintiffs' TDF medicines were accompanied by FDA-approved labeling that disclosed TDF's association with kidney and bone risks (and Plaintiffs' physicians were well aware of those risks), and the labeling did not contain any representations about TDF compared to

---

[4] Moreover, both Plaintiffs purchased TDF medicines after Gilead issued statements describing TAF's potentially favorable profile, and after TAF itself was available. SOF ¶¶ 8, 14, 26–27, 33.

TAF or other existing or potential medications. Again, the TDF medicines were exactly as represented. *See Vitello*, 50 F.4th at 691–93 (affirming summary judgment on MMPA claim where plaintiff took a supplement to treat attention-deficit disorder, but disclosures on packaging foreclosed reasonableness of any such expectation); *Thompson*, 993 F. Supp. 2d at 1012 (dismissing MMPA claim alleging that manufacturer unfairly charged consumers for single-use eye-drop vials containing more solution than needed; finding no ascertainable loss because the labeling disclosed what was in the vial and there was no showing "that the Restasis was anything other than what it has always purported to be—a single-use vial"); *see also Diesel v. Mariani Packing Co., Inc.*, 2024 WL 4263944, at *1–2, 5 (E.D. Mo. Sept. 23, 2024) (granting summary judgment on claim alleging deceptive "slack fill" packaging because "there was no discrepancy between the representation [on the package] and the product actually received").

*Third*, Plaintiffs "got exactly what they had bargained for." *Folgers Coffee Mktg.*, 159 F.4th at 1155. There is no dispute that the TDF medicines quickly and effectively treated their HIV, and the medicines did not cause them any adverse events. There can be no ascertainable loss where Plaintiffs "receive[d] the benefit of the medication for which [they] bargained." *Thompson*, 993 F. Supp. 2d at 1012; *see also In re Avandia Mktg. Sales Prac. & Prods. Liab. Litig. ("Avandia")*, 100 F. Supp. 3d 441, 446 (E.D. Pa. 2015) (no ascertainable loss for MMPA claim alleging failure to disclose drug risks where "Plaintiff received the drug she was prescribed, took the drug, and alleges neither that the drug failed to do its job … nor that she was injured by taking the drug"), *aff'd*, 639 F. App'x 866 (3d Cir. 2016); Doc. 263, at 13 (citing *Avandia*); *see also Hennessey*, 86 F.4th at 828–30 (affirming dismissal of MMPA claim alleging deceptive comparison pricing; finding no ascertainable loss because plaintiff "paid the prices advertised at the time of sale and received the products she expected to receive").

10

For each of these reasons, Plaintiffs cannot establish any ascertainable loss, whether Plaintiffs characterize their claim as based on a misrepresentation, an omission, or the allegedly unreasonable delay of TAF. Regardless of whether TAF is "objectively superior" to TDF, Plaintiffs each bargained for an effective HIV medication, and that is what they received. Gilead did not represent to Plaintiffs that TDF was anything different from what was represented in its labeling. And Plaintiffs do not contend that their clinical (or financial) outcomes would be any better or different had they switched to a TAF medicine sooner.

Moreover, ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

5 ███████████████████████████████████████████████
███████████████████████████████████████████████

11

Accordingly, neither Plaintiff can establish the causation of any ascertainable economic loss. Summary judgment should be granted on each Plaintiff's MMPA claim.

**B.    Plaintiffs Cannot Establish Ascertainable Loss or Damages Through Dr. Bradford's Model.**

Plaintiffs cannot avoid the problems above by relying on Dr. Bradford's damages model. *Folgers* confirms that an MMPA plaintiff must establish causation of ascertainable loss based on his or her own transaction and cannot rely on a marketwide price-inflation theory as a substitute. *Folgers*, 159 F.4th at 1157–58. Further, this Court already found that Dr. Bradford's model is "fundamentally flawed" and "absurd[]" as applied to Plaintiffs. Doc. 263, at 19–20.[6]

As this Court previously observed, Plaintiffs' model purports to calculate damages as the difference between (1) the full "retail price" of the brand TDF medicines during the damages period (the alleged "as represented price") and (2) estimated generic TDF prices from several years after the damages period (the alleged "actual value"). SOF ¶ 36; Doc. 263, at 19. But the alleged "retail" prices are what the pharmacies charged to insurers or third-party payors, and thus are not a valid measure of the bargain or economic loss for *Plaintiffs.* Doc. 263, at 19–20; *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014) ("[T]he numerous complicating factors in the prescription drug market sever the relationship between price and value."). The second part of the model is even "worse" because "the price of generic versions of the medications years after the class period is not a reasonable proxy for the price at which Defendant would have sold its branded TDF medicines, absent the challenged conduct." Doc. 263, at 20–21 (because generic prices are normally lower than brand prices, "Plaintiffs' model simply observes the effect of normal generic competition," rather than damages caused by the challenged conduct).

---

[6] Even if Plaintiffs could show a difference between the quality of the TDF medicines as represented and as received (there is none), summary judgment would *still* be required because Dr. Bradford's flawed model is their *only* theory for damages.

Indeed, the Court already noted that this "model applied to the named Plaintiffs illustrates its absurdity," *id.* at 20, including because it would award substantial damages in alleged economic loss even for prescriptions for which Plaintiffs paid *nothing* out of pocket. In addition to its methodology flaws (discussed further in the motion to exclude), Plaintiffs' model violates the fundamental rule that benefit-of-the-bargain damages should "place an injured party in the position he would have been in" if the conduct never occurred, but "should not place a plaintiff in a *better* position." *In re Emerson Elec. Co. Wet/Dry Vac Mktg. & Sales Litig.*, 2021 WL 5003102, at *3 (E.D. Mo. Oct. 28, 2021). Here, the record does not permit a finding that Plaintiffs "lost" tens of thousands of dollars by taking "lifesaving" medicines that "worked exactly as prescribed" and "did so safely." Doc. 263, at 1–2. Even if there is a difference in the safety profile between TDF and TAF, Plaintiffs' model is not a valid measure of any such difference, and Plaintiffs have failed to show how that difference caused them to suffer any ascertainable economic loss and damages.

## C.     The TAF Delay Theory Fails as a Matter of Law.

The Court can and should grant summary judgment on the MMPA claim for the reasons above. To the extent it reaches the issue, Plaintiffs' TAF delay theory fails as a matter of law.[7]

In the related product liability case, the California Supreme Court held that Gilead had no legal duty to continue TAF development when TDF itself was not a defective product. *Gilead Tenofovir Cases*, No. S283862, 2026 WL 2223748 (Cal. Aug. 3, 2026). As the Court recognized, when Gilead stopped TAF development, TAF had undergone only preliminary Phase I/II testing—not the large-scale Phase III trials needed to establish safety and efficacy for FDA approval. *Id.* at *2–4. The Court concluded that, in such a context, a drug manufacturer cannot reliably *know* the

---

[7] In addition to the points made in this Section, the Court should exclude the "TAF timeline" opinion offered by Dr. Nagaich, for the reasons in Gilead's concurrently filed motion to exclude.

13

new drug will prove safer, so as to bear a legal duty *requiring* its continued development: such a duty "would place extraordinary burdens on drug manufacturers by effectively requiring them to commit substantial time, expenses, and resources to conduct the later-stage clinical trials," and would "risk distorting research priorities and chilling pharmaceutical innovation in ways that may ultimately undermine, rather than advance, public health and safety." *Id.* at *2.[8]

While the California Supreme Court addressed a negligence theory, its rationale applies equally to Plaintiffs' MMPA claim that Gilead "unreasonably" delayed TAF. Such a theory "lacks a clear limiting principle and raises serious questions about whether a workable standard for assessing the reasonableness of such decisions could ever be established." *Id.* at *1. "It also risks inviting fact finders to second-guess complex resource-allocation decisions about whether and when to pursue potential alternative products while a concededly nondefective product remains on the market." *Id.* The district court in *AIDS Healthcare Foundation, Inc. v. Gilead Sciences, Inc.* similarly rejected a statutory unfair practices claim based on TAF's alleged delay, explaining that "'[a]s a general rule, any firm, . . . may bring its products to market whenever and however it chooses,'" and it is not unlawful or unfair "'to delay the introduction of a new product.'" No. C 16-00443, 2016 WL 3648623, at *7, *9 (N.D. Cal. July 6, 2016), *aff'd*, 890 F.3d 986 (Fed. Cir. 2018). Accordingly, Plaintiffs' TAF delay theory fails as a matter of law.

### D.    Plaintiffs' Unjust Enrichment Claims Fail for Similar Reasons.

Plaintiffs' unjust enrichment claims fail for reasons similar to those above. An unjust enrichment claim requires showing that: "(1) [the plaintiff] conferred a benefit and enriched [the defendant]; (2) the enrichment was at [the plaintiff's] expense; and (3) it would be unjust for [the

---

[8] *See also id.* at *6–8 (explaining how the statutory and regulatory scheme reflects "that definitive judgments regarding a drug's risks and benefits ordinarily cannot be made before completion of phase III trials and FDA approval"); *id.* at *9–21 (applying public policy factors).

defendant] to retain the benefit." *Vitello*, 50 F.4th at 695. Where plaintiffs have "received the benefits they bargained for, there is no unjust enrichment." *Anderson v. Bass Pro Outdoor World, LLC*, 355 F. Supp. 3d 830, 839 (W.D. Mo. 2018); *see also Hennessey*, 86 F.4th at 831 ("[T]here can be no unjust enrichment if the parties receive what they intended to obtain." (citation omitted)); *Dedloff v. Whole Foods Market Grp., Inc.*, 688 F. Supp. 3d 893, 905 (E.D. Mo. 2023) (dismissing unjust enrichment claim where plaintiff received what she bargained for); *Bratton v. Hershey Co.*, 2018 WL 934899, at *4 (W.D. Mo. Feb. 16, 2018) (granting summary judgment in favor of defendants on an unjust enrichment claim where the plaintiff "knew roughly what he was getting . . . but chose to purchase them anyway"). Courts routinely reject claims for unjust enrichment where the related MMPA claim also fails. *See Vitello*, 50 F.4th at 695; *Hennessey*, 86 F.4th at 831.

Plaintiffs received what they bargained for. The TDF medicines that Plaintiffs purchased were "lifesaving"; they effectively treated Plaintiffs' HIV and did so safely; and Plaintiffs' prescriptions were accompanied by FDA-approved labeling with warnings about potential kidney and bone-related side effects. Plaintiffs concede that TDF had value; each Plaintiff continued purchasing a TDF medicine even after TAF was available; and Plaintiffs do not offer any evidence to show that their clinical or financial outcomes are worse than if they had switched to a TAF medicine sooner. Under these circumstances, no reasonable jury could find unjust enrichment.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant Gilead's motion and enter summary judgment in Gilead's favor on each Plaintiff's claims.

15

Date:  August 6, 2026                              Respectfully submitted,


By: */s/ David R. Carpenter*
    David R. Carpenter (*pro hac vice*)
    drcarpenter@sidley.com
    SIDLEY AUSTIN LLP
    350 S. Grand Avenue
    Los Angeles, California 90071
    Telephone:  (213) 896-6000
    Facsimile:  (213) 896-6600

    Jennifer A. Hill (No. 60696 (MO))
    Eric Anielak (*pro hac vice*)
    Shook, Hardy & Bacon L.L.P.
    2555 Grand Boulevard
    Kansas City, MO 64108
    Telephone: (816) 474-6550
    jshill@shb.com
    eanielak@shb.com

    Patrick Oot (*pro hac vice*)
    Shook, Hardy & Bacon L.L.P.
    1800 K. Street N.W., Suite 1000
    Washington, D.C. 20006
    Telephone: (202) 783-8400
    oot@shb.com


   ATTORNEYS FOR DEFENDANT

16

## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that I electronically filed on this 6th day of August, 2026, the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered users. Sealed copies will be sent by email to the following:

J. Toji Calabro
Email: tojicalabro@calabro-law.com
Two Pershing Square
2300 Main Street, 9th Floor
Kansas City, MO 64108
Tel: (555) 585-1247


Patrick J. Stueve
Todd E. Hilton
Kasey A. Youngentob, *pro hac vice*
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
stueve@stuevesiegel.com
hilton@stuevesiegel.com
youngentob@stuevesiegel.com


                      */s/ David R. Carpenter*
                      David R. Carpenter